# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| CORECIVIC, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CITY OF LEAVENWORTH, KANSAS, | ) | |
| MAYOR HOLLY PITTMAN, MAYOR PRO | ) | Case No. 2:25-cv-2457 |
| TEM NANCY BAUDER, COMMISSIONERS | ) | |
| GRIFF MARTIN, JERMAINE WILSON AND | ) | |
| EDD HINGULA, IN THEIR OFFICIAL | ) | |
| CAPACITIES AS MEMBERS OF THE | ) | |
| LEAVENWORTH CITY COMMISSION. | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF BRADLEY D. SIMON IN SUPPORT OF
APPLICATION FOR PRELIMINARY INJUNCTION AND
DECLARATORY RELIEF**

BRADLEY D. SIMON declares as follows pursuant to 28 U.S.C. §1746:

1.    I am a member of Schlam Stone & Dolan LLP, co-counsel to Plaintiff CoreCivic, Inc. ("CoreCivic").

2.    I submit this declaration based on my review of the referenced legal filings and other documents in support of CoreCivic's application for declaratory relief and for a preliminary injunction staying enforcement of the State Temporary Injunction dated July 11, 2025 (discussed within), and to confirm CoreCivic's right to operate a civil immigrant detention center at 100 Highway Terrace in Leavenworth, Kansas (the "Property" or the "Midwest Facility"), under agreement with U.S. Immigration and Customs Enforcement ("ICE") and/or to negotiate toward, enter into, and perform under a subsequent agreement with ICE for that purpose.

3.    On September 24, 2025, the United States Department of Justice filed a Statement of Interest in support of CoreCivic's effort to confirm its right to operate the Midwest Detention Center as an immigrant detention facility in coordination with ICE. ECF No. 27.

4.    Additional facts in support of CoreCivic's application are set forth in the accompanying declarations of Bart Verhulst, CoreCivic's Vice President/Federal & Local Partnership Relations, and Juan Acosta, a Facility Support Contractor retained by CoreCivic who previously served with ICE for eighteen (18) years before

retiring as Assistant Director of Field Operations for ICE's Enforcement and Removal sector.

### A.    CoreCivic And Historic Use/Regulation Of The Property

5.    As set forth in the accompanying Declaration of Bart Verhulst, CoreCivic has operated a "jail or prison" at the Property, within the meaning of the City of Leavenworth's Development Regulations (the "Dev. Regs.," relevant excerpts attached at Exhibit 1 hereto), under contract with the Federal Government since 1992. In 2012, the City of Leavenworth enacted Ordinance No. 7911, which amended the Dev. Regs. to prohibit the operation of a jail or prison without a Special Use Permit ("SUP") issued by the City. A true and correct copy of Ordinance No. 7911 is attached as Exhibit 2 hereto.

6.    With the enactment of Ordinance No. 7911, a party whose property was subject to a SUP was required to submit an application and supporting documentation to the City Commission before using the property for a particular purpose. Exhibit 1, Sec. 2.04.B. The application would then be subject to a series of procedures: among others, a notice of the application would be made to the public (Sec. 2.04.B.3); a public hearing before the Planning Commission would be held (Sec. 2.04.B.2 & 4); the Planning Commission would issue recommendations on the application (Sec. 2.04.B.5); the public could submit protest petitions relating to the application (Sec. 2.04.B.6); and the City Commission would ultimately decide

whether to issue the SUP (Sec. 2.04.B.7), namely a "signed document from a designated community official authorizing development" (Art. 12) (defining "Permit").

7.    The Dev. Regs. also set rules for the continuation and rescission of a SUP.  Section 2.04.C of the Regulations explained that:

> A [SUP] may be granted by and continued annually by the City Commission, City of Leavenworth, Kansas.  The continuation of a [SUP] exists within the property as long as such [SUP] is used in accordance with its original intended and approved purpose and the annual SUP fee is paid.  Any discontinuance of more than 12 months, violation of permit conditions, or failure to pay a fee may enable the City Commission to administratively rescind a [SUP].

Section 2.04.C.

8.    Section 1.05.E.2 of the Dev. Regs. provided:

> Any existing legal use at the effective date [November 13, 2012] of these Development Regulations which is designated as a special use by these Development Regulations shall be deemed as **[1] an existing special use and [2] a lawful conforming use**.

Section 1.05.E.2 (emphasis and brackets added).

9.    Based on my review of the City's filings in *City of Leavenworth, Kansas v. CoreCivic, Inc., et al.*, Case No. LV-2025-CV-000180 (Bryant, John J.) (the "State Court Action."), I understand that neither at the time of Ordinance No. 7911's enactment, nor at any time prior to the events discussed below that give rise to this action, did the City require CoreCivic to apply for, pay for or obtain a SUP

3

with respect to the Property. *See, e.g.*, Amended Petition ¶¶ 40-41, (annexed hereto at Exhibit 3.)

10.    Following CoreCivic's announcement that it had agreed with ICE to house detainees at the Midwest Facility on the Property, the City Commission adopted Resolution No. B-2394 (the "Resolution," annexed hereto at Exhibit 4) on March 25, 2025. The Resolution is addressed only to the Property; no other entity or property is named or considered.

11.    The City Commission proclaimed in the Resolution that the use of the Property by CoreCivic "as a jail or prison was discontinued and abandoned on or about January 1, 2022, and has not been reestablished as of the date of this resolution, such that the use was discontinued or abandoned for a period exceeding twelve (12) months." Resolution, Exhibit 4, Sec. 2.  According to the City Commission, this purported discontinuance or abandonment of use authorized it – "pursuant to Sec. 2.04.C of the Development Regulations" (addressing SUP discontinuances or violations) – to "administratively rescind[] any and all special use permits or special use designations for … the Property as a jail and/or prison" *Id.,* Sec. 4.  The Resolution also stated that the Property could no longer operate as a jail or prison because its use was no longer "a **lawful nonconforming use**" under Section 1.05.D.8 of the Dev. Regs., *id*. at Sec. 2 and 3 (emphasis added), and, as such, the Property now needed a SUP to operate. *Id*. at Sec. 3.  Sec. 1.05.E.2 of the Dev. Regs.

4

provides in relevant part: "Any existing legal use at the effective date of these Development Regulations which is designated as a special use by these Development Regulations shall be deemed as an existing special use and a **lawful conforming use**." Sec. 1.05.E.2 of the Dev. Regs., Exhibit 1 (emphasis added.)

**B.      The City Initiates Litigation in Federal and State Court**

12.      On March 31, 2025, the City filed a lawsuit in the United States District Court for the District of Kansas seeking declaratory and injunctive relief to prevent CoreCivic from operating a jail or prison at the Property without a SUP. *City of Leavenworth, Kansas v. CoreCivic, Inc.*, No. 25-cv-02169-TC-BGS. On May 22, 2025, the Honorable Toby Crouse, U.S.D.J., dismissed the City's complaint for lack of subject matter jurisdiction because the City had failed "to allege that the sum or value of the dispute exceeds $75,000 as required to establish diversity jurisdiction under Section 1332." *See* Memorandum and Order, Dkt No. 37, at 5.

13.      On May 23, 2025, the City filed the State Court Action.  On June 2, 2025, the City filed an amended petition (annexed hereto at Exhibit 3.) As described in the amended petition, the issue presented in the State Court Action is "whether CoreCivic may use its property for a jail or prison within the City without first obtaining from the City a special use permit, as required by the City's Development Regulations." *Id.*, ¶ 2.  The City's amended petition asks the state court to determine that the City Commission correctly found that CoreCivic had "abandoned" the

5

Property in early 2022, and that the City Commission applied municipal law correctly when requiring, in accordance with the Dev. Regs., that CoreCivic obtain a SUP before operating the Property as a jail or prison.

14.    The City thus sought a declaration and injunction under Kansas state law (Kan. Stat. Ann. §§ 60-1701 and 12-761) to prevent CoreCivic from housing detainees at the Property without first obtaining a SUP. *See* Amended Petition, Exhibit 3, at 20 (Count I), 21 (Count II).

15.    On May 23, 2025, the City applied for the State Temporary Injunction, seeking to give immediate effect to the Resolution pending determination of the City's claims and CoreCivic's defenses.

16.    The City's amended petition begins with a lengthy quotation from United States District Judge Julie A. Robinson, taken from pp. 46-47 of the September 8, 2021 resentencing transcript for Matthew Clark in *United States v. Matthew Clark*, Case No. 16-cr-20078-JAR, Doc. No. 87.  *See* Amended Petition, Exhibit 3.

17.    Matthew Clark had pleaded guilty to possession of methamphetamine with intent to distribute, among other things.  See, e.g., *U.S. v. Clark,* Doc. No. 20. He has no known affiliation with CoreCivic apart from his detention at its facility on the Property.

18.    CoreCivic, as a non-party to Clark's criminal case, had no opportunity

6

to be heard regarding Judge Robinson's oral criticism of the conditions at CoreCivic, which were not reduced to any sort of findings.

19. The City's amended petition engages in a detailed criticism of CoreCivic's historical operations at the Property, *id.*, ¶¶ 16-27, relying heavily on Judge Robinson's unrelated comments and on an April 2017 report from the United States DOJ's Office of Inspector General (the "2017 OIG Report"), ¶¶ 17-21.

20. The City's papers in support of the State Temporary Injunction also relied heavily on Judge Robinson's comments and the 2017 OIG Report regarding CoreCivic's historical performance at the Property. *See, e.g.*, City's Memorandum In Support of the State Temporary Injunction, Exhibit 5 hereto, at pp. 3-4; 13, 16 (detailing same); City's Reply Memorandum In Support of the State Temporary Injunction, Exhibit 6 hereto, at p. 12 ("a person's past conduct is the best guide to their future conduct".)

21. There is no indication that either Judge Robinson or the 2017 OIG Report engaged in any comparison of CoreCivic's operations at the Property with any other jail or prison – state, local, federal or private.

22. On July 11, 2025, the District Court of Leavenworth County issued the State Temporary Injunction (Exhibit 7 hereto), prohibiting CoreCivic from operating the Property as a jail or prison pending a full determination on the merits or as "otherwise expressly permitted … by this Court or another court of competent

jurisdiction." *Id.* at 6.

23.    On July 7, 2025, CoreCivic moved before the Leavenworth County District Court to dismiss the amended petition.  On July 17, 2025, state court defendant Misty Mackey, CoreCivic's warden, moved before the Leavenworth County District Court to dismiss the amended petition's claims against her. On July 18, 2025, CoreCivic filed a notice of appeal from the State Temporary Injunction, and on July 23, 2025, it moved the Leavenworth County District Court to stay enforcement of the State Temporary Injunction.

24.    On August 6, 2025, the Leavenworth County District Court held oral argument on CoreCivic's motion to dismiss the amended petition.  The court made several statements during oral argument, and in the related Order that it issued, dated August 12 and entered August 15, 2025 (the "August 12 Order," Exhibit 8 hereto), that bear on CoreCivic's application at bar.  Specifically, the court:

- Observed "that the court believed that the issues ruled on by the court in its decision to grant the Temporary Injunction seem to be very closely tied to the issues raised in the subsequent Motions (listed above) as well as those raised in LV-2025-CV-229."[1] The court opined that

---

[1] This was a reference to *CoreCivic, Inc. v. City of Leavenworth, Kansas*, a case CoreCivic filed in Leavenworth District Court seeking a judicial determination of the reasonableness of City's actions as reflected in the March 25, 2025 Resolution. Although CoreCivic does not believe that it has received the final decision necessary for such a review, it filed this action out of an abundance of caution to preserve its right to seek such a review, pending the exhaustion of the municipal appeal process and its receipt of a final decision.

The court inquired at the August 6 argument about possible consolidation of that mater with the State Court Action and made no determination regarding consolidation in its August 12 Order. *Id.*, p. 4.

they were so closely related that it would seem that any decision made by the appellate courts could not only directly affect the Temporary Injunction, but also, any subsequent rulings which are based on the decisions made by the court regarding the issuance of said Order. Exhibit 8, pp. 2-3 (describing court's comments at August 6 argument).

- Noted that, between the August 6 argument date and the August 12 date of its order, the court had been advised by CoreCivic's counsel of the filing of the federal action at bar, and that "[t]he argument raised in that Complaint is the same as arguments made in the cases pending before this court regarding the Supremacy Clause of Article VI of the United States Constitution." *Id.,* p. 3.

- Concluded: "due to the pending appellate review *and ongoing federal case, the court has no choice but to stay certain decisions pending the outcomes of those matters.* The legal issues in those matters overlap the issues pending before this court to such a degree as to make them unable to be parsed. In fact, *if Defendant is successful in the newly filed federal case, it would appear to make any decisions in this matter moot. Id.,* p. 3 (emphases added).

- Declined to rule on CoreCivic's motion to stay the State Temporary Injunction, pending a decision on CoreCivic's appeal from same. *Id.,* p. 4.

25.    The court also indicated that defendant Mackey's motion to dismiss the nuisance claim (Count IV) asserted against her might be amendable to resolution and invited counsel to submit proposed dates for, or to waive, oral argument. *Id.* By Order dated August 18, 2025 (annexed hereto at Exhibit 9), the court dismissed the amended petition's nuisance claim as against both Mackey and CoreCivic as "hypothetical and based on Plaintiff's speculation, not on facts that would support the claim." Exhibit 9, p. 4. It also declined to decide CoreCivic's motion to dismiss Counts I (Declaratory Judgment) and II (Injunctive Relief), finding the issues

9

surrounding them "so closely related to those pending on appeal, that the court will stay its decision on those two counts pending a decision made by the Kansas appellate courts." Exhibit 9, p. 1.

26.     Apart from its maintenance of the State Temporary Injunction, the Leavenworth County District Court has effectively stayed the State Court Action pending developments in this Court and/or on CoreCivic's state court appeal.

27.     On August 22, 2025, CoreCivic filed a Motion to Suspend/Stay the State Temporary Injunction with the Kansas Court of Appeals. On September 4, 2025, the Kansas Court of Appeals denied that motion without elaboration or explanation (Exhibit 10 hereto) and entered an order concerning briefing of CoreCivic's appeal from the State Temporary Injunction. Exhibit 11 hereto. On September 8, 2025, the Leavenworth County District Court entered an order dismissing Court III, Aiding and Abetting CoreCivic, asserted against Defendant Mackey in the amended petition (Exhibit 12 hereto).

### C.     Irreparable Injury to CoreCivic

28.     At page 15 of its reply papers on the State Temporary Injunction (Exhibit 6) the City stated that it "has available cash reserves of over $5,000,000," which it said would be "sufficient to cover any reasonable damages CoreCivic could claim for a wrongful injunction."

29.     As set forth in the accompanying Declaration of Bart Verhulst,

CoreCivic's losses from the obstruction of its operations at the Midwest Facility are approximately $4 million per month/$50 million per year, and it also faces losses due to disruption of its relationship with ICE at other existing or prospective locations.

30.    According to its 2024 Annual Financial Report,[2] the City of Leavenworth had less than $10 million in tax receivables in the 2024 fiscal year (*id.,* p. 17) with revenues of $43,976,644 (*id.,* p. 10) and expenses of $43,438,731 (*id.*).

31.    I declare under penalty of perjury that the foregoing is true and correct. Executed on September 26, 2025.

/s/ Bradley D. Simon
Bradley D. Simon

---

[2]https://www.leavenworthks.gov/sites/default/files/fileattachments/finance/page/18637/2024_lea venworth_audited_financials_and_single_audit.pdf (last viewed Sept. 2, 2025).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CORECIVIC, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF LEAVENWORTH, KANSAS, | ) |
| MAYOR HOLLY PITTMAN, MAYOR PRO | )    Case No. 2:25-cv-2457-TC-GEB |
| TEM NANCY BAUDER, COMMISSIONERS | ) |
| GRIFF MARTIN, JERMAINE WILSON AND | ) |
| EDD HINGULA, IN THEIR OFFICIAL | ) |
| CAPACITIES AS MEMBERS OF THE | ) |
| LEAVENWORTH CITY COMMISSION. | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF CORECIVIC, INC.'S INDEX OF EXHIBITS
## TO THE SIMON DECLARATION

| Exhibit | Description |
|---|---|
| 1 | City of Leavenworth's Development Regulations Excerpts |
| 2 | Ordinance No. 7911 |
| 3 | State Court Amended Petition |
| 4 | Resolution No. B-2394 |
| 5 | City's Memorandum in Support of the State Temporary Injunction |
| 6 | City's Reply Memorandum in Support of the State Temporary Injunction |
| 7 | State Temporary Injunction |
| 8 | August 12 Order |
| 9 | August 18 Order |
| 10 | KCOA Order Denying Motion to Suspend or Stay |
| 11 | KCOA Order on Expedited Briefing |

| Exhibit | Description |
|---------|-------------|
| 12 | September 8 Order |

# EXHIBIT 1

DEVELOPMENT REGULATIONS
TABLE OF CONTENTS

## ARTICLE 1. GENERAL PROVISIONS

1.01    Overview
1.02    Administration
1.03    Interpretation
1.04    Enforcement
1.05    Nonconformances

## ARTICLE 2. APPLICATIONS & PROCEDURES

2.01    Text Amendments
2.02    Platting
2.03    Zoning Change
2.04    Special Use Permits
2.05    Site Plan
2.06    Minor Modifications
2.07    Appeals

## ARTICLE 3. SUBDIVISION STANDARDS

3.01    Purpose and Intent
3.02    Applicability and Exemptions
3.03    Minimum Design Standards
3.04    Required Improvements
3.05    Exceptions

## ARTICLE 4. ZONING DISTRICTS & STANDARDS

4.01    Purpose
4.02    Establishment of Districts & Intent
4.03    Property Development Standards
4.04    Use Standards
4.05    Redevelopment Overlay District

## ARTICLE 5. ACCESS & PARKING

5.01    Applicability
5.02    Required Parking
5.03    General
5.04    Parking Design
5.05    Access
5.06    Off-street Loading
5.07    Drive-Through Stacking

## ARTICLE 6. LANDSCAPE & SITE DESIGN

6.01    Purpose & Applicability
6.02    Landscape Units
6.03    Required Landscaping

6.04    Parking Lot Landscaping
6.05    Buffers
6.06    Landscape Design
6.07    Screening
6.08    Fences
6.09    Tree Preservation

## ARTICLE 7.  DESIGN STANDARDS

7.01    Purpose and Applicability
7.02    Residential Design
7.03    Non-Residential Design
7.04    Alternate Equivalent Compliance

## ARTICLE 8.  SIGNS

8.01    Purpose and Intent
8.02    Scope
8.03    Computations
8.04    Permits
8.05    Sign Installers
8.06    General Standards
8.07    Signs Permitted in All Districts
8.08    Signs Permitted in Residential Districts
8.09    Signs Permitted in the Mobile Home Park District
8.10    Signs Permitted in the Neighborhood Business District and Residential Mixed Use District
8.11    Signs Permitted in Commercial and Industrial Districts
8.12    Temporary Signs
8.13    Electronic Message Center Signs
8.14    Billboards
8.15    Nonconforming, Hazardous, Illegal, and Prohibited Signs
8.16    Appeals

## ARTICLE 9.  HISTORIC PRESERVATION

9.01    Purpose
9.02    General
9.03    Applicability
9.04    Leavenworth Preservation Commission
9.05    Administration
9.06    Enforcement
9.07    Appeals
9.08    Variances
9.09    Historic Resources Survey
9.10    Identification of Landmarks and Historic Districts
9.11    Leavenworth Landmarks Register
9.12    Nomination of Landmarks and Historic Districts
9.13    Report and Recommendation
9.14    City Commission Designation
9.15    Designation
9.16    Procedure for Demolition, Alteration, or Expansion

9.17    Signs
9.18    Retention of Accessory Structures and Landscaping
9.19    Public Properties
9.20    Promotion of Other Functions
9.21    Promotion
9.22    Public Hearing Process
9.23    Alteration, Expansion or Demolition – Major

## ARTICLE 10.  SUPPLEMENTAL STANDARDS

10.01   Solar Energy
10.02   Wind Energy
10.03   Commercial Communication Towers and Antennae

## ARTICLE 11.  BOARD OF ZONING APPEALS

11.01   Creation
11.02   General
11.03   Powers and Jurisdiction
11.04   Applications
11.05   Appeal of Board Decisions

## ARTICLE 12.  DEFINITIONS

## APPENDIX A – USE TABLE

## ARTICLE 1.  GENERAL PROVISIONS

### 1.01    Overview

A.      ***Title.***  These regulations, shall be known, as the "Development Regulations of the City of Leavenworth, Kansas."  These regulations are adopted pursuant to Kansas Statues 12-747 *et. seq.* and 12-757 *et. seq.*

B.      ***Purpose***.  These regulations serve the following purposes:

    1.      To promote the health, safety, comfort and economic development of the city;

    2.      To preserve and protect property values throughout the city;

    3.      To regulate the height, number of stories and size of buildings; the percentage of lot coverage; the size of yards, courts, and other open spaces; and density of population;

    4.      To divide the jurisdictional area into zones and districts;

    5.      To regulate the location and use of buildings and land within each district or zone.

C.      ***Jurisdiction.***  These regulations apply to all land and structures within the incorporated area of the City of Leavenworth, Kansas.  Fort Leavenworth, the U.S. Penitentiary, and the Veterans Administration Reservations are excluded from the jurisdiction of these regulations.

D.      ***Exemptions.***  The following structures and uses shall be exempt from the provisions of these regulations:

    1.      *Utilities.*  Poles, wires, cables, conduits, vaults, laterals, pipes, street lighting, mains, valves, or other similar equipment or improvements for the distribution to consumers of telephone or other communications, electricity, gas, or water, or the collection of sewage or surface water operated or maintained by a public utility.

    2.      *Railroads.*  Railroad track, signals, bridges, and similar facilities and equipment located on a railroad right-of-way, and maintenance and repair work on such facilities and equipment.

E.      ***Annexation.***

    1.      All territory annexed into the City of Leavenworth, voluntarily or involuntarily, shall be zoned after annexation in accordance with the zoning district most closely matching the Comprehensive Land Use Plan for that area, determined by Table 1-01 below.

    2.      The landowner may propose a different zoning classification through an application for rezoning, as provided elsewhere in this code.  The rezoning must be completed at or before the time the annexation petition is presented to the City Commission for consideration.

**Table 1-01:  Zoning District & Direct Future Land Use Map Associations**

| Zoning District | Future Land Use Map Designation |
|---|---|
| **R1-25** Low Density Single-Family Residential District | Low Density Residential |
| **R1-9** Medium Density Single-Family Residential District | Low or Medium Density Residential |
| **R1-7.5** Medium Single-Family Residential District | High Density Residential |
| **R1-6** High Density Single-Family Residential District | High Density Residential |
| **R4-16** Medium Density Multiple Family Residential District | High Density Residential |
| **R-MF** Multiple-Family Residential District | Multi Family |
| **RMX**-Residential Mixed Use | Urban Residential |
| **MP** Mobile/Manufactured Home Park District | Multi Family |
| **NBD** Neighborhood Business District | Commercial |
| **OBD** Office Business District | Commercial |
| **CBD** Central Business District | Commercial |
| **GBD** General Business District | Commercial |
| **I-1** Light Industrial District | Industrial |
| **I-2** Heavy Industrial District | Industrial |
| **PUD** Planned Unit Development District | Not Applicable |
| **FP** Flood Plain District | Not Applicable |
| | |

F.    ***Severability.*** It is intended that each and every provision of these regulations, to the extent they may reasonably be interpreted and applied independently from any other provision, shall stand alone as an independent and separate regulation of the city. If any section, subsection, clause, phrase, or portion of these regulations is held to be invalid or unconstitutional by a court of competent jurisdiction, then that decision shall not affect the validity of the remaining or any other portions of these regulations.

## 1.02.    Administration

A.    ***Authorities.*** The following authorities are responsible for the administration of specified aspects of these regulations:

1.    *Planning Commission.* It is the duty of the Planning Commission (PC) to publicly hear testimony concerning proposed changes in zoning districts, amendments to this ordinance, proposed annexations, proposed special use permits, and review disputed site plans and then to make appropriate recommendations to the City Commission. The Planning Commission shall operate according to a set of bylaws approved by the City Commission.

2.    *Board of Zoning Appeals.* It is the duty of the Board of Zoning Appeals (BZA) to conduct public hearings and to take final action on appeals from interpretation and enforcement actions of administrative officials; to conduct public hearings and act on requests for variances from this ordinance; to conduct public hearings and act on requests for exceptions to the provisions of this ordinance in those instances where the Board is specifically authorized to grant such exceptions and only under the terms of this ordinance. Appeal of decisions by the Board is made to District Court. The Board of Zoning Appeals shall operate according to a set of bylaws approved by the City Commission.

3. *Development Review Committee.* It is the duty of the Development Review Committee (DRC) to plan, coordinate, review, and facilitate all new development and substantial redevelopment within the City; including all development applications and requests for variances and exceptions.

    a. Development issues will entail the adequate provision of power, potable water, sewage service, communications, road access and capacity, solid waste disposal, life safety aspects, comprehensive plan compatibility, requests for minor modifications, zoning appropriateness, storm drainage, visual aesthetics, and all other issues which may be necessary to provide for the health, safety, and welfare of the citizens of Leavenworth.

    b. The Development Review Committee (DRC) shall be comprised of the following persons or their designated representatives, or other similar city representatives designated by the City Manager:

        (1) Chief Building Inspector
        (2) City Clerk
        (3) City Manager
        (4) Assistant City Manager
        (5) City Planner
        (6) Economic Development Director
        (7) Fire Chief
        (8) Parks & Recreation Director
        (9) Planning & Community Development Director
        (10) Police Chief
        (11) Public Works Director

    c. *Meetings.* The Development Review Committee (DRC) shall meet weekly in the City Commission Chambers, as needed. The City Planner, or designee, shall prepare the weekly agenda, and shall provide the necessary staff to record meeting minutes and maintain a record of documents submitted for each agenda item.

    d. *Chair.* The City Planner shall be the administrative coordinator of the Development Review Committee (DRC) and shall preside as the Chair.

4. *City Commission.* Upon receipt of recommendations from the Planning Commission, the City Commission shall act as the final local authority on all requests for district boundary changes, amendments to the text of this ordinance, annexation requests, approval of disputed site plans and special use permits. The City Commission may grant extensions of time for submission or completion of projects, as it deems expedient. Appeals from decisions of the City Commission are made to District Court. The City Commission shall hear all appeals from staff decisions referred to it under these Development Regulations.

5. *Administrative Staff.* The Director is responsible for the enforcement of this Ordinance. Implementation and administration of the provisions of the Development Regulations shall be the responsibility of the administrative officials listed throughout these Development Regulations. Administrative staff duties will include, but are not limited to, the following:

a.   Scheduling and conducting inspections of buildings, structures, and uses of land to determine compliance with the provisions of the Development Regulations.

b.   Maintaining permanent and current records of the Development Regulations, including, but not limited to, all zoning district maps, amendments, special uses, variances, exceptions, appeals and applications therefore and records of hearings thereon.

c.   Preparing and having available in book, pamphlet, or map form, on or before March 31 of each year:

(1)   The compiled text of the zoning regulations and amendments thereto, including all amendments adopted through the preceding December 31, and

(2)   A zoning district map or maps, showing the zoning districts, divisions, and classifications in effect on the preceding December 31.

d.   Maintaining for distribution to the public paper and electronic copies of the zoning district map, the text of the Development Regulations and the bylaws, agendas and meeting minutes of the Planning Commission and the Board of Zoning Appeals.

e.   Providing such clerical, technical, and consultative assistance as may be required by the City Commission, Planning Commission, Board of Zoning Appeals, Preservation Commission and other boards or commissions in the exercise of their duties relating to these Development Regulations.

f.   Preparing and distributing hearing notices as required.

g.   Providing information, clerical, technical, and consultative assistance to developers and property owners with regard to the application process and requirements of this ordinance generally.

6.   *Leavenworth Preservation Commission.*  The Leavenworth Preservation Commission authority and procedures are established in Article 9.

B.   ***Schedule of Fees.***  The Schedule of Fees and Charges for any applicable fees shall be on file with the City Clerk according to all city ordinances.

## 1.03.   Interpretation

A.   ***Rules of Construction.***  In interpreting these regulations, the following rules shall apply:

1.   Words used in the present tense shall include the future.

2.   Words in the singular number include the plural number, and words in the plural number include the single number.

3.   The phrase "used for" shall include the phrases "arranged for", "designed for", "intended for", "maintained for" and "occupied for".

4.   The word "shall" is mandatory.

5.   The word "may" is permissive.

6.  The word "person" includes individuals, firms, corporations, associations, governmental bodies and agencies and all other legal entities.

7.  Any word or phrase which is defined in in these regulations shall have the meaning as so defined, unless such definition is expressly limited in its meaning or application.

B.  *Computations of Time.* Unless specifically stated in individual sections, wherever these regulations state a time period, it shall be interpreted as follows:

1.  The day of the act, event, or other means which commences the time period shall not be counted.

2.  The last day of the time period shall be included in the time period, unless it is a Saturday, Sunday, or legal City holiday, in which case the next working day shall end the time period.

3.  Whenever the time period is expressed to require a formal submittal to the City, the time period shall end at 5:00 P.M. on the last day of the time period.

4.  Any time period expressed in years shall include a full calendar year from the act, event or other means which commences the time period.

C.  *Minimum Requirements.* The provisions of these regulations shall be held to be the minimum requirements for the promotion of the public health and welfare.

D   *Conflicts.* Where the conditions imposed by any provision of these regulations are either more restrictive or less restrictive than any other law, ordinance, resolution, rule or regulations of any kind, the more restrictive shall control. In making a determination of which regulation is more restrictive, the Director shall determine which regulation establishes a higher standard for the promotion of the public health, safety, and general welfare shall control and more closely follows the policies of the Comprehensive Plan.

E.  *Private Agreements*. These regulations are not intended to abrogate, annul or otherwise interfere with any easement, covenant or any other private agreement of legal relationship; provided, however, that where the provisions of these regulations are more restrictive (or impose higher standards or requirements) than such easements, covenants or other private agreements or legal relationships, the provisions of these regulations shall govern.

F.  *Existing Uses.* Any existing structure, use, or occupation of land previously approved as of the effective date of this ordinance shall be permitted to continue as a lawful use or occupation. The approved site plan and all terms, covenants and conditions applicable as of the effective date of this ordinance shall continue to apply and control the use or occupation of such land. However, any proposed change or modification in the use or occupation of such land, or in the approved site plan for such land, shall be made in accordance with the standards and procedures of this ordinance.

G.  *Interpretation of District Boundaries.* Where uncertainty exists with respect to the boundaries of any district on the zoning district map, the following rules shall apply:

1.  Boundaries indicated as approximately following platted lot lines shall be construed as following such lot lines;

2.  Boundaries indicated, as approximately following city limits shall be construed as following such city limits;

3.   Boundaries indicated as following railroad lines shall be construed to be midway between the main tracks of the railroad line;

4.   Boundaries indicated as following shorelines shall be construed to follow such shore lines, and in the event of change in the shore line, the boundaries shall be construed as moving with the actual shore line; boundaries indicated as approximately following the center lines of streams shall be construed to follow such center lines;

5.   Boundaries indicated as approximately following the center lines of streets, highways or alleys shall be construed to follow such center lines; where public ways have been vacated, boundaries shall be construed to follow either the original center line or new property line;

6.   Boundaries indicated as parallel to or extensions of features shall also so be construed as to follow a parallel path;

7.   Distances not specifically indicated on the Official Zoning District Map shall be determined by the scale of the map; and

8.   No single parcel subdivided or rezoned after the adoption of these development regulations shall have 2 or more zoning districts.

## 1.04.   Enforcement

A.   ***Violations.***  If any building, structure, use, or other action or condition is found to be in violation of these regulations the city, in addition to other remedies, may institute any appropriate action or proceeding to:

1.    Prevent the continuance of any unlawful action or condition;

2.   Correct or abate any violation, and withhold public improvements until the violation is abated or corrected;

3.   Prevent the issuance of permits, occupancy of the building, structure or land, and otherwise prevent any further illegal act, conduct business, or use of the premises;

4.   Prevent the sale, transfer, lease or recording of any land or lot.

Such regulations shall be enforced by the Director or other administrative official so authorized in writing.

B.   ***Penalties.***  Any person violating any of the provisions of this Code shall be guilty of a misdemeanor, each day, or portion thereof, constituting a separate offense.  Each offense shall be punishable by a term of confinement in the City or county jail, which shall be fixed by the court, shall not exceed one year, and may, in addition to, or instead of the confinement, be sentenced to pay a fine not exceeding $500 in addition to any other fine or remedy provided by law.

## 1.05.   Nonconformances

A.  **General**.  Nonconformities are of three types: nonconforming lots of record, nonconforming structures, and nonconforming uses.  A definition of each type is as follows:

1.  *Nonconforming Lot of Record*.  A lot which is part of a recorded subdivision or a parcel of land, the deed to which was recorded prior to the adoption of the original Subdivision Regulations in the city, July 19, 1966, and neither the lot nor parcel complies with the lot width or area requirements for any permitted uses in the district in which it is located.

2.  *Nonconforming Structure*.  An existing structure which does not comply with the lot coverage, height or yard requirements which are applicable to new structures in the zoning district in which it is located.

3.  *Nonconforming Use*.  An existing use which does not comply with the use regulations applicable to new uses in the zoning district in which it is located.

B.  **Nonconforming Lots of Record.**  The Building Inspector shall issue a building permit for any nonconforming lot of record provided that:

1.  The lot is shown by a recorded plat or deed to have been owned separately and individually from adjoining tracts of land at a time when the creation of a lot of such size and width at such location would not have been prohibited by any zoning regulations, and

2.  The lot has remained in separate and individual ownership from adjoining tracts of land continuously during the entire time that the creation of such lot has been prohibited by the applicable zoning regulations, and

3.  The lot or group of continuous nonconforming lots can meet all setback requirements for the district in which it is located, and

4.  The lot can connect with a public sewer system or can meet the minimum sanitary sewer requirements of the city.

C.  **Nonconforming Structures.**

1.  *Authority to Continue.* Any structure which is devoted to a use which is permitted in the zoning district in which it is located, but which is located on a lot which does not comply with the applicable property development standards on the effective date of these Development Regulations, may be continued, so long as it remains otherwise lawful.

2.  *Enlargement, Repair, Alterations*.  Any nonconforming structure may be enlarged, maintained, repaired or remodeled, provided however, that no such enlargement, maintenance, repair, or remodeling shall either create any additional nonconformity or increase the degree of existing nonconformity of all or any part of such structure.

3.  *Setbacks and Yards*.  A structure which is in nonconformance with respect to a side or rear yard setback shall not use the existing setback in expanding or enlarging but may be enlarged if the new part of the structure complies with the setbacks of the district.

4.  *Destruction.*  If a nonconforming structure is damaged by more than fifty percent (50%) of its fair market value, such building shall not be restored if such building is

not in conformance with the regulations for the zoning district in which it is located, or an exception is granted by the Board of Zoning Appeals.

5.   *Moving.*  No nonconforming structure shall be moved in whole or in part for any distance, to any other location on the same or any other lot unless the entire structure shall thereafter conform to the regulations of the zoning district in which it is located after being moved.

D.   ***Nonconforming Uses.***

1.   *Authority to Continue.*  Any lawfully existing nonconforming use of part or all of a structure or any lawfully existing nonconforming use of land, not involving a structure or only involving a structure which is accessory to such use or land, may be continued, so long as otherwise lawful.

2.   *Ordinary Repair and Maintenance.*

a.   Normal maintenance and incidental repair or replacement, installation or relocation of nonbearing walls, nonbearing partitions, fixtures, wiring or plumbing may be performed on any structure that is devoted in whole or in part to a nonconforming use.

b.   Nothing in these regulations shall be deemed to prevent the strengthening or restoring to a safe condition a structure in accordance with an order of a public official who is charged with protecting the public safety who declares such structure unsafe and orders its restoration to a safe condition.

3.   *Extension.*  Any nonconforming use shall not be physically extended, expanded, or enlarged.  Such prohibited activities shall include, without being limited to:

a.   Extension of such use to any structure or land area other than that occupied by such nonconforming use on the effective date of these regulations (or on the effective date of subsequent amendments or that cause such use to become nonconforming).

b.   Extension of such use within a building or other structure to a portion of the floor area that was not occupied by such nonconforming use on the effective date of subsequent amendments hereto that cause such use to become nonconforming; provided, however, that such use may be extended throughout any part of such building or other structure that is lawfully and manifestly designed or arranged for such use on such effective date.

4.   *Enlargement.* No structure that is devoted in whole or in part to a nonconforming use shall be enlarged or added to in any manner unless such structure and the use thereof shall thereafter conform to the regulations of the district in which it is located.

5.   *Damage or Destruction.* If a structure devoted to a nonconforming use is damaged or destroyed by more than fifty percent (50%) of its fair market value, such building shall not be restored if the use of such building is not in conformance with the regulations of the zoning district in which it is located.

6.   *Moving.*  No structure that is devoted in whole or in part to a nonconforming use and no nonconforming use of land shall be moved in whole or in part for any distance, to any location on the same or other lot, unless the entire structure and the use thereof

or the use of land shall thereafter conform to all regulations of the zoning district in which it is located after being so moved.

7. *Change in Use.*  Any nonconforming use of a structure, or structure and premises, may be changed to another nonconforming use, as an exception granted by Board of Zoning Appeals in accordance with Article 11. Board of Zoning Appeals, provided that the Board of Zoning Appeals, either by general rule or by findings of fact in the specific case, shall find that the proposed use is equally appropriate or more appropriate to the district than the existing nonconforming use.  In permitting such change, the Board of Zoning Appeals may require appropriate conditions and safeguards

8. *Abandonment or Discontinuance.*  When a nonconforming use is abandoned for a period of twenty-four (24) consecutive months any subsequent use or occupancy of such land after this period shall comply with the regulations of the zoning district in which such land is located.

9. Nonconforming Accessory Uses.  No use which is accessory to a principal nonconforming use shall continue after such principal use shall cease or terminate.

E. **Status of Special Use Permits.**

1. *Status of Existing Special Use Permits.* Where a Special Use Permit exists at the effective date of these Development Regulations and is permitted by these regulations as a Special Use Permit in the zoning district in which it is located, such use shall be deemed a lawful conforming use in such zoning district, as provided by prior approval.  Where a Special Use Permit exists at the effective date of these Development Regulations and is not permitted as a Special Use Permit in the zoning district in which it is located, such use shall be deemed a continuing nonconforming use.

2. *Status of Existing Legal Uses Designated as Special Uses.* Any existing legal use at the effective date of these Development Regulations which is designated as a special use by these Development Regulations shall be deemed as an existing special use and a lawful conforming use.

F. **Signs for Nonconforming Uses.**  The lawful use of any sign existing at the time of the passage of these Development Regulations, in conjunction with a nonconforming use, may be continued.  Any sign installed subsequent to the passage of these Development Regulations for a nonconforming use must conform to the Article 8,  Signs in compliance with the district in which the nonconforming use is located.

## ARTICLE 2. APPLICATIONS & PROCEDURES

### 2.01    Text Amendments

A.    ***Applicability:*** Text amendments to these regulations may be initiated by City Staff, the City Commission or the Planning Commission.

B.    ***Amendment Procedure:***

1.    *Public Hearing.* The Planning Commission shall hold a public hearing on each proposed amendment. The Planning Commission shall select a reasonable hour and place for the public hearing, but it shall hold the hearing within 60 days from the date on which the proposed amendment is filed. An applicant for an amendment may waive the requirement that such hearing be held within 60 days.

2.    *Notice.* Public notice of a hearing on a proposed amendment shall be published once in the official city newspaper at least 20 days prior to the date of the hearing. The notice shall fix the time and place for the hearing and contain a statement regarding the proposed changes and regulations or restrictions or in the boundary or classification of any zone or district.

3.    *Conduct of Hearing.* The hearing shall be conducted and a record of the proceedings shall be preserved in such manner and according to such procedures as the Planning Commission may from time to time prescribe by rule. Any interested person or party may appear and be heard at the hearing in person, by agent or by attorney. The Planning Commission may request a report on any proposed amendment from any governmental official or agency, or any other person, firm or corporation. If such a report is made, a copy thereof shall be made available to the applicant and any other interested persons and shall be available for review in the offices of the Secretary, Leavenworth City Planning Commission at least three business days before the date set for the public hearing.

4.    *Recommendations.* Upon the conclusion of the public hearing, the Planning Commission shall prepare and adopt its recommendations in the form of a proposed Development Regulation and shall submit it with a record of the hearing to the City Commission.

5.    *Action by the City Commission.* When the Planning Commission submits a recommendation of approval or disapproval of such amendment and the reasons therefore, the City Commission may:

a.    Adopt:  Adopt such recommendation by ordinance,

b.    Override:  Override the Planning Commission's recommendation by a two-thirds majority vote of the membership of the City Commission, or

c.    Return:  Return such recommendation to the Planning Commission with a statement specifying the basis for the City Commission's failure to approve or

disapprove. If the City Commission returns the Planning Commission's recommendation, the Planning Commission after considering the same may resubmit its original recommendation giving the reasons therefore or submit new and amended recommendations. Upon the receipt of such recommendation, the City Commission by a simple majority thereof may adopt or may revise or amend and adopt such recommendation by ordinance or it need take no further action thereon. If the Planning Commission fails to deliver its recommendation to the City Commission following the Planning Commission's next regular meeting after receipt of the City Commission's report, the City Commission shall consider such course of inaction on the part of the Planning Commission as a resubmission of the original recommendation and proceed accordingly.

6.    *Publication.* If the City Commission approves an application, it shall adopt an ordinance to that effect, but the ordinance shall not become effective until its publication in the official newspaper.

## 2.02   Platting

A.    ***Applicability:*** Plat applications are required to establish or alter the legal boundaries of property, and may be the owners or agents of any property affected.

B.    ***Platting Procedures:*** Applications for platting shall be proposed on forms established by the Director of the Planning Department and filed with the City Clerk. Applications shall be processed according to the following specific procedures:

1.    *Types of Plats.* Plat applications are classified and processed as one of the following types:
   a.    Administrative Plats, which are routine applications for lot splits or lot combinations that do not alter development patterns or impact public services; or
   b.    Minor Subdivisions, which are platting of five or fewer new lots, including any remainder parcel, that do not alter development patterns or impact public services; or
   c.    Major Subdivisions, which larger subdivisions are with new ownership and development patterns that impact public services.

2.    *Pre-application Conference.* Prior to the filing of any plat, the applicant shall (preferably with 2 copies of a rough sketch plan of the proposed subdivision) contact the City staff to determine:

   a.    Classification of the plat.
   b.    Procedure for filing plats.
   c.    Availability of City sewers and water, and other major utilities, including a letter or similar proof of availability from any utility.
   d.    Comprehensive Land Use Plan requirements for major streets, land use, parks, schools and public open spaces.
   e.    Zoning requirements for the property in question and adjacent property.
   f.    Special setback requirements for arterial, collector and local streets.

3.    *Administrative Plat.*  Administrative plats shall be processed according to the following criteria and procedures.

a.    Criteria.  An application may be classified as an administrative plat if the Director determines that all of the following are met.  Any application not classified as an administrative plat shall be processed as a minor or major subdivision.

(1)    No new street or alley right-of-way, or other public dedication is needed.

(2)    No significant increase in service requirements (utilities, schools, traffic control, streets, etc.), or the ability to maintain existing service levels will result.

(3)    For a lot split, involves a single split of one lot resulting in two separate lots, or for a lot combination involves the combining of two separate lots into one lot.

(4)    All lots meet the legal standards of the subdivision regulations and applicable zoning districts.

(5)    The lot patterns are consistent with the surrounding area.  In determining consistency, the size and dimension of lots previously developed, the layout and design of existing subdivisions and rights of way, and the degree of deviation from previous development shall be considered.

(6)    No other significant issues exist with potential development enabled by the plat that could impact planning policies, development regulations or adjacent property owners.

(7)    All property involved must have been previously platted.

(8)    No property involved may have been part of a previously approved Administrative Plat.  Any subsequent revisions to property lines must be processed as a Minor or Major Subdivision.

b.    Filing Requirement.  An administrative plat shall include all applicable information required for final plats.

c.    Review and Approval.  Upon review by the Director, Development Review Committee, or any affected departments or agencies, and within 60 days of filing, the Director shall approve any administrative plats that meet all requirements of these regulations, or deny the application and recommend any further processing as a major subdivision.

d.    Effect of Decision.  Approval of an administrative plat requires the applicant to record the plat with the Leavenworth Register of Deeds.  Denial or recommendation of major subdivision shall be processed according to major subdivision review requirements.

e.    The Administrative Plat shall be recorded with the Register of Deeds within 18 months of approval by the Director.  Plats which are not recorded within said time period shall be deemed null and void.

f.    Disposition of Final Plats.  After the plat has been recorded, the applicant shall provide two full-sized copies of the recorded plat to the Department of Planning and Community Development

4.    *Minor Subdivision.*  Minor subdivisions shall be processed according to the following criteria and procedures.

a.    Criteria.  An application may be classified as minor subdivision if the Director determines that all of the following are met.  Any application not classified as a minor subdivision shall be processed as a major subdivision.

(1)    No new street or alley right-of-way, or other public dedication is needed.
(2)    No significant increase in service requirements (utilities, schools, traffic control, streets, etc.), or the ability to maintain existing service levels will result.

(3)    The application results in five or fewer new lots, including any remainder parcel.
(4)    All lots meet the legal standards of the subdivision regulations and applicable zoning districts.
(5)    The lot patterns are consistent with the surrounding area.  In determining consistency, the size and dimension of lots previously developed, the layout and design of existing subdivisions and rights of way, and the degree of deviation from previous development shall be considered.
(6)    No other significant issues exist with potential development enabled by the plat that could impact planning policies, development regulations or adjacent property owners.

b.    Filing Requirement.  A minor subdivision shall include all applicable information required for final plats.

c.    Review and Approval.  Within 60 days after submission of a plat, the Planning Commission shall approve, disapprove, conditionally approve, or with approval of the applicant, table the plat.  If the Planning Commission approves the plat, the plat shall have house numbers assigned and shall be recorded with the office of the Leavenworth County Register of Deeds.

d.    The plat shall be recorded with the Register of Deeds within 18 months of approval by the Planning Commission.  Plats which are not recorded within said time period shall be deemed null and void.

e.    Disposition of Final Plats.  After the plat has been recorded, the applicant shall provide two full-sized copies of the recorded plat to the Department of Planning and Community Development

5.    *Major Subdivision*

a.    Preliminary Plat.  A preliminary plat shall be processed according to the following criteria and procedures.

(1)   Development Review Committee.  At least seven days prior to the Planning Commission review, the Development Review committee shall review the preliminary plat and submit their recommendation to the Planning Commission.

(2)   Planning Commission Review.  Within 60 days after the submission of a preliminary plat, the Planning Commission shall approve, disapprove or, with the approval of the applicant, table the plat.  Action by the Planning Commission shall be conveyed to the applicant in writing within ten days after the official Planning Commission meeting at which the plat was considered.  In case the plat is disapproved, the applicant shall be notified of the reason for such action and what requirements shall be necessary to meet the approval of the Planning Commission.

(3)   Effect of Decision.   The approval of the preliminary plat does not constitute an acceptance of the subdivision, but is deemed an authorization to proceed with the preparation of the final plat. If the Planning Commission rejects or withholds approval of a preliminary plat, the applicant may request that said plat be submitted to the City Commission and the Planning Commission shall forward the proposed plat, together with their report, stating the reason or reasons for the action taken.  The City Commission may make such finding and determinations as are deemed proper.

(4)   Effective Date.  The approval of the preliminary plat shall be effective for one year.

b.   Final Plat. After approval of the Preliminary Plat, the applicant may submit a Final Plat for all or portions of the preliminary plat area.

(1)   Planning Commission.  Within 60 days after submission of a final plat, the Planning Commission shall approve, disapprove, conditionally approve, or with approval of the applicant, table the final plat.  If the Planning Commission approves or conditionally approves the final plat, it shall be forwarded to the City Commission with a recommendation that they accept dedication of easements and rights-of-way.

(2)   Dedication of Land for Public Purposes.  The City Commission shall approve or disapprove the dedication of land for public purposes within 30 days following the action of the Planning Commission.  The City Commission may defer action for an additional 30 days to allow modifications to comply with requirements established by the City Commission.  If the City Commission defers or disapproves such dedication, it shall advise the Planning Commission of the reasons therefore.

(3)   Recording.  If the City Commission accepts the proposed easements and rights-of-way, the final plat shall have house numbers assigned and shall

be recorded with the office of the Leavenworth County Register of Deeds.

(4) Effective Date.  Final plats shall be recorded with the Register of Deeds within 18 months following approval by the Planning Commission, or City Commission approval of land dedicated to public purposes, if required. Final plats which are not recorded within said time period shall be deemed null and void

c. Disposition of Final Plats.  After the plat has been recorded, the applicant shall provide two full-sized copies of the recorded plat to the Department of Planning and Community Development.

C. *Improvement Procedures.*

1. *General.* After the approval, but prior to the recording of the final plat, the applicant may do the grading and any drainage work that is required, all according to plans approved by the Director of Public Works.  Prior to the issuance of building permits, all street paving, sanitary sewer, storm drainage, and utility lines must be installed in accordance with the most recent version of the Engineering and Public Works Department's Infrastructure Design and Construction Manual and plans approved by the appropriate utility company.

2. *Plans and Specifications.*  Upon the approval of the Final Plat, the applicant shall have a licensed professional engineer prepare engineering drawings for proposed required improvements which will be constructed by the developer containing information and details required by the Infrastructure Design and Construction Manual or Public Works Department standards.   The Director of Public Works shall review all engineering drawings in order to determine whether such drawings are consistent with the approved Final Plat and comply with their design standards.

3. *Construction of Improvements.* No improvements shall be constructed nor shall any work preliminary thereto be done until such time as a Final Plat and the engineering drawings accompanying it have been approved and there has been compliance with all of the requirements relating to an agreement, bond or deposit specified in these regulations. The developer may install 6" x 5' sidewalks in conjunction with the street paving and forgo the required sidewalk bond.

4. *Inspections.* All improvements constructed or erected shall be subject to inspection by the City or its designated representative responsible for setting and enforcing the applicable design and construction standards of the required improvement.  The cost attributable to all inspections required by this regulation shall be charged to and paid by the applicant. Before any required inspections take place, the applicant may be required to post a deposit with the City Clerk to cover the cost of such inspections.  Onsite inspections may be conducted at any times and work may be terminated if it does not comply with standards of final drawings.

5. *Final Inspection.*  Upon completion of all improvements within the area covered by the Final Plat, the applicant shall notify the Director of Public Works who shall conduct a final

inspection of all improvements installed.  If the final inspection indicates that there are any defects or deficiencies in any the improvements as installed, or if there are any deviations in the improvements as installed from the final engineering plans and specifications, he shall notify the applicant in writing of such defects, deficiencies, or deviations, and the applicant shall, at his sole cost and expense, correct the defects or deviations.  When the defects, deficiencies, or deviations have been corrected, the applicant shall notify the official that the improvements are ready for final re-inspection.

6.    *Acceptance.*  Upon receipt by the City Commission of the certificate of the Director of Public Works that all improvements have been installed in conformance with the approved engineering drawings, and with the requirements of these regulations, and all other applicable statutes, ordinances and regulations, the City Commission and/or such appropriate utility shall thereupon, by letter or motion, formally accept such improvements. The improvements shall become the property of the City Commission or appropriate utility company involved.

## 2.03   Zoning Change

A.    ***Applicability:*** Zoning changes to specific property may be initiated by a City Commissioner, the City Commission, the Planning Commission, or the owners or agents of any property affected.

B.    ***Zone Change* Procedure:**  Applications for a zoning change shall be proposed on forms established by the Director of the Planning Department and filed with the City Clerk.  Applications shall be processed according to the following specific procedures:

1.    *Certified Ownership List.*  The application shall be accompanied by an ownership list certified by an attorney or a title company or a list and map prepared by the Leavenworth County GIS Department listing the legal description and name and address of the owners of record of all property located within 200 feet of the property proposed to be rezoned if within the incorporated limits of the city and if rezoning of property located adjacent to or outside the city limits, the area of notification is extended to 1,000 feet in the unincorporated area.

2.    *Public Hearing.*  The Planning Commission shall hold a public hearing on each proposed amendment.  The Planning Commission shall select a reasonable hour and place for the public hearing, but it shall hold the hearing within 60 days from the date on which the proposed amendment is filed.  An applicant for an amendment may waive the requirement that such hearing be held within 60 days.

3.    *Notice.*  Public notice of a hearing on a proposed amendment shall be published once in the official city newspaper at least 20 days prior to the date of the hearing.  The notice shall fix the time and place for the hearing and contain a statement regarding the proposed changes and regulations or restrictions or in the boundary or classification of any zone or district, and the property shall be designated by legal description or a general description sufficient to identify the property under consideration.  In addition to publication notice, written notice of the proposed zoning change shall be mailed at least 20 days before the hearing to all owners of record of lands located within at least 200 feet

of the area proposed to be rezoned within the city.  If the area proposed to be rezoned is adjacent to or outside the city limits, the area of notification of the city's action shall be extended to 1,000 feet in the unincorporated area. .

4.    *Conduct of Hearing.*  The hearing shall be conducted and a record of the proceedings shall be preserved in such manner and according to such procedures as the Planning Commission may from time to time prescribe by rule.  Any interested person or party may appear and be heard at the hearing in person, by agent or by attorney.  The Planning Commission may request a report on any proposed amendment from any governmental official or agency, or any other person, firm or corporation.  If such a report is made, a copy thereof shall be made available to the applicant and any other interested persons and shall be available for review in the offices of the Secretary, Leavenworth City Planning Commission at least three business days before the date set for the public hearing.

5.    *Conditions of Determination.*  Whenever the Planning Commission or City Commission takes action on an application for a zoning change the Planning Commission and City Commission shall consider the following factors:

   a.    The character of the neighborhood;
   b.    The zoning and use of properties nearby;
   c.    The suitability of the subject property for the uses to which it has been restricted;
   d.    The extent to which removal of the restrictions will detrimentally affect nearby property;
   e.    The length of time the subject property has remained vacant as zoned;
   f.    The relative gain to economic development, public health, safety and welfare by the reduction of the value of the landowner's property as compared to the hardship imposed by such reduction upon the individual landowner;
   g.    The recommendations of permanent or professional staff;
   h.    The conformance of the requested change to the adopted or recognized Comprehensive Land Use Plan being utilized by the city; and
   i.    Other factors as may be relevant to a particular proposed amendment.  The factors considered in taking action on any proposed amendment shall be included in the minutes or otherwise be made part of the written record.

6.    *Recommendations.* Upon the conclusion of the public hearing, the Planning Commission shall prepare and adopt its recommendations in the form of a proposed Development Regulation and shall submit it with a record of the hearing to the City Commission.

7.    *Protest by Petition.* If a written protest against a proposed zoning change is filed in the office of the City Clerk within 14 days as of the date of the conclusion of the public hearing, pursuant to the publication notice, signed by the owners of record or 20% or more of any real property proposed to be rezoned, or by the owners of record of  20% or more of the total area required to be notified by this act of the proposed rezoning of a specific property, excluding streets and public ways, the ordinance adopting such amendment shall not be passed except by at least a three-fourths vote of all of the members of the City Commission.

8.  *Action by the City Commission.* The City Commission shall not consider a request prior to the lapse of the 14-day protest period.  When the Planning Commission submits a recommendation of approval or disapproval of such amendment and the reasons therefore, the City Commission may:

    a.  Adopt:  Adopt such recommendation by ordinance,

    b.  Override:  Override the Planning Commission's recommendation by a two-thirds majority vote of the membership of the City Commission, or

    c.  Return:  Return such recommendation to the Planning Commission with a statement specifying the basis for the City Commission's failure to approve or disapprove.  If the City Commission returns the Planning Commission's recommendation, the Planning Commission after considering the same may resubmit its original recommendation giving the reasons therefore or submit new and amended recommendations.  Upon the receipt of such recommendation, the City Commission by a simple majority thereof may adopt or may revise or amend and adopt such recommendation by ordinance or it need take no further action thereon.  If the Planning Commission fails to deliver its recommendation to the City Commission following the Planning Commission's next regular meeting after receipt of the City Commission's report, the City Commission shall consider such course of inaction on the part of the Planning Commission as a resubmission of the original recommendation and proceed accordingly.

9.  *Publication.*  If the City Commission approves an application, it shall adopt an ordinance to that effect, but the ordinance shall not become effective until its publication in the official newspaper.  If the official zoning district map has been adopted by reference, the amending ordinance shall define the change or boundary as amended, shall order the official zoning district map to be changed to reflect such amendment and shall amend the section of the regulations incorporating the same and shall reincorporate such map as amended.

## 2.04.  Special Use Permits

A.  ***Applicability:***  All uses identified in the zoning districts, use table or elsewhere in these regulations as a special use in any particular zoning district shall require a special use permit. Applications for special use permits may be submitted by the owners or agents of any property affected.

B.  ***Special Use Permit Procedures:*** Applications for a special use permit shall be proposed on forms established by the Director of the Planning Department and filed with the Clerk.

    1.  *Certified Ownership List.*  The application shall be accompanied by an ownership list certified by an attorney or a title company or a list and map prepared by the Leavenworth County GIS Department listing the legal description and name and address of the owners of record of all property located within 200 feet of the subject property if within the

incorporated limits of the city and if rezoning of property located adjacent to or outside the city limits, the area of notification is extended to 1,000 feet in the unincorporated area.

2.   *Public Hearing.*  The Planning Commission shall hold a public hearing on each proposed special use request.  The Planning Commission shall select a reasonable hour and place for the public hearing, but it shall hold the hearing within 60 days from the date on which the application is filed.  An applicant for a special use permit may waive the requirement that such hearing be held within 60 days.

3.   *Notice.*  Public notice of a hearing on a special use permit shall be published once in the official city newspaper at least 20 days prior to the date of the hearing.  The notice shall fix the time and place for the hearing and contain a statement regarding the proposed special use, and the property shall be designated by legal description or a general description sufficient to identify the property under consideration.  In addition to publication notice, written notice of the proposed special use permit shall be mailed at least 20 days before the hearing to all owners of record of lands located within at least 200 feet of the subject property within the city.  If the subject property is adjacent to or outside the city limits, the area of notification of the city's action shall be extended to 1,000 feet in the unincorporated area. .

4.   *Conduct of Hearing.*  The hearing shall be conducted and a record of the proceedings shall be preserved in such manner and according to such procedures as the Planning Commission may from time to time prescribe by rule.  Any interested person or party may appear and be heard at the hearing in person, by agent or by attorney.  The Planning Commission may request a report on any proposed amendment from any governmental official or agency, or any other person, firm or corporation.  If such a report is made, a copy thereof shall be made available to the applicant and any other interested persons and shall be available for review in the offices of the Secretary, Leavenworth City Planning Commission at least three business days before the date set for the public hearing

5.   *Planning Commission Recommendations.*  The Planning Commission may recommend issuance of those Special Uses which are expressly authorized to be permitted in a particular zoning district or districts as found in Article 4 – Zoning Districts and Standards and Appendix A - Use Table.

6.   *Protest by Petition.* If a written protest against a proposed special use permit is filed in the office of the City Clerk within 14 days as of the date of the conclusion of the public hearing, pursuant to the publication notice, signed by the owners of record of  20% or more of the total area required to be notified by this application for a special use permit, excluding streets and public ways, the ordinance adopting such amendment shall not be passed except by at least a three-fourths vote of all of the members of the City Commission.

7.   *Final Approval.*  The City Commission may recommend issuance of a Special Use Permit whenever it finds that:

   a.   The proposed special use complies with all applicable provisions of this ordinance.

b.      The proposed special use at the specified location will contribute to and promote the economic development, welfare or convenience of the public

c.      The special use will not cause substantial injury to the value of other property in the neighborhood in which it is to be located.

d.      The location and size of the special use, the nature and intensity of the operation involved in or conducted in connection with it, and the location of the site with respect to streets giving access to it are such that the special use will not dominate the immediate neighborhood so as to prevent development and use of neighboring property in accordance with the applicable zoning district regulations.  In determining whether the special use will so dominate the immediate neighborhood, consideration shall be given to:

(1)     The location, nature and height of buildings, structures, walls, and fences on the site, and

(2)     The nature and extent of landscaping and screening on the site.

(3)     Off-street parking and loading areas whether on the premises or auxiliary to the premises will be provided in accordance with the standards set forth in this ordinance and such areas adjoining residential uses will be located to protect such residential uses from any injurious effect.

(4)     Adequate utility, drainage, and other necessary facilities have been or will be provided.

(5)     Adequate access roads or entrance and exit drives will be provided and shall be so designed to prevent traffic hazards and to minimize traffic congestion in public streets and alleys.

C.      ***Discontinuance or Violation of Permit Conditions:***  A Special Use Permit may be granted by and continued annually by the City Commission, City of Leavenworth, Kansas.  The continuation of a Special Use Permit exists with the property as long as such Special Use Permit is used in accordance with its original intended and approved purpose and the annual SUP fee is paid.  Any discontinuance of more than 12 months, violation of permit conditions, or failure to pay a fee may enable the City Commission to administratively rescind a special use permit.

D       ***Revocation:***  A special use permit may be revoked for cause upon the finding that the special use permit has violated any criteria of approval, changed circumstances supporting the approval or a determination that the use has become a nuisance by reason of design or operation of the use, site or buildings.  Revocation shall require that the City Commission hold a public hearing with at least 21 days' notice and no more than 60 days' notice, with a certified letter being sent to the property owner and general notice to the public.  Notice shall contain the date, time, place and purpose of the hearing and cite the reason for the proposed revocation.

## 2.05   Site Plan

A.      ***Applicability:***  All applications for multi-family, commercial, industrial, SUPs, PUDs and rezoning shall be accompanied by a site plan and all submissions for a building permit for

any permitted use therein must be accompanied by a Site Development Plan.  Single family dwellings are exempt from this requirement.

B.   **Site Plan Procedures:** Applications for a site plan shall be proposed on forms established by the Director of the Planning Department and filed with the Planning Department.  Except for site plans that accompany other required approval processes, applications shall be processed according to the following specific procedures:

1.   The City Planner shall determine if submitted site plans are in accordance with these regulations and then forward all site plan submissions to the Development Review Committee along with a written opinion on the plan's merits.

2.   The Development Review Committee is responsible for final review and approval of site plans for multi-family residential, mixed-use, mobile home parks, planned unit developments, commercial or industrial developments which are in accordance with these regulations.

3.   In its review, the Development Review Committee will consult and consider the recommendation of the various departments and agencies affected by the proposed site plan.

4.   If the Development Review Committee rejects or withholds approval of the site plan the applicant may appeal the decision to the Planning Commission at its next regular meeting.  The Planning Commission may recommend approval, disapproval or approval with conditions to the City Commission.

C.   **Criteria:**  Site design shall ensure that all provisions of these Development Regulations and all other ordinances, Comprehensive Land Use Plan, and general plans and standards of the City of Leavenworth shall be complied with, where applicable.  In determining the applicability of a site plan to the standards, and in interpreting the standards, the following criteria shall be used:

1.   The proposed development shall not have any detrimental effect upon the general health, welfare, safety, and convenience of persons residing or working in the neighborhood; and shall not be detrimental or injurious to the neighborhood.

2.   The proposed development shall promote a desirable relationship of structures: to one another; to open spaces; and to the topography on the site and in the surrounding area.

3.   The height, area, setbacks, and overall mass, as well as parts of any structure (buildings, walls, signs, lighting, etc.) and landscaping shall be adequate and appropriate to the development, the neighborhood, and the community.

4.   Ingress, egress, internal traffic circulation, off-street parking facilities, loading and service areas, and pedestrian walkways shall be so designed as to promote safety and convenience.

5.   The architectural character of the proposed structure shall meet the requirements of Article 7, Design Standards.

D.    ***Amendment to Site Plan:***  No approved Site Plan may be modified, or expanded in ground or structural area more than 10% of the gross floor area unless the Site Plan is amended and approved in accordance with the procedures applicable to initial approval, or as otherwise approved through Minor Modifications in Section II.F.  Such changes will require the applicant to resubmit the Site Plan as outlined in the preceding sections.

E.    ***Effect of Decision.***  All elements of the approved site plan must be executed in association with a building permit or certificate of occupancy, except that installation of landscape may be delayed for up to six months to allow optimal planting, and provided other adequate assurances of implementation are provided by applicant.

## 2.06    Minor Modifications

A.    ***General.***  This section sets forth the required review and approval procedures for "minor modifications," that are minor deviations from otherwise applicable standards that may be approved by the Director.  Minor modifications are to be used when the small size of the modification requested and the unlikelihood of any adverse effects on nearby properties or the neighborhood make it infeasible to seek a formal variance.  Minor modifications to development standards may only be requested where no additional permit, such as conditional use or special use, is required prior to construction.

B.    ***Applicability.***  Requests for minor modifications must be made in writing to the Director who shall have 21 days from receipt to respond in writing.   If the Director does not act on the request within 21 calendar days, the application shall be deemed denied.  The Director may approve a single minor modification per development of up to a maximum of 10% from the following general development and zoning district standards:

1.    Minimum lot area requirements,

2.    Setback requirements, and

3.    Quantitative development standards generally applicable throughout the Development Regulations of the City of Leavenworth, Kansas.

The Director shall have sole decision-making authority for a minor modification.

C.    ***Limitations.***  In no circumstance shall the Director approve a minor modification that results in:

1.    Any change in required floodplain elevations;

2.    An increase in overall project density;

3.    A change in permitted uses or mix of uses;

4.    A deviation from the use-specific standards in Article 4, Zoning Districts & Standards;

5.    A change in conditions attached to the approval of any site plan or special use permit;

6.      A change to a development feature already modified through a variance or other minor modification; or

7.      Any change in the maximum area of signage.

8.      No more than two standards may be modified on any single development project;

D.    **Criteria**.  The review and approval of a minor modification is administrative and shall not require any form of notice or a public hearing prior to determination.  The following criteria shall be met for a minor modification:

1.      Evidence of substantial compliance with the provisions of the Comprehensive Land Use Plan, any other applicable city plans and the Development Regulations;

2.      Compatibility with surrounding land uses; and

E.    **Appeal.**  Appeal of the Director's determination shall be to the Development Review Committee.

F.    **Approval Termination**:  An approved minor modification terminates at the same time as the original approval.  Minor modification of an approval does not extend the lapse period of the original approval.

G.    **Record of Minor Modifications and Annual Review:** The Director shall keep a record of all minor modifications that includes information about the date of the request, the location of the project, a brief description of the minor modification request, and the Director's action.  The Director shall submit the minor modification log to the Planning Commission annually for review. Upon reviewing the record, the Planning Commission may determine whether changes to the Zoning & Development Ordinance of the City of Leavenworth, Kansas are necessary.

## 2.07  Appeals

Any person wishing to appeal a provision of this document as it has been applied to their case shall make application for appeal to the appropriate entity as listed below.

A.      Zoning Regulations.    Zoning regulations shall be appealed to the Board of Zoning Appeals as specified in Article 11.  Specifically this shall include:
1.      Article 1. Section 1.05 Non-conformances
2.      Article 2. Section 2.05 Site Development Plans
3.      Article 4.  District Regulations
4.      Article 5. Parking
5.      Article 6. Landscaping
6.      Article 8. Signs
7.      Article 10. Supplementary District Regulations

B.      Development Regulations.   Development regulations shall be appealed to the City Commission where specified in these regulations. Specifically this shall include:
1.      Article 3.  Subdivision Standards
2.      Article 9. Historic Preservation

Summary Table:

| | Pre-application Meetings | | Review Body | | | | Notice | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Staff | Community | Staff | PC | CC | BZA | Published | Posted | Mailed |
| Text Amendment | ☐ | | R | R/H | D | | ■ | | |
| Rezoning | ■ | ☐ | R | R/H | D | | ■ | ■ | ■ |
| Plat, Minor | ■ | | R | D | A | | | | |

D E V E L O P M E N T   R E G U L A T I O N S

A R T I C L E   2 .   A P P L I C A T I O N S   &   P R O C E D U R E S

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Plat, Preliminary | ■ | | R | D | A | | | ■ | |
| Plat, Final | | | R | R | D | | | ■ | |
| Site Plan | □ | | D | A/D | | A | | | |
| Planned Zoning | ■ | ■ | R | R/H | D | | ■ | ■ | ■ |
| Special Use Permit | ■ | | R | R/H | D | | ■ | | ■ |
| Minor Modification | ■ | | D | A | | | | | |
| Other Appeals (specified in these regulations) | Dependent on specific applicable code sections | | | | | | | | |
| Variance | □ | | R | | | D | ■ | | ■ |
| Appeal of Administrative Decision | | | | | | D | ■ | | ■ |

R = Review/Recommendation          PC = Planning Commission

D = Decision                                     CC = City Commission

A = Appeal                                         BZA = Board of Zoning Appeals

H = Public Hearing

■ = Required

□ = Optional or Recommended

## ARTICLE 11.  BOARD OF ZONING APPEALS

### 11.01. Creation

A Board of Zoning Appeals is created for the City of Leavenworth.  Such Board shall consist of five members, all of whom shall be residents of the City of Leavenworth.  Members shall be appointed by the Mayor with the consent of the City Commission.   Appointments shall be made for three-year terms. Vacancies shall be filled by appointment for the unexpired term.  Members of the Board shall serve without compensation.

### 11.02. General

The word "Board" when used in this article shall mean Board of Zoning Appeals.  The Board shall adopt rules of procedure as may be necessary and proper to govern its own proceedings; such rules shall not be in conflict with other laws, regulations, or resolutions.  The Board shall keep minutes of its proceedings, showing the description of evidence presented, the findings of facts by the Board, the decision of the Board, and the vote of each member upon each question, or if absent or failing to vote, indicating such fact, and shall keep records of its examinations and other official actions, all of which shall be filed in the office of the Board immediately and shall be of public record.

A.    *Secretary:*  The Secretary of the Board of Zoning Appeals shall be a member of the city staff appointed by the Director.

B.    *Meetings:*  Unless notified otherwise the members of the Board of Zoning Appeals will meet regularly once each month, at such time and place as is fixed by resolution.  They shall select one of their members as chairman and one as vice-chairman, who shall serve one year or until their successors have been selected.  Special meetings may be called at any time by the chair or in his absence, by the vice-chairman.  A majority of the Board shall constitute quorum for the transaction of business.  The Board shall cause a proper record to be kept of its proceedings.

C.    *Quorum*:  A majority of the Board shall constitute a quorum for the transaction of business, and a concurring vote of a majority of the entire Board shall be necessary to reverse any order, requirement, decision or determination of the Building Inspector, or to decide in favor of the applicant upon any matter which it is required to pass under these regulations, or to affect any variation in such regulation.

### 11.03. Powers and Jurisdiction

The Board shall have those powers and duties authorized by this ordinance and by KSA 12-759 and any amendments thereto.

A.    *Appeals:*  After proper hearing to decide appeals where it is alleged there is an error in an order, requirement, decision, or determination made by an administrative official in the enforcement of these regulations, except where the City Commission is specifically empowered to hear an appeal.

1. Appeals to the Board may be taken by the person aggrieved, or by any officer or department of the city government affected by the rigid enforcement of these Development Regulations. Such appeal shall be filed with the Secretary of the Board, as shall be herein prescribed. The administrative official shall forthwith transmit to the Secretary of the Board all papers constituting the record upon which the action appealed from is taken.

2. An appeal stays all proceedings in furtherance of the action appealed from, unless the Secretary of the Board certifies to the Board, after the Notice of Appeal shall have been filed with him, that by reason of facts stated in the certificate, a stay would, in his opinion, cause imminent peril to life or property. In such case, proceedings shall not be stayed otherwise than by a restraining order, which may be granted by a court of record.

B. *Variances:* To authorize in specific cases a variance from the specific terms of these Development Regulations which will not be contrary to the public interest and where, owing to special conditions, a literal enforcement of the provisions of these Development Regulations will, in an individual case, result in unnecessary hardship, provided the spirit of these Development Regulations shall be observed, public safety and welfare secured, and substantial justice done. Such variance shall not permit any use not permitted by the Development Regulations of the City of Leavenworth, Kansas in such district. Rather, variances shall only be granted for the detailed requirements of the district such as area, bulk, yard, parking or screening requirements.

1. The applicant must show that his property was acquired in good faith and where by reason of exceptional narrowness, shallowness or shape of this specific piece of property at the time of the effective date of the Zoning Ordinance, or where by reason of exceptional topographical conditions or other extra-ordinary or exceptional circumstances that the strict application of the terms of the Development Regulations of the City of Leavenworth, Kansas actually prohibits the use of his property in the manner similar to that of other property in the zoning district where it is located.

2. A request for a variance may be granted, upon a finding of the Board that all of the following conditions have been met:

   a. The Board shall make a determination on each condition, and the finding shall be entered in the record.

   b. That the variance requested arises from such condition which is unique to the property in question and is not ordinarily found in the same zone or district; and is not created by an action or actions of the property owner or the applicant.

   c. That the granting of the permit for the variance will not adversely affect the rights of adjacent property owners or residents.

   d. That the strict application of the provisions of the Development Regulations from which the variance is requested will constitute unnecessary hardship upon the property owner represented in the application.

   e. That the variance desired will not adversely affect the public health, safety, morals, order, convenience, prosperity, or general welfare;

f.      That granting of the variance desired will not be opposed to the general spirit and intent of the Development Regulations.

3.      In granting a variance, the Board may impose such conditions, safeguards, and restrictions upon the premises benefited by the variance as may be necessary to reduce or minimize any potentially injurious effect of such variance upon other property in the neighborhood, and to carry out the general purpose and intent of these Development Regulations.

C.      **Exceptions:** To grant exceptions which are specifically listed as permitted in these Development Regulations.  In no event shall exceptions to the provisions of the Development Regulations be granted where the exception contemplated is not specifically listed as in the Development Regulations of the City of Leavenworth, Kansas.  An exception is not a variance.  Further, under no conditions shall the Board have the power to grant an exception when the conditions of this exception, as established by these Development Regulations, are not found to be present.

D.      **Conditions of Determination:** In exercising the foregoing powers, the Board, in conformity with the provisions of these Development Regulations, may reverse or affirm, wholly or partly, or may modify the order, requirement, decision or determination, and to that end shall have all the powers of the administrative official and may attach appropriate conditions, restrictions or safeguards necessary to protect public interest and welfare.

## 11.04. Applications

A.      The procedure for requesting a hearing before the Board shall be as follows:

1.      *Application Submission:*  All applications to the Board shall be in writing on forms provided by the Secretary of the Board.  Said application shall be completed in its entirety and filed in the office of the City Clerk with all supporting data.

2.      *Notification of Nearby Property Owners:*  All applications shall be accompanied by an ownership list certified by an attorney, a title company or a list and map prepared by the Leavenworth County GIS Department listing the names and addresses of all property owners located within 200 feet, excluding streets and alleys, of the boundaries of the property included in the application.  If the property is adjacent to the city limits, the area shall be expanded to 1,000 feet of property owners outside the city limits.

3.      *Public Notification:*  The Board shall fix a reasonable time for the hearing of an application, and notice of the time, place and subject of each hearing shall be published in the official newspaper (as designated by the City Commission) at least 20 days prior to the date fixed for the public hearing.  A copy of the notice of public hearing shall be sent to each party of interest, each person on the ownership list, and the chair of the Planning Commission.

B.      In addition to the above requirements, certain applications require additional information as follows:

1.      *Appeals:*

a. An application for an appeal shall be filed within 10 days after a ruling has been made by an Administrative Official and furnished to the appellant in writing.

b. A copy of the written ruling of the Administrative Official which the applicant believes to be in error shall be submitted.

c. A clear and accurate written description of the proposed use, work or action in which the appeal is involved and a statement justifying the appellant's position.

d. Where necessary, a plot plan, drawn to scale, showing existing and proposed plans for the area in question shall be submitted.

2. *Variances:*

a. The applicant shall submit a statement, in writing, justifying the variance requested, indicating the enforcement provisions of the specific regulations from which the variance is requested, and outlining in detail the manner in which it is believed that this application will meet each of the five conditions as set out in herein.

b. The applicant shall submit six (6) copies of a sketch drawn to scale and showing the lot or lots included in the application; the structures existing thereon; and the structures contemplated necessitating the variance requested.  All appropriate dimensions and any other information which would be helpful to the Board in consideration of the application should be included.

3. *Exceptions:*

a. The applicant shall submit a statement in writing justifying the exception applied for and indicating under which article and section of the Development Regulations the Board of Zoning Appeals is believed to have jurisdiction.

b. The applicant shall prepare and submit at the time of filing, the application, six copies of a detailed plot plan drawn to scale, showing all existing and proposed structures, property lines with dimensions, parking spaces, points of ingress and egress, driveways, and any other information which would be helpful to the Board in consideration of the application.

C. **Conditions of Approval:**  In making any decision varying or modifying any provisions of the Development Regulations, or in granting an exception to the district regulations, the Board shall impose such restrictions, terms, time limitations, landscaping, screening and other appropriate safeguards as needed to protect adjoining property.

D. **Performance Bonds:**  The Board may require a performance bond to guarantee the installation of improvements such as parking lot surfacing, landscaping, etc.  The amount of the bond shall be based on a general estimate of cost for the improvements as determined by the Board for 125% of necessary improvements, and shall be enforceable by or payable to the City Commission in the sum equal to the cost of constructing the required improvement.  In lieu of the performance bond requirements, the Board may specify a time limit for the completion of such

required improvements and in the event the improvements are not completed within the specified time, the Board may declare the granting of the application null and void after reconsideration.

## 11.05. Appeal of the Board Decision

Any person, official or governmental agency dissatisfied with any order or determination of the board may bring an action in the district court of the county to determine the reasonableness of any such order or determination.  Such appeal shall be filed within 30 days of the final decision of the board, per KSA 12-759.

## ARTICLE 12. DEFINITIONS

Terms defined in this Article shall be the basis for interpretation of all such terms throughout these Development Regulations.  If not so defined a term shall be assigned the meanings found in Webster's most current New Collegiate Dictionary.

**100-year Flood:**  The Base Flood.

**Abandoned Sign:**  Any sign on any building, structure or premises that has been vacated for a six (6) month period.

**Abutting:**  Having property or district lines in common; e.g., two lots are abutting if they have property lines in common.

**Access or Accessway:**  The place, means, or way by which pedestrians or vehicles shall have safe, adequate, and usable ingress and egress to a property or use as required by this ordinance.

**Accessory Building, Accessory Structure, or Accessory Use:** A building or use which: (1) is subordinate to and serves a principal building or principal use; (2) is subordinate in area, extent or purpose to the principal building or principal use served; (3) contributes to the comfort convenience, or necessity of occupants of the principal building or principal use; (4) is located on the same zoning lot as the principal building or principal use. The same as "appurtenant structure."

**Actuarial Rates:**  "risk premium rates."

**Adaptive Use:**  The process of changing the use of a structure or property to a use other than that for which the structure or property was originally designed.

**Addition:**  Any construction which increases the size of the building such as a porch, attached garage or carport, or a new room or wing.  An addition is a form of alteration.

**Address Sign**:  A sign identifying, through any set of numerals or letters, a principal building's location with respect to the streets or to those homes or buildings around that building.  An address sign may include the name of the occupant and may include the name of a home occupation.

**Administrative and Professional Offices:**  Private commercial office space where the public may transact business, receive services or where commercial firms conduct internal office operations.

**Administrative Official:**  A member of the city staff who is empowered to administer and implement the provisions of this Ordinance.  Specifically, the Director of Planning and Community Development, City Planner, Planning and Zoning Technician, Director of Public Works, Building Inspector and Environmental Officer.

**Administrator:**  As used in Article X, Floodplain Management, means the Federal Insurance Administrator.

**Adult Day Center:**  Any place or facility operating less than 24 hours a day providing activities and social engagement opportunities for not more than 15 unrelated adult individuals who, due to functional impairment, require some degree of supervision or assistance with the activities of daily living, with no on-site medical services provided.

**Agency:** means the Federal Emergency Management Agency (FEMA).

**Agent:** The legally authorized representative of a landowner

**Agriculture Accessory Building:**  A detached accessory structure used for the shelter of livestock, the storage of agricultural products, or the storage and maintenance of equipment or supplies used for agricultural or property maintenance activities.

**Agriculture Uses:** The use of a tract of land for growing crops in the open, dairying, pasturage, horticulture, floriculture, and necessary accessory uses, including the structures necessary for carrying out farming operations; provided, however, such agricultural use shall not include the following uses: (1) the maintenance and operation of commercial greenhouses or hydroponic farms, except in zoning districts in which such uses are expressly permitted; (2) wholesale or retail sales as an accessory use unless the same are specifically permitted in this ordinance; (3) the feeding, grazing, or sheltering of animals or poultry in either penned enclosures or in open pasture within one hundred (100) feet of any lot line.  Agriculture does not include the feeding of garbage to animals, the raising of poultry or fur-bearing animals as a principal use, or the operation or maintenance of a commercial stockyard, or feed yard.

**Airport:**  Any location where one or more craft capable of containing a human, takes off or lands, and for which ground facilities necessary to these operations are constructed.

**Alley:** A public thoroughfare, which affords only a secondary means of vehicular access to abutting property, and is not intended for general traffic circulation.  An alley line shall mean the centerline of an alley right-of-way.

**Alteration:**  Any change or rearrangement to the structural parts of an existing building or property.  Any enlargement, whether by height or dimension, shall be considered an alteration.  Any act or process that changes the exterior architectural appearance of a building.

**Amendment:**  A change in the wording, context, or substance of this ordinance, an addition, deletion, or change in the district boundaries or classifications upon the district map, which imposes any regulation not heretofore imposed or removes or modifies any such regulation heretofore imposed.

**Amphitheater:** Any open-air venue used for entertainment and performances.

**Amusement Park:**  A commercial amusement activity such as a carnival, circus, miniature golf course, or similar establishment, which is not entirely within an enclosed building.

**Animal Clinic or Animal Hospital:** A place where animals or pets are given medical or surgical treatment in emergency cases and are cared for during the time of such treatment.  Use as kennel shall be limited to short-time boarding and shall only be incidental to such hospital use and shall be enclosed in a soundproof structure

**Animal Day Care:**  See Kennel

**Animal Husbandry (other than dairy):**  The agricultural practice of breeding and raising livestock.

**Animal Research Facilities**:  Any facility in which research on animals is performed in a careful study of a subject, which may be related to the health or other welfare of animals of the same or other species, including humans.

**Animal Sales and Service:** Any facility where the on-site sale of animals is performed including the sale of animal husbandry or animal health related supplies.

**Animation/Animated:**  Any visible moving part, or oscillating lights either natural or artificial, or visible movement achieved by any means that move, change, oscillate, or visibly alter in appearance to depict action or create special effects or scenes.

**Apartment Building:**  A building used as a dwelling for several families each living separate and apart. Apartments are generally rental units.

**Apiary:**  A place for the keeping of bees

**Appeal:**  An application to a recognized higher authority to correct an alleged injustice done and an error committed in an order, requirement, decision, or determination made by an administrative official in the enforcement of city regulations.  Also, a request for review of the Floodplain Administrator's interpretation of any provision of this ordinance or a request for a variance.

**Applicant:** The owner or duly designated representative of a structure or property.  Applicants may apply for building, fence, sign, and other permits or nominations for local, state or national registry, or group of owners of structures in a proposed historic district, or the owner or duly designated representative who has applied for a building permit, demolition or clearance permit involving a registered historic property or property within 500 feet of a registered historic property.

**Appropriate:**  Suitable to or compatible with what exists in the surrounding context or setting.

**Appurtenant Structure:**  A structure that is on the same parcel of property as the principle structure and the use of which is incidental to the use of the principal structure.

**Arboretum or botanical garden:**  A botanical garden containing living collections of woody plants intended for public appreciation and/or for scientific study.

**Area of Shallow Flooding:**  A designated AO or AH zone on a community's Flood Insurance Rate Map (FIRM) with a one percent or greater annual chance of flooding to an average depth of one (1) to three (3) feet where a clearly defined channel does not exist, where the path of flooding is unpredictable and where velocity flow may be evident.  Such flooding is characterized by ponding or sheet flow.

**Area of Special Flood Hazard:**  The land in the floodplain within a community subject to a one percent or greater chance of flooding in any given year.

**Arena and Field House:**  Structures with indoor space sufficient to house large community events and/or indoor sporting events.

**Art Gallery or Museum:**  A building or space for the exhibition of art, usually visual art.  Museums can be public or private, but what distinguishes a museum is the ownership of a collection.  Paintings are the most commonly displayed art objects; however, sculpture, decorative arts, furniture, textiles, costume, drawings, pastels, watercolors, collages, prints, artists' books, photographs, and installation art are also regularly shown.  Although primarily concerned with providing a space to show works of visual art, art galleries are sometimes used to host other artistic activities, such as performance art, music concerts, or poetry readings.

**Arterial Street:**  A major thoroughfare designed to carry traffic from one area to another and as designated in the Future Land Use Map, which is a part of the Leavenworth Comprehensive Land Use Plan.

**Assembly Hall:**  Any building, or portion of a building, used primarily for public or private gatherings, with a maximum capacity for congregation in the assembly area of at least 50 people.

**Assisted Living Facility:**  Facilities which provide residents with supervision or assistance with activities of daily living; coordination of services by outside health care providers; and monitoring of resident activities to help to ensure their health, safety, and well-being.  Other licensure terms used for this philosophy of care include Residential Care Home, Assisted Care Living Facilities, and Personal Care Homes.

**Athletic Facilities:**  Outdoor facilities designed and used for athletic events, practice and coaching.

**Auction Establishment:**  Any facility at which regularly scheduled auctions occur and for which public space has been established.  This includes private or member only auction facilities.

**Auditorium/Exhibition Hall/Convention Center:**  A large building that is designed to hold a convention, where individuals and groups gather to promote and share common interests.  Convention centers typically offer sufficient floor area to accommodate several thousand attendees.  Convention centers typically have at least one auditorium and may contain concert halls, lecture halls, meeting rooms, and conference rooms.

**Automobile Parts Recycling Business:**  Any facility, structure, or land-use storage of used and reusable or scrap salvage materials, including but not limited to resale of parts, shredding, milling, grinding, baling, or packing equipment for the handling of used and re-saleable parts, scrap, salvage materials, or used materials.

**Automobile Repair Shop:**  A place where automobiles are repaired by any of the following; auto mechanics, body shop technicians or electricians.

**Automobile Towing Service Storage Yard; Impound Lot:**  A place where automobile tow trucks are stationed between calls and where automobiles are temporarily stored after being towed for reasons other than mechanical malfunction.  The dismantling or salvage of vehicles is not included in this definition.

**Automobile, Boat, Truck, Motorcycle, RV Sales, Rental, and Service:** A place where automobiles and other power sport vehicles are sold, rented or repaired by any of the following; mechanics, body shop technicians or electricians.

**Awning or Canopy Sign**: Any sign that is a part of or attached to an awning, canopy, or other fabric, plastic, or structural protective cover over a door, entrance, window, or outdoor service area. A Marquee is not a canopy. A canopy sign shall be considered a wall sign. Any sign printed on a backlit canopy shall be considered a wall sign.

**Banner**: A canvas, plastic, cloth, or fabric sign used to advertise a product, service, event, or promotion. Banners are considered to be temporary signs only. (See Temporary Sign.)

**Base Flood:** The flood having a one percent chance of being equaled or exceeded in any given year.

**Basement:** Any area of the structure having its floor subgrade (below ground level) on all sides.

.

**Bed and Breakfast Inn:** Any residential structure within a zoning district which allows this land use wherein boarders are allowed to share guest rooms and living space with other guests and breakfast is served at no additional charge. No upper time limit on residency is to be established. In approval of a **Bed and Breakfast Inn** the city may consider impact on neighbors' parking needs, etc. and place additional requirements as deemed appropriate. Owner occupancy is not required. However, a 24-hour management presence is required for all operations when 1 or more guests are in residence.

**Better Building:** This ratio is determined by dividing the County's most recent appraised value for a building (not the site) by the building's area in square feet. The upper 1/3 of all building value to area ratios within 1000' shall be used to determine if a proposed architectural style is generally compatible with the area. Commercial buildings shall only be compared to commercial, industrial to industrial.

**Billboard:** An off-premise sign having a specified display surface that advertises goods, products, or services, generally not available or sold on the premises.

**Block:** A piece or parcel of land entirely surrounded by public highway, streets, streams, railroad rights-of-way or parks, etc., or a combination thereof.

**Board of Zoning Appeals (BZA):** A local body created by ordinance, whose responsibility is to hear appeals from decisions of the local zoning administrative officials and to consider requests for variances and exceptions permissible under terms of the Development Regulations of the City of Leavenworth, Kansas.

**Boarding or Rooming House**: A building other than a bed and breakfast, hotel, motel, cafe, or restaurant where, for compensation, directly or indirectly, lodging and/or 2 meals per day are provided for three (3) or more boarders and/or roomers exclusive of the occupant's family.

**Buffer Strip**: A strip of land, identified in the Development Regulations of the City of Leavenworth, Kansas, established to protect one type of land use from another with which it is incompatible.  Additional use, yard, or height restriction may be imposed but normally a properly screened area can provide a buffer.

**Builders Supply Yards and Lumberyards (except when indoors as part of a hardware store):**

**Building** – A structure having a roof supported by columns or walls for shelter, support, or enclosure of persons, animals, or personal property.

**Building Coverage:** The amount of land covered or permitted to be covered by a building, usually measured in terms of percentage of a lot

**Building Height:** The vertical distance measured from the average existing grade within the building setback envelope to the uppermost point of the roof of the building.

**Building Materials:**  Substances used in construction of a building, specifically the exterior elements, which influence character, appearance, and durability.

**Building Supplies and Equipment:**  A wholesale sales and warehousing operation catering to building contractors and not open to the public.

**Building Type:**  A definition based on floor plan, height and roof shape, related to architectural style.

**Bulk:** That measure that establishes the maximum size of a building and its location on a lot. Components of bulk include: size and height of building, location of exterior walls at all levels with respect to lot lines; streets and other buildings; gross floor area of building and amount of lot area provided per dwelling unit

**Bus Garage and Equipment Maintenance:**  Any facility for the storage, maintenance or operation of transportation equipment.

**Bus Terminal:**    A structure or place for the loading, unloading, and transportation of people into vehicles capable of transporting more than 15 people.  Unlike a bus stop, a bus terminal includes restroom facilities and the vending of trip tickets.

**Camp, Private, Overnight:** A private facility for use of its membership which allows temporary residence, not to exceed 30 days, in tents or recreational camper trailers.  On-site staff members are not limited to a residency period restriction.  Recreational Vehicles are not included.

**Campground:**  A facility, which allows temporary residence, not to exceed 30 days, in tents or recreational camper trailers.  Recreational Vehicles are not included.

**Canopy and Awning:** A roof-like cover having no supporting walls but supported otherwise from the ground, deck, floor, or walls of the building.

**Car Wash/Truck Wash:**  A facility for the washing and further cleaning of cars or trucks.

---

**CBD**:  Central Business District as defined by the most current Development Regulations.

**Cellar:** See Basement.

**Cemetery:**  An area set apart for or containing graves, tombs, or funeral urns.

**Certificate of Appropriateness -Minor:** A Certificate of Appropriateness which may be granted by certain designated staff for exterior repairs, maintenance, signage or for non-registered properties which have no adverse impact on historic properties.

**Certificate of Appropriateness or CofA**: A certificate issued by the City approving plans for alteration, construction, demolition or other matters relating to various historic properties.

**Certificate of Occupancy:** Official certification that a premises and its identified use conforms to the provisions of the Development Regulations of the City of Leavenworth, Kansas and building codes and may be used or occupied.  This certificate is granted for new construction.

**Certified Ownership List**:  A current list of names and addresses of property owners of record, and a legal description of the property owned that would lie within 200 feet (1000 in the rural area of the County) of the external boundaries of any land proposed for rezoning, special use permit, variance, or exception. This list may be prepared and certified by an abstractor, attorney, surveyor, or the County GIS department.  The Director may accept a list prepared by city staff.

**Changeable Message Sign, Electronic** – A sign that is activated electronically, whose message, content, or display, in whole or in part, may be changed by means of either electronic, computerized programming or any other means, and which the message is in text, alphanumeric characters, symbols, logos, or static image.

**Changeable Message Sign, Manual** – A sign on which the message or copy is changed manually in the field.

**Character:**  Those individual qualities of building, sites, and districts that differentiate and distinguish them from other buildings, sites, and districts.

**Chief Engineer:**  The chief engineer of the division of water resources, Kansas Department of Agriculture.

**Chief Executive Officer or Chief Elected Official:**  The official of the community who is charged with the authority to implement and administer laws, ordinances, and regulations for that community; i.e., the City Manager.

**Child Care Center:** A day nursery providing care for seven (7) or more children, for part or all of a day or night, away from the home of the parent or legal guardian; including full day child care, nursery schools, play groups, Head Start, centers giving emphasis to programming for special children, kindergartens not operated by the public schools, and other establishments offering care to groups of children for part or all of the day or night.  Centers for infants and toddlers or for handicapped children may have fewer than seven (7) children but be licensed as a center because the program meets child care center regulations.

**City Commission:** The elected, governing body of the City of Leavenworth.

**City Manager**:  Executive appointed by the City Commission

**City Planning Commission:** The Leavenworth City Planning Commission.

**City:** The City of Leavenworth, Kansas.

**Civic, Social, and Fraternal Organizations:**  Any organization with a mission of promoting the public good.

**Collector Street:**  A major thoroughfare designed to carry traffic from an arterial street to the local streets as designated in the Future Land Use Plan in the Leavenworth Comprehensive Land Use Plan.  Collector streets serve large subdivisions or neighborhoods.

**College or University:**  An organization which is listed in the U.S. Department of Education's Office of Postsecondary Education database which has been accredited by an accrediting agency or state approval agency recognized by the U.S. Secretary of Education as a "reliable authority as to the quality of postsecondary education" within the meaning of the Higher Education Act of 1965, as amended.

**Commercial Message:**  Any message, content, text, logo, or display that directly or indirectly names, advertises or calls attention to a business, product, service or other commercial activity or concerns the economic interest of the advertiser.

**Commercial Sign:**  Any sign that directly or indirectly names advertises or calls attention to a business, product, service or other commercial activity or concerns the economic interest of the advertiser.

**Commercial Vehicle:**   A motor vehicle or combination of motor vehicles used in commerce to transport passengers or property if: the vehicle has a gross vehicle weight rating or gross combination weight rating, or a gross vehicle weight or gross combination weight over 10,000 pounds; or the vehicle is designed or used to transport more than eight passengers, including the driver, for compensation; or the vehicle is designed to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or the vehicle is of any size and is used in the transportation of hazardous materials.

**Communication Tower:**  Any commercial structure with one or more antennae rising more than 20 feet above grade or the roof of a structure.

**Community Centers:**  Public locations and structures where members of a community gather for group activities, social support, public information, and other purposes.  They may sometimes be open for the whole community or for a specialized group within the greater community.

**Community playfields, playgrounds, and parks:** Any park or recreation facility accessible by all members of the public and intended to serve the recreation needs of the community as a whole.

**Community:**  Any State, area, or political subdivision thereof, which has authority to adopt and enforce floodplain management or other regulations for the areas within its jurisdiction.

**Compatible:** Of such character as not to detract from surrounding elements, buildings, sites or structures; consistent and appropriate with the surrounding context and setting.

**Component:** An individual part of a building, structure, site, or district.

**Concentrated Animal Feeding Operations:** Agricultural operations where animals are kept and raised in confined situations. CAFOs congregate animals, feed, manure and urine, dead animals, and production operations on a small land area. Feed is brought to the animals rather than the animals grazing or otherwise seeking feed in pastures, fields, or on rangeland.

**Consumer Goods Retail Sales:** The sale of goods or merchandise from a fixed location, such as a department store, boutique, or kiosk, or by mail, in small or individual lots for direct consumption by the purchaser. Retailing may include subordinated services, such as delivery. Purchasers may be individuals or businesses. In commerce, a "retailer" buys goods or products in large quantities from manufacturers or importers, either directly or through a wholesaler, and then sells smaller quantities to the end user. Retail establishments are often called shops or stores.

**Context:** The setting in which a historic element or building exists.

**Contracting Services, no storage or yard:** A facility from which service contractor vehicles are dispatched to jobs, but which has no outdoor storage of construction materials.

**Contributing/Key contributing:** A building, site, structure or object which adds to the architectural qualities, historic association or archeological values of historic register property for which a property is significant because: (a) it was present during the pertinent historic time; (b) it possesses integrity and reflects its significant historic character or is capable of yielding important information about the pertinent historic period or ( c) it independently meets the standards and criteria of the Historic Preservation regulations.

**Convent/Monastery:** A building, or complex of buildings, that houses a room reserved for prayer (e.g. an oratory) as well as the domestic quarters and monastic workplaces for monks or nuns, whether living in community or alone (hermits). Monasteries may vary greatly in size – a small dwelling accommodating only a hermit, or in the case of communities anything from a single building housing only one senior and two or three junior monks or nuns, to vast complexes and estates housing tens or hundreds.

**Conversion:** Changing, by alteration, the original purpose of a building to a different use.

**Country Club:** A private club, which may have a closed membership, offering a variety of recreational sports facilities. Activities may include golf, tennis, swimming, or polo. A country club will usually provide hospitality to members and guests such as a restaurant and bar, and may provide suitable accommodations for host-catered events, such as weddings.

**Covenant**: A private legal restriction on the use of land contained in the deed of the property or otherwise formally recorded.

**Cul-de-sac:**  A vehicular turnaround which is either temporary or permanent, located at the closed end of a dead-end street or alley.

**Day Care Center/Preschool:**  Any facility providing care of 15 or more children during the day by a person other than the child's legal guardians, typically performed by someone outside the child's immediate family. Day care centers typically offer an ongoing service during specific periods, such as the parents' time at work.  Preschool is the provision of care and an educational program for children before the commencement of statutory education, usually between the ages of three and five.

**Day Care Home:** A day nursery providing care for not more than six (6) children under kindergarten age. To qualify for a home occupation, no one other than members of the immediate family residing on the premises can be employed (see Child Care Center)

**Deciduous Trees:**  Generally those trees, which shed their leaves annually, such as Ash, Sycamore, Willow, etc.

**Density:**  The average number of families, persons, or housing units per unit of land; expressed in numbers of families per gross developable acre.

**Design guideline/standard:** The standards set forth by the Secretary of the US Department of the Interior for the preservation of historic places.

**Design:**  The location of streets, alignment of streets, grades, and widths of streets, alignment of easements, grades and widths of easements, alignment and rights-of-way for drainage and sanitary sewers, and the designation of minimum lot area, width and length.

**Developable Area (Gross):** The total acreage or square footage in a lot or tract proposed to be developed

**Developable Area (Net):** The gross developable area minus the area to be dedicated for public use or right-of-way

**Development Plan**: The provisions for the development of land including such drawings as shall serve as a plat or subdivision and all covenants relating to use, location and bulk of buildings and other structures, intensity of use or density of development, private drives and ways, parking facilities, common open space and public space.  All written or graphic materials prepared for the development will be considered "provisions of the development."

**Development:**  Any man-made change to improved or unimproved real estate, including but not limited to buildings or other structures, levees, levee systems, mining, dredging, filling, grading, paving, excavation or drilling operations, or storage of equipment or materials.

**Digital Billboard:**  A billboard capable of displaying multiple static images controlled by electronic communications.

**Directional Sign:**  Any sign that provides direction for the safe and efficient flow of vehicular or pedestrian traffic on a property, and shall include signs marking entrances, exits, parking areas, loading areas or other operational features of the premises.  A directional sign may contain the name or logo of

an establishment, but no commercial message.  Examples are parking and entrance signs.  The logo area shall not exceed 25% of sign area.  Off-premise directional signs are only allowed, as regulated, under Special Event Signs.

**Director:**  The Director of Planning & Community Development or a person designated in writing by the Director.

**Dissolve (A frame effect):**   A transition from one message to another where static messages are changed by means of varying light intensity or pattern where the first message gradually appears to dissipate and lose legibility simultaneous to the gradual appearance and legibility of the subsequent message.

**District (historic district):**  An area that possesses a significant concentration, relationship between, or continuity of sites, buildings, structures, or objects united historically or architecturally by plan or physical development.  Districts include college campuses, downtown areas, residential areas, industrial complexes, civic centers, government reservations, planned street systems, and parks.  The term may also be applied to individual, associated, or functionally related sites, buildings, structures, or objects that are geographically separated.  In such cases, visual continuity should not be necessary to convey the historic relationship of a group of related resources.

**District:**  See Zone, Overlay District, or Zoning District

**Dormitory:**  A residence hall providing rooms for individuals or for groups usually without private baths.

**Drinking Establishment:**  A place of business, which sells liquor-by-the-drink and maintains at least 30% of receipts in food sales as regulated by the Alcoholic Beverage Control Division, Department of Revenue.

**Driveway, Customary**: A private lane which leads from a street or an alley to a garage, carport, rear yard parking area, a parking space established in accordance with the provisions of this ordinance, or to another street or alley.  Such driveway may extend in front of, alongside of, or in the rear of a principal structure either planned for or erected upon a building site.

**Duly Authorized Representative:**  Any individual or person or any section, division or department of the city administration or any individual or person within the designated section, division or department of the city administration who has been designated by the Director  to implement, administer, and enforce the provisions of these Development Regulations.  Generally, references are to the City Planner and his/her designee, assignee, agent, or designated person as used in the text of the ordinance.

**Dwell Time:**  The length of time during which each frame is displayed on any sign that is capable of sequentially displaying more than one message on its sign face.

**Dwelling in Mixed-Use Structure:**  A dwelling unit within a larger structure, which is used in whole or in part as a commercial establishment.  The dwelling unit(s) need not be the principal residence of the business operator.

**Dwelling, Attached:**  A dwelling where at least one wall is shared, in common, with another dwelling.

**Dwelling, Detached:** A dwelling which is separated from any other principal structure

**Dwelling, Earth Sheltered:** A single family dwelling unit which incorporates the use of earthen materials to insulate not more than three sides of the structure, but which incorporates a conventional mansard, hip, gable, or gambrel roof, all built to the specifications of the local building code. For the purposes of administering this ordinance, an earth sheltered dwelling is NOT a basement dwelling.

**Dwelling, Elderly or Retirement Home:** A dwelling unit or high-rise apartment building specifically designed to be occupied by residents who are at least sixty-two (62) years of age, and who are ambulatory and able to take care of themselves.

**Dwelling, IBC/IRC Modular Home:** Sectional prefabricated buildings or houses that meet local building codes and consist of multiple modules or sections, which are manufactured in a remote facility and then delivered to their intended site of use. The modules are assembled into a single residential building using either a crane or trucks.

**Dwelling, Live/Work:** A dwelling unit, part of which may be used as a business establishment and the dwelling unit is the principal residence of the business operator.

**Dwelling, Manufactured Home:** Those structures, which are built to standards pursuant to the Federal Manufactured Home Construction and Safety Standards Act, 42 U.S.C.  5401, et seq.  Usually these are a  dwelling unit that is mass produced in a factory, is designed for long term residency and is constructed for transportation to a site for installation and use on a permanent foundation when connected to required utilities, and is either an independent, individual building or a module for combination with other elements to form a building.  The term "manufactured home" does not include a "recreational vehicle."

**Dwelling, Mobile Home:** A movable dwelling over thirty-two (32) feet in length or over eight (8) feet wide, constructed to be towed on its own chassis and designed to be installed with or without a permanent foundation for human occupancy as a residence when connected to utilities.  The term shall not include travel trailers, campers or self-contained motor homes or camper buses.

**Dwelling, Multi-Family:** A building or portion thereof, designed for occupancy by three (3) or more families.

**Dwelling, Single Family:** A building designed for occupancy by one (1) family.

**Dwelling, Single-Family Detached:** A building designed for occupancy by one (1) family, which has required yards and setbacks from other residential structures.

**Dwelling, Townhouse:** A building designed for occupancy by one (1) family in a style of medium-density housing that originated in Europe in the late 17th century, where a row of identical or mirror-image houses share side walls.

**Dwelling, Two-Family**: A building designed for occupancy by two (2) families

**Dwelling:** A dwelling is any building or portion thereof not including mobile homes, which is designed or used exclusively for residential purposes including an attached garage, provided the attached garage is

subordinate in area to the living portion of the structure.  An attached garage shall have a common wall with a main structure for a distance of at least 25% of the length of the longest dimension of the garage.  An attached garage not meeting this test may qualify as a detached garage, which need not comply with the five (5) foot setback requirement between buildings but shall meet all setback requirements of the principal structure.

**Easement:**  A right of the owner of one (1) parcel of land by reason of such ownership, or a right of the public, to use the land of another for a special purpose as designated.

**Educational and Scientific Research, Development, and Testing Services:**

**Element:**  An individual defining feature of a building, structure, site, or district.

**Elevated Building:**  For insurance purposes, a non-basement building which has its lowest elevated floor raised above ground level by foundation walls, shear walls, posts, piers, pilings, or columns.

**Eligible Community or Participating Community:**  A community for which the Administrator has authorized the sale of flood insurance under the National Flood Insurance Program (NFIP).

**Environmental Officer:**  The Director of Planning & Community Development.

**Environs:** The area immediately surrounding a property listed upon the National Register of Historic Places (hereafter, "registered"). The Historic Preservation regulations shall apply to all structures which are within 300 feet of a registered property and to all structures intervisible with the registered property up to, but not farther than, 500 feet.  Intervisible is further defined as "the condition of being able to see one point from another without physical, permanent obstruction."  Intervisibility shall be determined by standing at the main entrance of the registered property and looking in all directions for a distance of up to 500 feet.  All references to "within 500 feet of a landmark or historic district" as used throughout this code shall use the intervisibility standard for determining changes to the environs of a registered property.

**Evergreen Trees**:  Generally those trees which do not shed their leaves annually, such as Pine, Spruce, Juniper, etc.

**Exception**:  A grant of permission to depart from the general provision of the Development Regulations of the City of Leavenworth, Kansas which is expressly authorized by provisions of the ordinance after a finding of fact and imposition of conditions by the applicable governing body.

**Existing Construction:**  For the purposes of determining insurance rates, structures for which the "start of construction" commenced before the effective date of the FIRM or before January 1, 1975, for FIRMs effective before that date.  "Existing construction" may also be referred to as "existing structures."

**Existing Manufactured Home Park or Subdivision:**  A manufactured home park or subdivision for which the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including, at a minimum, the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads) is completed before the effective date of the floodplain management regulations adopted by a community.

**Expansion to an Existing Manufactured Home Park or Subdivision:**  The preparation of additional sites by the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads).

**Exterior Architecture/Feature:**  The character and composition of the exterior of the structure, including but not limited to, the kind and texture of the building material and the type, design and character of all windows, doors, light fixtures, signs and appurtenant elements, and, the elements and components of the outer surface of a structure including windows, doors, light fixtures, signs, fences, hitching posts, decorations, chimneys, false fronts, parapets, flag poles, landscaping, retaining walls and related materials.

**Facade:**  The front elevation of a building.

**Fascia Sign:**  A wall sign mounted against the horizontal piece covering the joint between the top of the wall and the projecting eaves of the roof.

**Fade (A frame effect):**  A transition from one message to another by means of varying light intensity, where the first Message gradually reduces intensity to the point of not being legible and/or gradually increases intensity to become legible.

**Family:**  A person living alone, or any of the following groups living together as a single nonprofit housekeeping unit and sharing common living, sleeping, cooking, and eating facilities: (1) any number of people related by blood, marriage, adoption, guardianship or other duly-authorized custodial relationship; (2) two unrelated people; (3) two unrelated people and any children related to either of them; or  (4) not more than eight people and up to two caretakers who are residents of a "Group Home" as defined in K.S.A. 12-736 and this ordinance.  This definition does not include those persons currently illegally using or addicted to a "controlled substance" as defined in the Controlled Substances Act, 21 U.S.C. §802(6). Exceptions: "Family" does not include: any society, club, fraternity, sorority, association, lodge, combine, federation, coterie, or like organization; any group of individuals whose association is temporary or seasonal in nature; or any group of individuals who are in a group living arrangement because of criminal offenses.

**Farm:**  An area, which is used for the production of farm crops such as vegetables, fruit trees, cotton, or grain and their storage as well as raising thereon of farm animals such as poultry, cattle, or swine on a limited basis.  Farms also include dairy operations.

**Farming:**  The practice of raising crops and/or livestock for profit.

**Fence:**  A barrier intended to prevent escape or intrusion, or to mark a property boundary.  Open fences are those constructed of wood, masonry, metal, woven wire or other material whose surface area is greater than 50 % open.  Solid fences are those constructed of wood, masonry, metal, plantings, hedges, or other material whose surface area is or may become less than 50% open.

**Final Plat:**  A plan or map prepared in accordance with the provisions of this regulation and those of any other applicable local regulation, which plat is prepared to be placed on record in the office of the Register of Deeds of the County.

**Financial Institution, with Drive-thru:** An institution that provides financial services for its clients or members including deposit-taking institutions, which accept and manage deposits and make loans. Examples are banks, building and loan societies, credit unions, trust companies, mortgage loan companies, insurance companies, pension funds, brokers, underwriters, and investment funds. This definition does not include short term or automobile title loan businesses. If these institutions have a physical facility to allow their customers to make transaction from a vehicle they are "drive-thru."

**Financial Institution, without Drive-thru:** An institution that provides financial services for its clients or members including deposit-taking institutions, which accept and manage deposits and make loans. Examples are banks, building, and loans societies, credit unions, trust companies, mortgage loan companies, insurance companies, pension funds, brokers, underwriters, and investment funds. This definition does not include short term or automobile title loan businesses. If these institutions do not have a physical facility to allow their customers to make transaction from a vehicle they are "without drive-thru."

**Fish Farm/Hatchery:** A place where large numbers of fish eggs are artificially fertilized and hatched, and fish are raised in an enclosed environment. Hatcheries may be owned and operated by either governments or private interests. Some hatcheries raise the fry until they reach adulthood and have commercial value; others release the fry into the wild with the intent of building up the wild stock. Fish Farms raise the fish until they are ready for market.

**Flashing:** A pattern of changing light Illumination where the sign's illumination alternates suddenly between fully illuminated and fully non-illuminated for drawing attention to the sign.

**Floating Zone:** A special detailed use of district of undetermined location in which the proposed kind, location, size, juxtaposition and form of structures must be preapproved, and which, like a special use permit, is legislatively predetermined to be compatible with the areas in which it may thereafter be located on a particular application, provided specified predetermined standards are met and actual incompatibility is not revealed. A Planned Unit Development is the only floating zone in this ordinance.

**Flood Boundary and Floodway Map (FBFM):** An official map of a community on which the Administrator has delineated both special flood hazard areas and the designated regulatory floodway.

**Flood Elevation Determination:** A determination by the Administrator of the water surface elevations of the base flood, that is, the flood level that has a one percent or greater chance of occurrence in any given year.

**Flood Elevation Study:** An examination, evaluation and determination of flood hazards and if appropriate, corresponding water surface elevations.

**Flood Fringe:** The area outside the floodway encroachment lines, but still subject to inundation by the regulatory flood.

**Flood Hazard Boundary Map (FHBM):** An official map of a community, issued by the Administrator, where the boundaries of the flood areas having special flood hazards have been designated as (unnumbered or numbered) A zones.

**Flood Hazard Map:**  The document adopted by the City Commission showing the limits of:  (1) the floodplain; (2) the floodway; (3) streets; (4) stream channel; and (5) other geographic features.

**Flood Insurance Rate Map (FIRM):**  An official map of a community, on which the Administrator has delineated both the special flood hazard areas and the risk premium zones applicable to the community.

**Flood Insurance Study (FIS):**  An examination, evaluation and determination of flood hazards and, if appropriate, corresponding water surface elevations.

**Flood or Flooding:**  A general and temporary condition of partial or complete inundation of normally dry land areas from: (1) the overflow of inland waters; (2) the unusual and rapid accumulation or runoff of surface waters from any source; and (3) the collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels or suddenly caused by an unusually high water level in a natural body of water, accompanied by a severe storm, or by an unanticipated force of nature, such as flash flood, or by some similarly unusual and unforeseeable event which results in flooding as defined above in item (1).

**Floodplain Management Regulations:**  Development Regulations, Zoning ordinances, subdivision regulations, building codes, health regulations, special purpose ordinances (such as floodplain and grading ordinances), and other applications of police power.  The term describes such state or local regulations, in any combination thereof that provide standards for the purpose of flood damage prevention and reduction.

**Floodplain Management:**  The operation of an overall program of corrective and preventive measures for reducing flood damage, including but not limited to emergency preparedness plans, flood control works, and floodplain management regulations.

**Floodplain or Flood-prone Area:**  Any land area susceptible to being inundated by water from any source (see "flooding").

**Floodproofing:**  Any combination of structural and nonstructural additions, changes, or adjustments to structures that reduce or eliminate flood damage to real estate or improved real property, water and sanitary facilities, or structures and their contents.

**Floodway Encroachment Lines:**  The lines marking the limits of floodways on Federal, State and local floodplain maps.

**Floodway or Regulatory Floodway:**  The channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than one foot.

**Floodway Use:** A use that can be approved by the City Engineer upon the application of certain criteria for uses in the 100-year floodway as regulated by Article X – Floodplain Management.

**Floor Area Defined:** For the purpose of applying the requirement of off-street loading and parking, the term "floor area" in the cases of offices, merchandising, or service types of use, shall mean the gross floor area used or intended to be used by tenants, or for the service to the public as customers, patrons,

clients, or patients, including areas occupied by fixtures and equipment for display or sale of merchandise.  It shall not include areas used principally for non-public purposes, such as storage, incidental repair, processing, or packaging of merchandise, offices incidental to the management or maintenance of stores or buildings,  restrooms, facilities, or exterior balconies.

**Food, Beverage, Convenience and Groceries Retail Sales:**  A grocery store is a store established primarily for the retailing of food.  It stocks different kinds of foods from assorted places and cultures, and sells them to customers.  Large grocery stores that stock products other than food, such as clothing or household items, are called supermarkets.  Small grocery stores that mainly sell fruits and vegetables are known as produce markets.  Bodegas and kiosks are small grocery stores that predominantly sell snack foods and sandwiches.  Convenience stores typically also retail gasoline.

**Foster Home:** A residence or building in which 12 to 24-hour care is provided to no more than five (5) children, two (2) or more of which are unrelated to the foster parent.  Foster homes are permitted in all residential districts as they are considered a family

**Frame Effect:**  A visual effect on an Electronic Changeable Message Sign applied to a Frame to transition from one Frame to the next.

**Frame:**  A single static image generally used to convey a picture or message or portion thereof that could include multiple frames through scrolling, traveling, and other effects.

**Fraternity/Sorority Home:**  A chapter house, providing residential and dining facilities for members of social organizations with a membership consisting of undergraduate students at colleges and universities. These are single-sex, initiatory organizations with membership considered active during the undergraduate years only.  A fraternity or sorority must be recognized by and affiliated with a local college or university.

**Free Standing Sign**:  Any self-supporting ground, pole, pylon, or monument sign which is detached and is independent from any structure.

**Freeboard:**  A factor of safety usually expressed in feet above a flood level for purposes of floodplain management.  "Freeboard" tends to compensate for the many unknown factors that could contribute to flood heights greater than the height calculated for a selected size flood and floodway conditions, such as bridge openings and the hydrological effect of urbanization of the watershed.

**Frontage:** The frontage of a lot is the side nearest the street.  For the purpose of determining yard requirements on corner lots and through lots, all sides adjacent to streets shall be considered frontage and yards shall be provided, as set forth in this document.

**Functionally Dependent Use:**  A use that cannot perform its intended purpose unless it is located or carried out in close proximity to water.  This term includes only docking facilities and facilities that are necessary for the loading and unloading of cargo or passengers, but does not include long-term storage or related manufacturing facilities.

**Funeral, Mortuary, Crematory:**  A facility for the provision of funeral services, including the preparation of bodies for burial or their disposal by cremation.

**Future Land Use Map:**  A component of the Comprehensive Land Use Plan.

**Gas Station:**  See Service Station.

**GBD:**  General Business District as defined by the most current Development Regulations.

**Golf course, private:** A golf course, with private membership and ownership, consists of a series of holes, each consisting of a teeing ground, fairway, rough, and other hazards, and a green with a flagstick and cup, all designed for the game of golf.  It may include a driving range, restaurant, pro-shop and bar.

**Golf course, public:** A golf course, with public membership and either private or public ownership, consisting of a series of holes, each consisting of a teeing ground, fairway, rough and other hazards, and a green with a flagstick and cup, all designed for the game of golf.  It may include a driving range, restaurant, pro-shop and bar.

**Governing Body:**  The City Commission of Leavenworth, Kansas.  **Government Activities or Services:** The rendering of services of a governmental nature (police, fire protection, refuse collection, or code enforcement for example) required within or upon any property regardless of zoning classification.

**Government Administrative Buildings and Support Facilities:**  Primary and accessory structures to be used by United States, Kansas, county, city, and local school districts or governments for the delivery of essential services to the public.  This definition does not apply to nonprofit corporations or organizations, which may deliver government services but are not under the jurisdiction of a popularly elected legislative board or commission.  All other provisions of the city's Development Regulations, zoning, land use, construction, and property maintenance codes shall apply to government-owned facilities.

**Government Offices and Facilities:**  Any facility, function, office, shop, or place operated by any one of the following governments: United States, State of Kansas, County of Leavenworth, City of Leavenworth, USD 453, or any other division of the state of Kansas with the authority to levy and collect taxes.

**Grass:**  A species of perennial grass grown as permanent lawns or for landscape purposes as distinguished from those species grown for agricultural or commercial seed purposes.

**Greenhouse/Nursery:** A nursery is a place where plants are propagated and grown to usable size.  These include retail nurseries that sell to the public, wholesale nurseries that sell only to businesses such as other nurseries and to commercial gardeners, and private nurseries that supply the needs of institutions or private estates.  Some retail and wholesale nurseries sell by mail.

**Group Home: Disabled (defined by K.S.A.  12-736):** A dwelling unit occupied by not more than ten (10) persons, including eight (8) or fewer persons with a "disability", which is licensed by a regulatory agency of the state.  "Disability" refers to persons with physical or mental impairments substantially limiting major life activities.

**Gun Sales and Service:**  Any place, structure, or person licensed by the federal government, which offers the sale, rental, service, repair, or storage of guns, ammunition and shooting accessories.

**Health Resort/Spa:**  A business establishment which people visit for professionally administered personal care treatments such as dietary counseling, various therapies, massages, and facials in a hotel setting where people reside for a day or more.

**Heavy Industrial:**  The production of products, which are either heavy in weight or heavy in the scale of the processes leading to their production.  Products are often produced with by the use of smelters, furnaces, and high energy or raw material inputs.  Often heavy industrial processes involve the use of large machines, smokestacks, hazardous products, and waste chemicals.  Typical Heavy Industrial processes have some negative effects on the surrounding property through the emission of noise, large vehicle traffic, particulate matter emissions, mechanical vibration, unpleasant smells, and or deleterious environmental impacts.  Heavy industrial projects can be generalized as more capital intensive or as requiring greater or more advanced resources, facilities or management.  These industries are often the most heavily regulated by the federal or state governments.

**Heavy Vehicle/Equipment Sales, Rentals, and Service:**

**Heliport:**  Any location where one or more heaver than air rotor-wing craft capable of containing a human, takeoff or land, and for which ground facilities necessary to these operations are constructed.

**Highest Adjacent Grade:**  The highest natural elevation of the ground surface prior to construction next to the proposed walls of a structure.

**Historic and Monument Sites:**  Any site so designated by the local, state, or federal Government.

**Historic District:**  An area designated as an historic district and which may contain within definable geographic boundaries one or more significant sites, structures or objects and which may have such other structures which contribute to the overall visual characteristics of the significant structures or objects located within the designated area, and are free from non-contributing structures which detract from the historic properties.

**Historic Preservation:**  The study, identification, protection, restoration and rehabilitation of buildings, sites, structures, objects, districts, and areas significant to the history, architecture, archaeology or culture of the city, state or nation.  Preservation may include work to halt the process of decay, normal maintenance, and other measures to retain and sustain the nature, form, material, and integrity of historically or architecturally important properties, structures or districts.

**Historic reconstruction:**  The reproduction of the exact form and detail of a vanished building, site, structure or object or a part thereof, as it appeared at a pertinent time using materials based on precise historical documentation and specification, including construction method.

**Historic replication:** the reconstruction of structural elements, which match the shape and size but may be made of different materials or methods than those used in the original construction.

**Historic restoration:** the accurate reconstruction of structural elements matching in shape, size and texture the original construction method and material, including removal of materials that are not appropriate to the structure.

**Historic Structure:**  Any structure that is  (a) listed individually in the National Register of Historic Places (a listing maintained by the Department of Interior) or preliminarily determined by the Secretary of the Interior as meeting the requirements for individual listing on the National Register; (b) certified or preliminarily determined by the Secretary of the Interior as contributing to the historical significance of a registered historic district or a district preliminarily determined by the Secretary to qualify as a registered historic district; (c) individually listed on a state inventory of historic places in states with historic preservation programs which have been approved by the Secretary of the Interior; or (d) individually listed on a local inventory of historic places in communities with historic preservation programs that have been certified either (1) by an approved state program as determined by the Secretary of the Interior or (2) directly by the Secretary of the Interior in states without approved programs.

**Historically or Architecturally important feature:** The qualities present in a structure, property, or district because it: (a) Is associated with an event or events that significantly contributed to the broad patterns of the history or architectural heritage of the city, state, or nation.  (b) Is associated with the life of a person(s) significant to the history of the city, state, or nation.  (c) Embodies distinctive characteristics of a type, design, period, or method of construction.  (d) Represents the work of a master craftsman or possesses high artistic value.  (e) Exemplifies the cultural, political, economic, social, or historic heritage of city, state, or nation.  (f) Contains elements of design, detail, materials, or craftsmanship which represent a significant construction innovation.  (g) Is part of or related to a square, park or other distinctive area that was or should be developed or preserved according to a plan based on a historic or architectural motif.  (h) Is an established and familiar visual feature of a neighborhood or of the community.  (i) Has yielded or is likely to yield archeological artifacts and/or information.

**Holiday Decorations:**  Displays erected on a seasonal basis in observance of religious, national, or state holidays that are not intended to be permanent in nature and that do not constitute commercial signs.

**Home Occupation:**  A business, profession, service, or trade, meeting the qualifications of and permitted by the Supplementary District Regulations of this ordinance, conducted for gain or support within a residential building.

**Hospital:**  An institution for health care providing patient treatment by specialized staff and equipment, and often, but not always providing for long-term patient stays.

**Hotel:**  A building or portion thereof, or a group of buildings, which provide sleeping accommodations for transients on a daily  or weekly basis for pay, whether such establishments are designated as a hotel, inn, automobile court, motel, motor inn, motor lodge, tourist cabin, tourist court, or otherwise.

**Hotels and Motels (with accessory uses):** A commercial establishment that provides guest-lodging accommodations consisting of a room with a bed, bathroom, climate control and maid service on a short-term basis.  Hotels typically have rooms exiting on to a semi-secure central hallway.  Motels typically have rooms exiting directly to the outdoors and have parking close to the room door.

**Identification Sign:**  Any sign giving the nature, logo, trademark or other identifying symbol, address, or any combination of the name, symbol, and address of a building, business development, or establishment on the premises where it is located.

**Illegal Lot Combination/Transfer:**  A lot that contains one (1) or more portions of a lot or lots of record. The transference of a portion of a platted lot without a replat of both the donor and recipient lots is illegal.

**Illegal Sign**:  A sign that violates the intent or provisions of the sign code and is installed or erected after the effective date of the  current sign code or was illegally installed before the effective date of the sign code and is not in conformance with the sign code.

**Illuminated Sign:** A sign lighted by, or exposed to, artificial lighting either by lights on or in the sign or directed toward the sign.

**Illumination:**  The amount of light that is incident to the surface of an object.  This is the method for describing ambient light levels or the amount of light that is projected onto a front-lit sign.  This parameter is typically measured in Lux (foot-candles x meters).

**Improvements**: Street and drainage work and utilities that are to be installed, or agreed to be installed in conformance to City of Leavenworth's standard and specifications, by the subdivider on the land to be used for public or private use of the lot owners in the subdivision, as a condition precedent to and acceptance of the final plat.

**Indirectly Illuminated Sign**:  A sign whose source of Illumination is exterior to the body of the sign with the light shining directly on the sign.

**Indoor Commercial Recreation/ Entertainment:** Any facility for recreation, which is indoors, and commercial in nature.

**Indoor Shooting Ranges:**  Any indoor shooting range for guns or archery meeting National Rifle Association standards for the design, construction, and operation of the facility.

**Infill Construction:**  Construction of a new residential or commercial structure on a previously platted and developed lot where one or more main structures were removed.  Infill constructions shall conform to established setback lines, building orientation, mass, form, and architectural styling of the surrounding buildings.

**Inoperative Vehicle:** A vehicle that is wrecked, partially dismantled and/or damaged to the extent that the equipment required by State statute on any such vehicle used on the streets and highways is not present or is not in good condition or proper adjustment or such vehicle is in an inoperable condition or a condition that would render the operation on the streets and highways a hazard to public safety.

**Internally Illuminated Sign** – A sign in which the source of Illumination is contained within the sign.

**Inter-Parcel Access:**  A private, vehicular way adequate to convey vehicular traffic from the subject property to adjacent properties in an unimpeded manner.

**Jails and Prisons:**   Places in which people are physically confined and, usually, deprived of a range of personal freedoms.  In the United States, "jail" and "prison" refer to separate levels of incarceration; generally speaking, jails are county or city administrated institutions which house both inmates awaiting trial on the local level and convicted misdemeanants serving a term of one year or less, while prisons are state or federal facilities housing those awaiting trial on the state or federal level and convicted felons

serving a term of more than one year. On the federal level, this terminology has been largely superseded by a more complex five-tier system implemented by the Federal Bureau of Prisons that ranges from low security "Prison Camps" to medium security "Correctional Institutions" and finally maximum security "Penitentiaries."

**Junk Yard:** The use of any lots, portion of a lot, or tract of land for the storage, processing, sale, or abandonment of junk, including scrap metal or other scrap material, or for the dismantling, demolition or abandonment of automobiles, or other vehicles, or machinery or parts thereof

**Junkyard, Salvage Yard:** The location of a dismantling business where wrecked or decommissioned vehicles or other scrap is brought, their usable parts are sold for use in operating vehicles, while the unusable metal parts, known as scrap metal parts, are processed and sold to metal-recycling companies.

**Kansas Register/State Register:** The current State Register of Historic Places as prepared, approved and amended by the State Historic Sites Board of Review and authorized by KSA 75-2701, et.seq.

**Kennel:** A facility, which houses, boards, breeds, or trains five (5) or more dogs or cats by other than the owner.

**Landfill, Construction and Demolition:** An approved location through the special use permit process wherein the following can be deposited: waste building materials and rubble resulting from construction, remodeling, repair or demolition operations on houses, commercial buildings, other structures, and pavement.

**Landfill, Cut And Fill:** A location wherein clean fill dirt may be deposited or cut with the approval and review of the Director of Public Works.

**Landfill, Municipal Solid Waste:** A landfill accepting all types of material as regulated by the State of Kansas not including Construction and Demolition Landfills or Cut and Fill Landfills. Municipal Solid Waste Landfills are not allowed in the City of Leavenworth.

**Landowner:** (Also known as property owner) The legal or beneficial owner or owners of all land proposed for action under this ordinance. The holder of a contract to purchase or other persons having an enforceable proprietary interest in such land shall be deemed a landowner or property owner for the purpose of this ordinance.

**Landscape Material:** Living material such as trees, shrubs, ground cover/vines, turf grasses, and non-living material such as: rocks, pebbles, sand, bark, brick pavers, earthen mounds (excluding pavement), and/or other items of a decorative or embellishment nature such as fountains, pools, walls, fencing, sculpture, etc.

**Landscaped Open Space:** All land area within the property lines not covered by building or pavement.

**Leavenworth Landmark:** A site, structure, or object designated as a landmark by the City Commission deemed worthy of preservation because of its historic, archaeological, and/or architectural significance to the City, state or nation.

**Legal Setback Line**:  A line established by the Development Regulations beyond which no building may be built.  A legal setback line shall be measured from the property line, not the curb line.

**Library:** A collection of sources, resources, and services, and the structure in which it is housed, organized for use and maintained by a public body, an institution, or a private individual.

**Light Industrial:**  Light industry is usually less capital intensive than heavy industry, and is more consumer-oriented than business-oriented.  Most light industry products are produced for end users rather than as intermediates for use by other industries.  Light industry facilities typically have less environmental impact than those associated with heavy industry.  Light industry is a manufacturing activity that uses moderate amounts of partially processed materials to produce items of relatively high value per unit weight.  Examples of light industries include the manufacture of clothes, shoes, furniture, consumer electronics, and home appliances.  Light industries require only a small amount of raw materials, area, and power.

**Local Streets:**  A street whose primary purpose is to provide access to private property.

**Lot Area:** The total square footage area of the property bounded by the front, side and rear lot lines, excluding all dedicated rights-of-way.

**Lot, Buildable:** Any lot of record meeting the zoning minimums or lot of record that has frontage on a dedicated street that is open and maintained by the city.  A street of less than a minimum right-of-way width shall require dedication of additional right-of-way prior to the issuing of any building permits.  No permits for residential uses shall be issued on streets that are not open, dedicated, and maintained by the city except in a PUD.

**Lot Coverage:**  The portion of a lot occupied by the building footprint and all impervious surfaces.

**Lot Line, Front**: The property line dividing a lot from the right-of-way of a street.  On a vacant corner lot, the shorter street right-of-way shall be considered as the front line.  On a developed corner lot, the front line should be determined by the structure's main entrance.

**Lot Line, Rear**: The lot line opposite and most distant from the front lot line and most nearly parallel to it.

**Lot Line:** Lot boundary line or property line.

**Lot of Record:** A lot which is a part of a subdivision, the map of which has been recorded in the office of the Register of Deeds of Leavenworth County; or a parcel of land described by metes and bounds, the deed to which was recorded in the office of the Register of Deeds prior to the adoption of this ordinance.

**Lot Width:** The distance between the side lot lines, measured along the front setback line as established by this ordinance.  Where the front setback line is curvilinear, lot width shall be measured along the tangent to this curve.

**Lot, Depth Of:** The average horizontal distance between the front and rear lot lines.

**Lot, Double Frontage:** A lot having a frontage on two (2) non-intersecting streets, as distinguished from a corner lot.

**Lot, Interior:** Any lot other than a corner lot.

**Lot/Parcel/Tract:**  As defined by the State of Kansas.

**Lot:**  A parcel or tract of land under single ownership or control.  A lot may consist of one (1) or more lots of record.  Multiple lots may be developed as one lot if internal easements are voided.  A portion of land in a subdivision or other parcel of land, intended as a unit for transfer of ownership or for development.

**Lowest Floor:**  The lowest floor of the lowest enclosed area, including basement.  An unfinished or flood-resistant enclosure, usable solely for parking of vehicles, building access, or storage, in an area other than a basement area, is not considered a building's lowest floor, provided that such enclosure is not built so as to render the structure in violation of the applicable floodproofing design requirements of this ordinance.

**LPC:** The Leavenworth Preservation Commission.

**Luminance:**  The amount of light that emanates from an internally illuminated sign.  This parameter is measured in nits.  The nit levels necessary for the sign to be legible vary with the ambient light conditions.  On a sunny day, the nit levels must be very high, while at night, the levels must be very low to prevent the image from distorting and to prevent glare.

**Major Arterial Street:**  A street of great continuity which serves as a major thoroughfare whose primary function is to move traffic from and to principal traffic generators within the region

**Mansard Sign** – A sign mounted on a roof with two angles of slope, the lower portion of which is steeper and architecturally comparable to a building wall.  Also may be a vertical façade that imitates a roof.  A mansard sign is a wall sign.

**Manufactured Home Park or Subdivision**:  A parcel (or contiguous parcels) of land divided into two or more manufactured home lots for rent or sale.

**Manufactured/Mobile Home Community:**  A community consisting entirely of single family homes manufactured off-site.  Typically, residents pay a lot rental fee to the owner of the community.

**Manufacturing, Fabrication, and Assembly:**  Any place or structure where value is added to a material product through manufacturing techniques.

**Map:** The Flood Hazard Boundary Map (FHBM), Flood Insurance Rate Map (FIRM), or the Flood Boundary and Floodway Map (FBFM) for a community issued by the Federal Emergency Management Agency (FEMA).

**Marina:** A marina is an artificial harbor with wharfs keeping boats and yachts and with services for recreational boating.  A marina may have refueling, washing and repair facilities, ship chandlers, stores and restaurants.  A marina may include ground facilities such as parking lots for vehicles and boat trailers and boat ramps to transfer trailered boats into the water.  A marina may have a boat hoist operated by service personnel.  A marina may have out-of-water-storage for out-of-season boat storage.  A marina differs from a port in that a marina does not handle large passenger ships or cargo from freighters.

**Market Value or Fair Market Value:** An estimate of what is fair, economic, just, and equitable value under normal local market conditions.

**Marquee Sign:**  A sign made a part of a marquee and designed as either a manual changeable message sign or an electronic changeable message sign.  A marquee sign is a wall sign.

**Marquee:**  A hood, canopy, or awning of permanent construction that projects from a wall of a Building, usually above an entrance.

**Mass:**  The ratio of solid wall space to window and door openings on a building footprint and all impervious surfaces with the sole exception of sidewalks.

**Mausoleum:**    A stone or masonry building with places for entombment of the dead above ground level.

**Maximum Extent Feasible:**  Reasonable efforts have been undertaken to comply with the regulations, but the cost of compliance clearly outweighs the potential benefits to the public or would unreasonably burden the proposed project, and reasonable steps have been undertaken to minimize any potential harm or adverse impacts resulting from noncompliance with the regulation.

**Mean Sea Level:**   For purposes of the National Flood Insurance Program (NFIP), the National Geodetic Vertical Datum (NGVD) of 1929 or other datum to which base flood elevations shown on a community's Flood Insurance Rate Map (FIRM) are referenced.

**Medical and Dental Clinics and Offices:** A clinic is a health care facility that is primarily devoted to the care of outpatients.  Clinics can be privately operated or publicly managed and funded, and typically, cover the primary health care needs of populations in local communities, in contrast to larger hospitals which offer specialized treatments and admit inpatients for overnight stays.  Clinics are often associated with general medical practice, run by one or several general practitioners or practice managers.

**Membership Clubs:** An organization composed of people who voluntarily meet on a regular basis for a mutual purpose.  The term club is not a legal term per se, but a group that organizes itself as a club must comply with any laws governing its organization and otherwise be cognizant of the legal ramifications in undertaking to organize itself in this manner.

**Message:**  As used in the sign code, a text, image, or combination thereof meant to be comprehended as a whole by the viewer.  Each simple concept shall be deemed a separate message.  A message can be either a static display or a display that, not fitting onto the screen all at once, is broken into parts, which appear sequentially, scrolling across the screen.  Electronic changeable message signs are capable of changeable messages.

**Mini-Storage:**  A business that owns and operates a facility that is subdivided into self-storage spaces, which are rented to tenants, usually on a monthly basis.  Self-storage facilities lease space to individuals, usually storing household goods, or to small businesses, usually storing excess inventory or archived records.  The rented spaces are secured by the tenant's own lock and key.  Facility operators do not have casual access to the contents of the space, unlike a professional warehouseman.  A self-storage operator does not take possession, care, custody, or control of the contents of the storage rental space unless a lien is imposed for non-payment of rent.

**Minor Arterial Street:**  A street whose primary function is the same as that of a principal arterial street, except that it serves on a small community scale, and provides destinations to specific traffic generators.

**Mobile Home Park:** Any lot, tracts, or parcel of land used or offered for use in whole or in part with or without charge for parking of mobile homes for non-transient use, but shall not include mobile home sales lots on which unoccupied mobile homes are parked for the sole purpose of display, inspection, sale or storage.

**Mobile Home Space:** A plot of ground within a mobile home park designed for the accommodation of one (1) mobile home.

**Monument Sign:**  A freestanding sign having the appearance of a solid base of landscape construction materials such as brick, stucco, stonework, textured wood, tile or textured concrete materials.  The base of a monument sign shall be architectural in nature, with a concealed means of support, and utilize materials consistent with the design of the building it is identifying.

**Motel:**  See Hotel.

**Motion:**  As used in the sign code, the depiction of movement or change of position of text, images, or graphics.  Motion shall include, but not be limited to, visual effects such as dissolving and fading text and images, scrolling sequential text, graphic bursts, lighting that resembles zooming, twinkling, or sparkling, changes in light or color, transitory bursts of light intensity, moving patterns or bands of light, expanding or contracting shapes and similar actions.

**Motor Vehicle Repair:**  General repair, engine rebuilding, rebuilding, or reconditioning of motor vehicles; collision service such as body, frame, or fender straightening and repair; overall painting; but not including painting of automobiles unless conducted in a completely enclosed spray booth.  Motor vehicle repair service shall only be performed within an enclosed yard or structure.  All inoperable vehicles shall also be stored within an enclosed yard or structure.

**Moving and Storage Facilities:**  A facility for the storage and dispatching of household or commercial relocation services, trucks and crews.  It may also contain facilities for the warehousing of household or commercial goods in short term or long-term storage.

**Name Plate Sign:**  A single-faced, non-illuminated wall sign that displays only the name and/or occupation of the person or persons occupying space in a building.  Name plate signs may be incorporated within wall signs and shall otherwise be subject to regulations restricting wall signs.

**National Register:**  The current National Register of Historic Places established by the National Preservation act of 1966, 80 Stat. 915.16 USC 470 *et seq,* as may be amended.

**Neighborhood Recycling Center**:  A center, designed to serve a limited area or specific neighborhood, for the collection of specific materials, which may be recycled.  It is not a center for the on-site processing of used materials into new materials.  Recyclable materials include many kinds of glass, paper, metal, plastic, textiles, and electronics.  The composting or other reuse of biodegradable waste, such as food or garden waste is not considered recycling under this definition.  Materials to be recycled are brought to a

collection center by local residents.  Commercially generated recyclables are not to be deposited in neighborhood recycling centers.

**New Construction:**  Construction of site infrastructure or a new element, building, or structure.

**New Construction:**  For the purposes of determining insurance rates, structures for which the "start of construction" commenced on or after the effective date of an initial FIRM or after December 31, 1974, whichever is later, and includes any subsequent improvements to such structures.  For floodplain management purposes, "new construction" means structures for which the "start of construction" commenced on or after the effective date of the floodplain management regulations adopted by a community and includes any subsequent improvements to such structures.

**New Manufactured Home Park or Subdivision:**  A manufactured home park or subdivision for which the construction of facilities for servicing the lot on which the manufactured homes are to be affixed (including at a minimum, the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads) is completed on or after the effective date of floodplain management regulations adopted by the community.

**NFIP**:  The National Flood Insurance Program.

**Nit**:  A unit of measure of brightness or luminance.  One nit is equal to one candela/square meter.

**Non-Affixed Sign:**  Any sign that is not permanently affixed to a building, structure or the ground.

**Non-Commercial Message:**  Any message, content, text, or display that is not a commercial message.

**Non-Commercial Sign:**  Any sign that is not a commercial sign.

**Non-Conforming Lot of Record:**  A lot which is part of a recorded subdivision or a parcel of land, the deed to which was recorded prior to the adoption of the original Subdivision Regulations in the city, July 19, 1966, and neither the lot nor parcel complies with the lot width or area requirements for any permitted uses in the district in which it is located.

**Non-Conforming Signs and Billboards**:  Any sign or billboard that was installed prior to the passage of this sign code and that was a legal sign, but which does not now conform to the requirements of this sign code.

**Non-Conforming Structure:** An existing structure which does not comply with the lot coverage, height or yard requirements which are applicable to new structures in the zoning district in which it is located.

**Non-Conforming Use:** An existing use which does not comply with the use regulations applicable to new uses in the zoning district in which it is located.

**Non-Contributing:**  A building, site, structure or object that does not add to the architectural quality, historic association or archaeological values for a landmark or historic district because it was not present historically, or has been altered or changed which has destroyed its historic integrity and it is incapable of being restored, or it cannot independently meet the criteria for landmark designation.

**Non-Residential Swimming Pools:** Swimming pools operated by a private membership organization or government.

**Normal Maintenance/Repair:**  Any work designed to correct damage or deterioration to the condition that existed prior thereto.  "Normal maintenance" includes all work performed on structures by a property owner which does not require a permit as prescribed by the City's development regulations.

**Nursery Care or School:**  See Child Care Center or Day Care Home.

**Nursing Home/Hospice:** A nursing home, convalescent home, Skilled Nursing Unit, care home, rest home, or hospice which provides a type of care for its residents.  It may be a place of residence for people who require constant nursing care and have significant deficiencies with activities of daily living.  Residents include the elderly and younger adults with physical or mental disabilities.  Residents in a skilled nursing facility may also receive physical, occupational, and other rehabilitative therapies following an accident or illness.  Hospice is a type of care that focuses on the palliation of a terminally ill patient's symptoms.  These symptoms can be physical, emotional, spiritual, or social in nature.

**Official Sign**:  Any sign installed or erected by a governmental body or agency or by a public utility such as traffic signs, signals, regulatory devices or warnings; signs designating properties or structures officially designated by the federal, state or local government as being of historical significance or other similar signs.  Commercial signage by a utility is not an official sign.

**Off-Premise Sign:**  A commercial sign containing a message that pertains to a business, establishment, person, organization, activity, entertainment, event, condition, place, service or product that is not principally located, or primarily manufactured, produced, available, furnished or sold on the premises upon which the sign is erected, The on-premises/off-premises distinction applies only to commercial signs.

**On-Premise Sign:**  A sign advertising an establishment, business, person, activity, good, product, or service that is located on the premises upon which the sign is erected.

**Open Space, Common:** An area of land or water or combination thereof reserved for the passive and active recreation of the residents of a designated area.  Such area shall not include areas used for streets, alley, driveway, private roads, off-street parking, or loading areas, utility easement, trash collection point or private yard area not open to common use by these residents.

**Open Space:**  An area of land or water or combination thereof planned for passive or active recreation, but does not include areas utilized for streets, alleys, driveways or private roads, off-street parking for loading areas, or required front, rear, or side-yards.

**Orientation:**  Direction on a lot followed by the building's dominant lines, i.e., front-to-back or side-to-side.

**Outdoor Commercial Recreation:**  Any facility for recreation, which is outdoors, and commercial in nature.

**Parking Lot or Garage (Commercial, Non-Accessory):**  Defined in the Off Street Parking section of these regulations.

**Parking Lot:**  A parcel of land devoted to the parking of motor vehicles, which considers the width, length, turning radii and ingress/egress requirements of a standard sized automobile.  A parking lot will be sealed with a dustless, all-weather surface.

**Parking Space:  Off-Street:** A parcel of land, which is required for parking purposes by this ordinance, on or near the property where the particular use is located.  Parking places required by this ordinance cannot be located on any part of a public easement or dedicated right-of-way.

**Parking Space:**  The portion of a parking lot sufficient in size to store one automobile.  The minimum design established is 8 1/2' x 18'.

**Parks and Open Space:**

**Participating Community:**  An "eligible community";  a community in which the Administrator has authorized the sale of flood insurance.

**PC:**  Planning Commission

**Pedestrian Way:**  A right-of-way dedicated to public use, which cuts across a block to facilitate pedestrian access of adjacent streets and properties.

**Permit:**  A signed document from a designated community official authorizing development.  As relating to floodplain management a signed document from a designated community official authorizing development in a floodplain, including all necessary supporting documentation such as: (1) the site plan; (2) an elevation certificate; and (3) any other necessary or applicable approvals or authorizations from local, state or federal authorities.

**Person:**  Includes any individual or group of individuals, corporation, partnership, association, or any other entity, including Federal, State, and local governments and agencies.

**Pervious Pavement:**  A pavement system with traditional strength characteristics but which allows rainfall to percolate through it rather than running off.  A pervious pavement system uses either porous asphalt, pervious concrete, or plastic pavers interlaid in a running bond pattern and either pinned or interlocked in place.  Porous asphalt consists of an open graded course aggregate held together by asphalt with sufficient interconnected voids to provide a high rate of permeability.  Pervious concrete is a discontinuous mixture of Portland cement, coarse aggregate, admixtures, and water that allows for passage of run-off and air. Examples of permeable pavement systems include Grasspave2®, Gravelpave2®, Turfstone®, and UNI Eco-stone®.2

**Pet Grooming:**  The hygienic care and cleaning of a pet as well as a process by which a pet's physical appearance is enhanced.

**Pet Shops:**  Any location where the retail sales of pets and pet accessories occurs.

**Petroleum Pipeline and Pressure Control Stations:**  Any facility used to measure or maintain the conditions in a pipeline operated by a public utility.

**Placement:**  Building siting or positioning on a lot, as determined by its setbacks.  Placement also refers to the positioning of individual elements on a building.

**Planned Unit Development (PUD):**  A single parcel or contiguous parcels of land intended to be developed in accordance with an overall design plan, which may include residential, commercial, industrial, or public land uses or a mixture thereof.

**Planning Commission:**  Shall mean the Leavenworth City Planning Commission.

**Pole Sign:**  A freestanding sign supported by uprights, braces, columns, poles, or other vertical members that are not attached to a building.

**Portable Sign:**  A temporary sign designed to be transported, including, but not limited to, signs designed to be transported by means of wheels or by a person, a sandwich board sign, balloons or other gas or air filled objects used as commercial signs, and signs attached to or painted on vehicles parked and visible from the public right-of-way, unless that vehicle is used in the normal day-to-day operations of the business.

**Porte Cochere:** (pronounced port co-SHARE) The architectural term for a porch- or portico-like structure at a main or secondary entrance to a building, through which a horse and carriage (or motor vehicle) can pass in order for the occupants to alight under cover, protected from the weather.

**Post Office Branches:**  Any physical subdivision or staffed permanent presence of the United States Postal Service.

**Preliminary Plat:**  A plan made for showing the design of a proposed subdivision and the existing conditions in and around it.  This plan need not be based on a detailed final survey of the property.

**Principal Structure:** A structure in which a dominant use of the lot on which the structure is located is conducted.

**Principal Use:** The main use of land or structures as distinguished from a subordinate or accessory use.

**Principally Above Ground:**  At least 51 percent of the actual cash value of the structure, less land value, is above ground.

**Private Club: "Class B Club"** A premises operated for profit by a corporation, partnership or individual, known as the management, to which premises the management allows persons, known as members to resort for the consumption of food or alcoholic beverages and for entertainment.

**Private Club: "Class A Club"** A premises owned or leased and operated by a corporation, partnership, business trust or association, for the exclusive use of the corporate stockholders, partners, trust beneficiaries or associates, their families and invited and accompanied guests, and which is not operated for a profit other than such as would accrue to the entire membership.  A corporation, partnership, business trust, or association not operated for a profit, for the purposes of the definition of a Class A Club shall only include a corporation, partnership, business trust, or association, which has been determined to be a bona fide nonprofit social, fraternal or war veterans club.

**Projecting Sign:**  A sign that projects from and is supported by a wall of a building or structure.  (Sign face may be perpendicular to the wall.)

**Property Identification Sign**:  A sign identifying a neighborhood, subdivision or other residential development.  A property identification sign may not be a temporary sign.

**Property Line**:  The boundary line (front, side, or rear) of land owned by an individual, firm or corporation described by metes and bounds or by a plat lot number.

**Public Interest Sign:**  Any sign intended to convey a legal right or restriction on a property, such as a "No Trespassing" sign; a sign intended to warn the public of a bona fide danger on the property, such as a "Beware of the Dog" sign; or a sign placed by order of a court or by a government official in the normal course of their duties.  Public interest signs shall include signs identifying a structure or area as a historic structure or place.

**Public or Private Membership:**  Any structure or area under the control of a group with restricted membership.

**Pylon Sign:**  A freestanding sign with a visible support structure that may or may not be enclosed by a pole cover.

**Racing Facilities:**  Any facility, with any surface, where motorized, electric, or internal combustion, vehicles with one or more human occupant race, practice, or test for racing purposes.

**Racquet Club:** A commercial facility for the playing of squash, tennis, or racquetball at which there is a clubhouse including restrooms.  Such a facility may provide additional services customarily furnished by a club such as swimming, outdoor recreation, and related retail sales that may include a restaurant and cocktail lounge as a secondary use.

**Radio, Television, and Recording Services:**  Any facility where electronic media for radio, television or other methods of distribution is made for commercial purposes.

**Railroad Terminal:**  Any passenger or freight terminal used by a railroad company.

**Ranching:**  The raising of livestock for commercial sale.

**Reasonably Safe from Flooding:**  Base flood waters will not inundate the land or damage structures to be removed from the SFHA and that any subsurface waters related to the base flood will not damage existing or proposed buildings.

**Recreational Vehicle:**  A vehicle which is (a) built on a single chassis; (b) 400 square feet or less when measured at the largest horizontal projections; (c) designed to be self-propelled or permanently able to be towed by a light-duty truck; and (d) designed primarily not for use as a permanent dwelling but as temporary living quarters for recreational, camping, travel, or seasonal use.

**Recycling Collection Station:**  As opposed to a neighborhood recycling centers, recycling collection stations are designed to serve a city sized area for the collection of specific materials, which may be recycled.  It is not a center for the on-site processing of used materials into new materials.  Recyclable

materials include many kinds of glass, paper, metal, plastic, textiles, and electronics.  The composting or other reuse of biodegradable waste, such as food or garden waste is considered recycling under this definition.  Materials to be recycled are brought to a collection center by local residents and businesses.  Commercially generated recyclables may be deposited at Recycling Collection Stations.

**Religious Assembly:**  Any assembly of one or more people in furtherance of their shared spiritual beliefs.

**Remedy a Violation:**  As used in Article X, Floodplain Management, **t**o bring the structure or other development into compliance with Federal, State, or local floodplain management regulations; or, if this is not possible, to reduce the impacts of its noncompliance.

**Residential Home-Stay:**  Any furnished residential structure wherein one limited-term boarder (not to exceed 180 days) is allowed the use of an entire structure, or a portion of a structure, and its grounds.  No management or owner presence is required and no meals are served.  In approval of a **Residential Home Stay** the city may consider impact on neighbors' parking needs, etc. and place additional requirements as deemed appropriate.  Such a business shall be registered with the City Clerk as a rental property.

**Residential:**  A Residential zoning district, RI-25, RI-9, RI-6, R4-16, RMF, and MP as defined by the most current Zoning Ordinance.

**Restaurant, Drive-thru or Drive-in:** An establishment whose primary business is the serving of food to the public, including, but not limited to, the types of business establishments customarily referred to as cafeterias, coffee shops, dairy bars, restaurants and soda fountains.  The Drive-in or Drive-thru component refers to a situation where food and drink are served for consumption, on or off the premises by order from and service to vehicular passengers outside the structure.

**Restaurant**: An establishment whose primary business is the serving of food to the public, including, but not limited to, the types of business establishments customarily referred to as cafeterias, coffee shops, dairy bars, restaurants and soda fountains.

**Retreat House:** A residential dwelling wherein short-term boarders are allowed (not to exceed one week) to share living space and participate in specifically defined activities related to hobbies or other shared interests.

**Riding Academies/Stables:**  Any facility dedicated to equine activities, to include teaching riding, riding, showing, boarding, maintenance, care, breeding, and rental of horses.

**Right-of-Way**: A public way established or dedicated by duly recorded plat, deed, grant, governmental authority or by operation of the law.

**Risk Premium Rates:**  Those rates established by the Administrator pursuant to individual community studies and investigations, which are undertaken to provide flood insurance in accordance with the National Flood Disaster Protection Act of 1973 and the accepted actuarial principles.  "Risk premium rates" include provisions for operating costs and allowances.

**Roof Sign**:  A sign erected upon or above a roof or parapet of a building or structure, affixed to, supported by, or braced upon the roof joists or rafters.

**Salvage/Junkyard:** The use of any lot(s), portion of a lot, or tract of land for the storage, processing, sale or abandonment of junk, including scrap metal or other scrap materials, or for the dismantling, demolition or abandonment of automobiles or other vehicles or machinery or parts thereof.

**Sandwich Board Sign**:  A self-supporting A-shaped freestanding, portable, temporary sign with only two visible sides angled, rather than parallel and flush; also called an A-Frame sign.  These signs are situated to a business, typically on a sidewalk.

**Scale:**  The size, both height and width, of a building or structure.  Scale is influenced by patterns, shapes, and sizes of materials, components, and openings.

**School, Elementary and Middle (Public and Private):**  As defined by the State of Kansas.

**School, Senior High:**  As defined by the State of Kansas.

**School, Vocational-Technical and Trade:**  As defined by the State of Kansas.

**Screening (Screening Enclosure Or Properly Screened):** A solid or semisolid fence or wall at least six (6) feet high but not more than eight (8) feet high, having a density of not less than eighty (80) percent per square foot.  A landscape screen consisting of trees, shrubs or hedges meeting density requirement may be used to meet the requirement.  Fence or wall shall be maintained in good condition by owner or owners of the property.

**Scrolling/Travel:**  A frame effect where the frame is changed by the apparent vertical or horizontal movement of a frame or of the letters or graphic elements of the message.

**Secretary:**  Secretary of the Planning Commission.

**Semi-Permanent Structures**:  Structures that have a general lifespan less than that of the primary structure.  Examples include both above and below grounds swimming pools, storage sheds, play structures, and gazebos.

**Senior Housing:**  Housing for people over 55 and their immediate family members, which may include some limited on-site care.

**Service Station, Automobile:** A retail business engaged primarily in the sale of motor fuels; but also in supplying goods and services generally required in the operation and maintenance of automobiles.

**Setback Line or Building Line:**  A line fixed parallel to the lot line beyond which a building cannot extend under the terms of the Development Regulations.  It is equivalent to the yard requirement.

**Set-Back:** The required distance between each structure located on a building lot and the property lines of the lot.  **Setting:**  The immediate physical environment of a building, structure, site, or district.

**Sexually Oriented Business:** A business establishment open to the public, or to members, that offers for sale any or all of the following: nude or semi-nude entertainment, sexually oriented outcall services, sexually oriented retail sales of products, seminude dancing, and seminude dancing agencies. These include any facility or establishment which offers for sale, loan or rental any printed, recorded, photographed, filmed or otherwise viewable material, or any sexually oriented paraphernalia or aid, if a substantial portion (over 25%) of the stock or trade is characterized by an emphasis on matters depicting, describing or relating to sexual activities. This may also involve employees, contractors or other workers displaying uncovered male or female genitals or nude female breasts related to some form of monetary compensation paid to the entity operating the use or to persons involved in such display.

**Shape:** Surfaces and edges of a building and individual elements.

**Shelter Home:** Shelter Home means an enclosed building, or portion thereof, operated by a nonprofit entity for the purpose of providing shelter, bathing and restroom facilities, a secure place for belongings, and sleeping accommodations for people at no charge. A shelter home may include related support such as meals, medical services, social services, counseling, and training.

**Shelter, Domestic Violence:** A place of temporary refuge and support for people escaping violent or abusive situations.

**Shrub:** Any self-supporting, woody plant of a species, which normally grows to an overall height of less than fifteen (15) feet in this region.

**Sidewalk:** A paved walk for pedestrians along and at the side of a street.

**Sign Alteration**: The replacement, enlargement, reduction, reshaping, changing, or adding to a sign, sign structure or other supporting members.

**Sign Face**: The entire area within a square, circle, rectangle, triangle or combination thereof that encompasses the extreme limits of the writing, representation, emblem, or other display, together with any material or color forming an integral part of the background of the display or used to differentiate the sign from the backdrop or structure against which it is placed, but not including the sign structure.

**Sign Maintenance**: The normal care and minor repair necessary to retain a safe, attractive, and finished sign, sign surface, or sign structure. Changing the copy or a logo on a sign face without increasing sign dimensions shall be considered sign maintenance, if the information, product or service depicted remains the same and if the sign is to serve the identical establishment using the same business firm name as before the change.

**Sign Refacing** – The changing or replacing of the words, numerals or other aspects of the sign face to serve a different establishment or business, or to create a substantially different visual effect without alternating, moving, or replacing the sign, sign structure, or sign face.

**Sign Structure**: The support, poles, upright bracing or brackets and framework for any sign that is mounted on or affixed to a building, structure, or the ground. A sign structure may be a single pole and may or may not be an integral part of the building.

**Sign Surface:**  The entire area aggregated on all sign faces, within a square, circle, rectangle, triangle or combination thereof that encompasses the extreme limits of the writing, representation, emblem, or other display, together with any material or color forming an integral part of the background of the display or used to differentiate the sign from the backdrop or structure against which it is placed, but not including the sign structure.

**Sign:**  Any device, fixture, or placard on a structure that uses any color, form, graphic, illumination, symbol, or writing to advertise, announce the purpose of, or identify the purpose of a person or entity, or to communicate information of any kind to the public.  Flags are not signs.  All signs must conform to the applicable city codes.

**Site (Historic):** The location of a significant event, a prehistoric or historic occupation or activity, or a building or structure, whether standing, ruined or vanished, where the location itself possesses historic, cultural, or archeological value.

**Site:**  A parcel, lot, or tract of land on which activities are conducted or one or more buildings or structures are located.

**Siting:**  Orientation and placement of a building on a parcel or lot.

**Small Wind Energy Systems:**  Privately owned wind energy generating systems designed to service a single family or building with under 10,000 square feet of floor space.

**Snipe Sign**:  A sign made of material such as cardboard, paper, pressed wood, plastic, or metal that is attached to a fence, window, tree, utility pole or temporary structure or any sign that is not securely fastened to a building or structure or firmly anchored to the ground.

**Social Service Center**: A facility whose sole purpose is to provide informational, educational, social, or economic counseling or other similar services to persons residing in the city or county.  A social service center must be sponsored and operated by a not-for-profit organization whose stated purpose is to improve quality of life within the city and county.  This does not include nursing homes, fraternal orders, or private clubs.

**Solar Collection Systems:**  Technologies employed to convert solar energy into usable light or heat, cause air-movement for ventilation or cooling, or store heat for future use.  Active solar uses electrical or mechanical equipment, such as pumps and fans, to increase the usable heat in a system.  Solar energy collection and utilization systems that do not use external energy, like a solar chimney, are classified as passive solar technologies.

**Solid Waste Facility:**  Any facility, which serves to collect, distributes or temporarily store household generated solid waste.

**Special Event Sign**:  A sign identifying a grand opening, parade, festival, fund drive or similar occasion.

**Special Flood Hazard Area:**  See "area of special flood hazard."

**Special Hazard Area:**  An area having special flood hazards and shown on an FHBM, FIRM or FBFM as zones (unnumbered or numbered) A, AO, AE, or AH.

**Sports/Entertainment Arena or Stadium:** Any place or structure where more than 100 people can gather to watch a sporting or entertainment event.

**Start of Construction:** Includes substantial-improvements, and means the date the building permit was issued, provided the actual start of construction, repair, reconstruction, rehabilitation, addition placement, or other improvements were within 180 days of the permit date. The actual start means either the first placement of permanent construction of a structure on a site, such as the pouring of slabs or footings, the installation of piles, the construction of columns, any work beyond the stage of excavation, or the placement of a manufactured home on a foundation. Permanent construction does not include land preparation, such as clearing, grading and filling, the installation of streets and/or walkways, excavation for a basement, footings, piers, foundations, the erection of temporary forms, nor installation on the property of accessory structures, such as garages or sheds not occupied as dwelling units or not part of the main structure. For a substantial improvement, the actual start of construction means the first alteration of any wall, ceiling, floor, or other structural part of a building, whether or not that alteration affects the external dimensions of the building.

**State Coordinating Agency:** The Division of Water Resources, Kansas Department of Agriculture, or other office designated by the governor of the state or by state statute at the request of the Administrator to assist in the implementation of the National Flood Insurance Program (NFIP) in that state.

**State Historic Preservation Officer or SHPO:** The person who has been designated by law and by the Governor of the State of Kansas to administer the State Historic Preservation Program for carrying out the provisions of the National Historic Preservation Act of 1966, as amended and related laws and regulations.

**State Review Board:** The Kansas Historic Sites Board of Review as established in KSA 75-2719a.

**Static:** Having no motion; being at rest; fixed, stationary.

**Street:** A right-of-way, dedicated to the public use, or a private right-of-way, which provides principal vehicular and pedestrian access to adjacent properties.

**Streetscape:** All physical elements that may be viewed along a street frontage.

**Structure:** A combination of materials to form a construction for use, occupancy, or ornamentation whether installed on, above, or below the surface of land or water.

**Student Housing:** Housing which only students in boarding schools, universities or other educational institutions are eligible to reside.

**Studio, Music/Movie/TV:** A place for the nurturing and recording of the visual and auditory arts.

**Style:** The visual appearance of a building, structure, site, or district depicting the influence of shape, materials, detailing or other features associated with a particular architecture.

**Subdivider:** A person, firm, corporation, partnership, or association who causes land to be divided into a subdivision for himself or for others.

**Subdivision (Major):**  The division of a tract of land into five or more lots or parcels for the purpose of transfer of ownership of building development, or, if a new street is involved, any division of a parcel of land.  The term "subdivision" includes "resubdivision," as used herein, shall include any further subdivision of a lot or parcel of land previously subdivided, for sale, use, or other purposes, which vary from the latest, approved plat of the same.

**Subdivision (Minor):** The division of a tract of land into not more than five (5) tracts, parcels, or lots meeting the requirements set forth herein.

**Substantial Damage:**  Damage of any origin sustained by a structure whereby the cost of restoring the structure to pre-damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred.

**Substantial Improvement:**  Any reconstruction, rehabilitation, addition, or other improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure before "start of construction" of the improvement.  This term includes structures, which have incurred "substantial-damage," regardless of the actual repair work performed.  The term does not, however, include either (1) any project for improvement of a structure to correct existing violations of state or local health, sanitary, or safety code specifications that have been identified by the local code enforcement official and which are the minimum necessary to assure safe living conditions, or (2) any alteration of a "historic structure," provided that the alteration will not preclude the structure's continued designation as a "historic structure."

**Substantial Renovation:**  Any alteration affecting the front elevation of a building or costing more than 50 % of the current assessed County tax valuation.

**Substantial Work:**  Work comprising the expenditure of more than 33% of the value of the project as listed on the building permit.

**Sundries, Pharmaceuticals, Convenience Store        Retail Sales:**

**Tailoring, Custom:** Making or altering apparel according to personal or special order.  The distinction between tailor shops and apparel manufacturing for zoning purposes is: 1.  A custom tailoring shop should not have more than the equivalent of fifteen (15) full-time employees and; 2.  Building space devoted to tailoring operations and product storage shall not exceed 12,000 square feet of floor space as measured by the exterior spatial dimensions.

**Tattoo Parlor/Piercing/Body Art:**  Any place or structure, which is regulated by the Kansas Board of Cosmetology and where any form of elective body modifications occurs.

**Tavern:**  An eating or drinking establishment where cereal malt beverages are sold for consumption on-premises as regulated by the Alcoholic Beverage Control Division, Kansas Department of Revenue.

**Taxi Dispatch**:  A facility for the radio dispatch of taxis for hire.  Taxis may also await dispatching at this location.

**Temporary Sign**:  Any sign, banner, searchlight, sidewalk or curb sign, pennant, valance, flag, balloon, air- or gas-filled figure, or advertising display that is intended to be displayed for a limited period of time

only and is typically constructed from nondurable material, such as paper, plastic, cloth, canvas, light fabric, cardboard, wallboard or other material, with or without frames.  Temporary signs may be portable or fixed, but are not intended for permanent display.  Temporary signs include, but are not limited to, real estate signs, garage sale signs, grand opening signs, construction signs, land for sale signs and open house signs.  Specific restrictions, in addition to those restrictions that apply to all temporary signs, may apply to specially identified types of temporary signs.  More comprehensive restrictions apply generally to all signs included in the broad category of temporary signs.

**Time and Temperature Sign:**  An electronic changeable message sign displaying solely the time and temperature.

**Tiny Home:**  A home between 200-400 square feet that is site-built or partially site built, that is set up and secured on a permanent foundation with any means of transporting the unit, including wheels, suspension, axel components, or trailer, being removed.  Tiny Homes do not include recreational vehicles, mobile homes, shipping containers, train cars, or any other similar structure or equipment.

**Trailer:**  A vehicular, portable device used for moving people/goods or services between points and usually towed by a motor vehicle (see mobile home).

**Transition:**  As used in the sign code**,**  a visual effect (frame effect) used on an electronic changeable message sign to change from one message to another.

**Travel Trailer Parks:**  See camp grounds

**Traveling:**   As used in the sign code, a frame effect where the frame is changed by the apparent horizontal movement of the letters or graphic elements of the message.

**Trees:**  Any self-supporting, woody plant of a species, which normally grows to an overall minimum height of fifteen (15) feet in this region.

**Truck Terminal, Freight, Air Courier Services:**  Any place or structure for the transfer of goods from one means of conveyance to another.

**Twirl Time**:  The time it takes for static text, images, and graphics on an electronic changeable message sign to transition to a different text, images, or graphics.

**Uniform Building Code**:  The current edition of the Uniform Building Code, published by the International Conference of Building Officials.

**Unlicensed Vehicle:** A vehicle not carrying the currently effective license or registered number plate or plates, including any registration issued to the owner of such vehicle displayed on the vehicle so registered as required by the motor vehicle laws of the State of Kansas.

**Urban Agriculture/Community Garden:**  Any place or structure within the city, which exceeds ¼ acre, where crops intended for human consumption are raised.

**Variance:** A grant of relief to a property owner from certain provisions of the Zoning Ordinance when because of the particular physical surroundings, shape or topographical conditions of the property,

compliance would result in a particular hardship upon the owner as distinguished from a mere inconvenience or a desire to make money.  The variance may be granted for area, yard bulk, or parking requirements but not for a use.  Or, a grant of relief by the community from the terms of a floodplain management regulation.  Flood insurance requirements remain in place for any varied use or structure and cannot be varied by the community.  Or, a variation from a specific requirement of the Secretary of the Interior's design standards, as applied to a specific structure or property.

**Vehicle Impound Lot:** The use of any part of a parcel or tract of land for the storage of automobiles or other vehicles that is not operable or roadworthy according to the laws of Kansas.  Generally, these lots receive vehicles because of accidents or abandonment.  No salvage of parts is permitted as part of this operation.

**Vehicle Storage Lot:** The use of any part of a parcel or tract of land for the storage of automobiles or other vehicles including recreational vehicles, that are owned by person(s) other than the operator of the storage lot, for a fee.  To qualify to be held in a storage lot, the vehicle need be licensed and roadworthy according to the laws of Kansas.

**Veterinary Clinic:**  Any place or structure where animal health services are provided by a one or more people licensed to provide veterinary services by the State of Kansas.

**Video:**  A high resolution, high frames per second motion picture display.

**Violation:**  As used in Article X, Floodplain Management, the failure of a structure or other development to be fully compliant with the community's floodplain management regulations.  A structure or other development without the elevation certificate, other certifications, or other evidence of compliance required by this ordinance is presumed to be in violation until that documentation is provided.

**Vision Clearance Triangle**: A space, triangular in shape, on a corner lot in which nothing is permitted to be built, placed on or grown in a way that would impede visibility.  Its purpose is to assure that vehicles and pedestrians have adequate and safe visibility.

**Wall Sign**:  Any sign attached to, erected against, or painted on the face or wall of a building or structure, with the exposed face of the sign in a plane parallel to the plane of the wall.  Mansard, awning or canopy, marquee and fascia signs are wall signs.

**Warehouse, Mini:** A building or portion thereof designed or used exclusively for storing excess personal property of an individual or family when not located on the lot of their residence.  Said personal property includes items normally found in the home or in accessory structures to residences including passenger or recreation vehicles, house trailer, boat, excess furniture, and similar household items, which are not used for the conduct of a business.  This shall not include the storage of any merchandise, stock, furnishings, or vehicles of a business of any kind.

**Warehousing:**  Any place or structure where the temporary storage of commercial or industrial goods is conducted.

**Water Storage:**  Potable commercial water storage structures or features of more than 10,000 gallons.

**Water Surface Elevation:**  The height, in relation to the National Geodetic Vertical Datum (NGVD) of 1929 (or other datum where specified) of floods of various magnitudes and frequencies in the floodplain riverine areas.

**Wearing Apparel and Accessories Retail Sales:**  Any place or structure where the retail sale of apparel and or accessory goods is conducted.

**Wholesale, Storage, Warehouse, and Distribution:** Any place or structure where the non- retail temporary storage, sale, or rental of commercial or industrial goods is conducted.

**Window Sign:**  Any sign that is placed on the inside of a window or upon the windowpanes and is visible from the exterior of the window.

**Yard, Front:**  A yard extending the full width of the lot and situated between the street right-of-way and the required building setback line.  The front yard of a residential corner lot is the yard adjacent to the shorter street frontage.

**Yard, Rear:** A yard extending the full width of the lot on which a building is located and situated between the rear lot line and a line parallel thereto and passing through the nearest point of the building.

**Yard, Side:** A yard extending from the required front yard, or front lot line where no front yard is required, to the required rear yard.

**Yard:** An open space at grade level on a tract with a building, unoccupied and unobstructed by any portion of a structure from the ground upward except as otherwise provided herein.  In measuring a yard for the purpose of determining the width of a side yard, the depth of a front yard or depth of a rear yard, the minimum horizontal distance between the lot line and the nearest architectural projection should be used.

**Zone or District:** A section or area of the city as depicted by the Zoning District Map, for which uniform regulations governing the use, height, area, size and intensity of use of buildings, land, and open space are herein established.

**Zoning District Map:**  A map or maps with all notations, dimensions, references, and symbols shown thereon depicting individual zoned districts as adopted and amended by the City Commission.

**Zoning Ordinance:**  The text of this ordinance and the accompanying Zoning District Map.

**Zoo:**  A collection of animals for display to the public.

A,    ***Table Organization.***  Table A1-1 Table of Permitted Uses classifies land uses and activities into general "use categories" and specific "use types" based on common functional or physical characteristics, such as the type and amount of activity, the type of customers or residents, types of products, how goods or services are sold or delivered, and site conditions.  Regardless of whether a use is allowed by right or permitted as a special use, there may be additional standards that are applicable to the use.  Uses are allowed as follows:

1.    *Permitted By-Right Uses.*  "P" in a cell indicates that the use is permitted by right in the respective zoning district and overlay district.  Permitted uses are subject to all other applicable regulations in this document, including the use-specific standards in this section.

2.    *Special Uses.*  "S" in a cell indicates that the use is allowed only if reviewed and approved as a special use in accordance with the procedures of Article II - Administration regarding Special Use Permits.  Special uses are subject to all other applicable regulations of this document including the use-specific standards in this section and the requirements of Article IV – Supplementary District Regulations.

3.    *Prohibited Uses:*  A blank cell indicates that the use is prohibited in the respective zoning district.

B.    ***Classification by Interpretation.*** This classification does not list every use or activity that may appropriately exist within the categories and specific uses may be listed in one category when they may reasonably have been listed in one or more other categories.  The categories are intended merely as an indexing tool for the specific use type and are not regulatory. When application is made for a use type that is not specifically listed in Table A1-1, Table of Permitted Uses but that appears similar to uses in that table, the Director shall make a determination as to the appropriate classification of any new or unlisted form of land use in the following manner:

1.    The Director shall consider the nature of the use and whether it involves dwelling activity; sales; processing; type of product, storage and amount, and nature thereof; enclosed or open storage; anticipated employment; transportation requirements; the amount of noise, odor, fumes, dust, toxic material, and vibration likely to be generated; and the general requirements for public utilities such as water and sanitary sewer.

2.    Standards for new and unlisted uses may be interpreted as those applicable to a similar use.

3.    The Director may choose to send a proposed use to the City Commission for interpretation where classification options are unclear or where the potential impact must be considered in the interpretation process.

4.    When the Director determines that a new or unanticipated use is so similar in impact to a specific use type, or uses generally within the use category the Director may:

a.    Make the interpretation the use type is generally broad enough to include the use in question; or

b.    For ease of future application and interpretation add the use to the appropriate category in the table.  Such administrative adjustment to the table shall not be considered an amendment to this ordinance provided the criterial above are clearly met, and provided notice and comment of the adjustment is placed on the agenda of both the Planning Commission and Governing Body for review and consent.

5.     Appeal of the Director's decision shall be made to the City Commission.

**Table A1-1, TABLE OF PERMITTED USES**
P = Permitted, S = Special Use Permit Required

| Use Category / Subcategory / Specific Use Type | R1-25 | R1-9 | R1-7.5 | R1-6 | R-MF | R4-16 | MP | RMX | NBD | OBD | CBD | GBD | I-1 | I-2 | FP | NN | DT | NG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Residential** | | | | | | | | | **Non-Residential** | | | | | | | **Overlay** | | |
| **RESIDENTIAL USES** | | | | | | | | | | | | | | | | | | |
| **Household Living** | | | | | | | | | | | | | | | | | | |
| Dwelling, Single-Family Detached | P | P | P | P | | P | S | P | P | | S | | | | | P | S | |
| Dwelling, Two-Family | S | S | S | S | P | P | | P | P | | | | | | | P | S | |
| Dwelling, Townhouse | | | | S | P | P | | P | P | | | | | | | P | P | |
| Dwelling, Multi-Family | | | | | P | P | | P | | | | | | | | P | P | |
| Dwelling in Mixed-Use Structure  Note [1] | | | | | | | | P | P | P | P | P | | | | P | P | P |
| Dwelling, Live/Work | | | | | | | | P | P | P | P | P | | | | P | P | P |
| Dwelling, Manufactured | P | S | S | S | | | P | | | | | | | | | | | |
| Dwelling,  Mobile Home | | | | | | | P | | | | | | | | | | | |
| **Group Living** | | | | | | | | | | | | | | | | | | |
| Assisted Living Facility | S | S | S | S | S | S | | S | | | P | P | | | | S | S | S |
| Convent/Monastery | P | P | P | P | P | P | P | P | | | | | | | | | | |
| Dormitory | S | S | S | S | S | S | | S | | | | | | | | | | |
| Fraternity/Sorority Home | S | S | S | S | S | | | | | | | | | | | | | |
| Group Home: Disabled (K.S.A.  12-736) | P | P | P | P | P | P | P | P | | | | | | | | S | S | S |
| Nursing Home/Hospice | S | S | S | S | P | S | | | | | | P | | | | S | S | S |
| Senior Housing | S | S | S | S | P | P | | S | | | P | P | | | | S | S | S |
| Shelter, Domestic Violence | P | P | P | P | P | P | P | P | P | P | P | P | | | | P | P | P |
| Shelter Home | S | S | S | S | P | P | | P | S | S | P | P | | | | S | P | S |
| Student Housing | S | S | S | S | P | P | | P | | | P | P | | | | | | |
| **PUBLIC AND INSTITUTIONAL USES** | | | | | | | | | | | | | | | | | | |
| **Community Services** | | | | | | | | | | | | | | | | | | |
| Adult Day Center | S | S | S | S | | | | | P | P | P | P | | | | S | P | P |
| Cemetery | S | S | S | S | | | | | | | | | | | | | | |

**Table A1-1, TABLE OF PERMITTED USES**
P = Permitted, S = Special Use Permit Required

| Use Category | Residential | | | | | | | | Non-Residential | | | | | | | Overlay | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Subcategory / Specific Use Type | R1-25 | R1-9 | R1-7.5 | R1-6 | R-MF | R4-16 | MP | RMX | NBD | OBD | CBD | GBD | I-1 | I-2 | FP | NN | DT | NG |
| Mausoleum | S | S | S | S | | | | | | | P | P | | | | | | |
| Civic, Social, and Fraternal Organizations | S | S | S | S | | | | S | | P | P | P | | | | P | S | P |
| Community Centers | | | | | | | | | | | P | P | | | | P | | P |
| Government Offices and Facilities | S | S | S | S | S | S | S | S | P | P | P | P | P | P | P | P | P | P |
| Historic and Monument Sites | P | P | P | P | P | P | P | P | P | P | P | P | | | | P | P | P |
| Jails and Prisons | | | | | | | | | | | | | S | S | | | | |
| Library | S | S | S | S | | | | S | P | P | P | P | | | | P | P | P |
| Post Office Branches | | | | | | | | | P | P | P | P | P | | | | P | P | P |
| Religious Assembly | P | P | P | P | P | P | P | P | P | P | P | P | | | | P | P | P |
| Safety Services | P | P | P | P | | | | P | P | P | P | P | | | | P | P | P |
| **Day Care** | | | | | | | | | | | | | | | | | | |
| Day Care Center/Preschool | S | S | S | S | S | S | S | S | P | P | P | P | | | | P | P | P |
| Day Care, Home (6 or less children) | P | P | P | P | P | P | P | P | P | P | P | P | | | | P | P | P |
| Day Care, Home (7 or more children) | S | S | S | S | S | S | S | S | P | P | P | P | | | | S | P | P |
| **Educational Facilities** | | | | | | | | | | | | | | | | | | |
| College or University | S | S | S | S | | | | | | P | P | P | | | | S | S | S |
| School, Elementary and Middle (Public and Private) | S | S | S | S | S | S | S | S | S | S | S | S | | | | S | S | S |
| School, Senior High | S | S | S | S | S | S | S | S | S | S | S | S | | | | S | S | S |
| School, Vocational-Technical and Trade | | | | | | | | | S | P | P | P | | | | | | S |
| **Health Care Facilities** | | | | | | | | | | | | | | | | | | |
| Hospitals | | | | | | | | | S | S | P | P | | | | | | S |
| Medical and dental clinics and offices | | | | | | | | P | P | P | P | P | | | | P | P | P |
| **Parks and Open Space** | | | | | | | | | | | | | | | | | | |
| Arboretum or botanical garden | S | | | | | | | | | | | P | | | | P | P | P |
| Campground | S | | | | | | | | | | | | | | | | | |

**Table A1-1, TABLE OF PERMITTED USES**
P = Permitted, S = Special Use Permit Required

| Use Category | Residential | | | | | | | | Non-Residential | | | | | | | Overlay | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Subcategory / Specific Use Type | R1-25 | R1-9 | R1-7.5 | R1-6 | R-MF | R4-16 | MP | RMX | NBD | OBD | CBD | GBD | I-1 | I-2 | FP | NN | DT | NG |
| Community playfields, playgrounds, and parks | P | P | P | P | | | | P | P | P | P | P | | | | P | P | P |
| Golf course, public | S | S | S | S | | | | | | | | | | | S | | | S |
| Golf course, private | S | S | S | S | | | | | | | | | | | S | | | S |
| Zoo | | | | | | | | | | | | P | | | | | | |
| **Transportation** | | | | | | | | | | | | | | | | | | |
| Airport | | | | | | | | | | | | S | S | S | | | | S |
| Bus Garage and Equipment Maintenance | | | | | | | | | | | | P | P | P | | | | |
| Bus Terminal | | | | | | | | | S | S | P | P | P | P | P | | | |
| Heliport | | | | | | | | | | | S | S | S | S | | | | |
| Railroad Terminal | | | | | | | | | | | | P | | | | | | |
| Taxi Dispatch | | | | | | | | | S | S | P | P | | | | | | |
| Truck Terminal, Freight, Air Courier Services | | | | | | | | | | | | | P | P | | | | |
| **Utility** | | | | | | | | | | | | | | | | | | |
| Private Wind Energy Systems | S | S | S | S | S | S | S | S | S | S | | S | S | S | | S | S | S |
| Private Solar Collection Systems | P | P | P | P | P | P | P | P | P | P | P | P | P | P | | P | P | P |
| Commercial Wind Energy Systems | S | S | S | S | S | S | S | S | S | S | | S | S | S | S | S | S | S |
| Commercial Solar Collection Systems | S | S | S | S | S | S | S | S | S | S | | S | S | S | S | S | S | S |
| Communication Tower | S | S | S | S | S | S | S | S | S | S | S | S | S | S | S | S | S | S |
| Communication Tower – Alternative Structure | S | S | S | S | S | S | S | S | S | S | S | S | S | S | S | S | S | S |
| Communication Facility on Existing Structure | S | S | S | S | S | S | S | S | S | S | S | S | S | S | S | S | S | S |
| Water Storage | P | S | S | S | S | S | S | S | S | S | P | P | | | | S | S | S |
| **COMMERCIAL USES** | | | | | | | | | | | | | | | | | | |
| **Animal Sales and Service** | | | | | | | | | | | | | | | | | | |
| Kennel | | | | | | | | | | | | P | P | P | | | | |
| Pet Shops | | | | | | | | | P | | P | P | | | | P | P | |
| Pet Grooming | S | S | S | S | | | | S | P | | P | P | | | | S | S | S |

DEVELOPMENT REGULATIONS
APPENDIX A. USE TABLE

**Table A1-1,  TABLE OF PERMITTED USES**
P = Permitted, S = Special Use Permit Required

| Use Category | Residential | | | | | | | | Non-Residential | | | | | | | Overlay | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Subcategory / Specific Use Type | R1-25 | R1-9 | R1-7.5 | R1-6 | R-MF | R4-16 | MP | RMX | NBD | OBD | CBD | GBD | I-1 | I-2 | FP | NN | DT | NG |
| Veterinary Clinic with Boarding | | | | | | | | | S | S | P | P | P | P | | S | S | P |
| Veterinary Clinic without Boarding | | | | | | | | | S | S | P | P | P | | | P | P | P |
| **Assembly** | | | | | | | | | | | | | | | | | | |
| Assembly Hall | | | | | | | | S | S | P | P | P | | | | | | |
| Auction Establishment | | | | | | | | | S | P | P | P | P | | | | | S |
| Membership Clubs | | | | | | | | | S | P | P | P | | | | S | S | S |
| Event Venue | | | | | | | | | S | P | P | P | | | | | P | P |
| **Financial Service** | | | | | | | | | | | | | | | | | | |
| Financial Institution, with Drive-thru | | | | | | | | P | P | P | P | P | | | | S | S | P |
| Financial Institution, without Drive-thru | | | | | | | | P | P | P | P | P | | | | P | P | P |
| **Food and Beverage Services** | | | | | | | | | | | | | | | | | | |
| Food and Beverage General | | | | | | | | S | P | S | P | P | | | | P | P | P |
| Bars or Taverns | | | | | | | | S | S | S | P | P | | | | S | P | P |
| Restaurant, with Drive-in or Drive-thru | | | | | | | | S | P | S | P | P | | | | | S | P |
| Restaurant, without Drive-in or Drive-thru | | | | | | | | S | P | S | P | P | | | | S | S | S |
| **Office** | | | | | | | | | | | | | | | | | | |
| Administrative and Professional Offices | | | | | | | | P | P | P | P | P | | | | P | P | P |
| Offices for Nonprofit, Community Health, and Welfare Service Organizations | | | | | | | | P | P | P | P | P | | | | P | P | P |
| **Recreation and Entertainment, Outdoor** | | | | | | | | | | | | | | | | | | |
| Arena and Field House | | | | | | | | | | | S | P | | | | | S | S |
| Country Club | S | S | S | S | | | | | | | | P | | | | | | |
| Marina | S | | | | | | | | | | | | S | S | S | | | |
| Outdoor Commercial Recreation and Entertainment | S | | | | | | | | | | | | S | P | S | | S | P |
| Racing Facilities | S | | | | | | | | | | | | S | S | S | S | | |

DEVELOPMENT REGULATIONS
APPENDIX A. USE TABLE

| Table A1-1, TABLE OF PERMITTED USES P = Permitted, S = Special Use Permit Required | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Use Category | Residential | | | | | | | | Non-Residential | | | | | | | Overlay | | |
| Subcategory | | | | | | | | | | | | | | | | | | |
| Specific Use Type | R1-25 | R1-9 | R1-7.5 | R1-6 | R-MF | R4-16 | MP | RMX | NBD | OBD | CBD | GBD | I-1 | I-2 | FP | NN | DT | NG |
| Riding Academies/Stables | S | | | | | | | | | | | | S | S | S | | | |
| Sports/Entertainment Arena or Stadium | | | | | | | | | S | S | S | P | S | | | | | P |
| Athletic Facilities | S | S | S | S | | | | P | P | P | P | P | S | | | | | |
| Non- Residential Swimming Pools Public or Private Membership | S | S | S | S | | | | | | | P | P | | | | P | | P |
| Recreation and Entertainment, Indoor | | | | | | | | | | | | | | | | | | |
| Art Gallery or Museum | | | | | | | | P | P | P | P | P | | | | P | P | P |
| Auditorium/Exhibition Hall/Convention Center | | | | | | | | | | | S | P | | | | | S | P |
| Indoor Commercial Recreation/ Entertainment | | | | | | | | | | | P | P | P | | | P | P | P |
| Commercial Services | | | | | | | | | | | | | | | | | | |
| Sexually Oriented Business | | | | | | | | | | | | | S | | | | | |
| Building Services | | | | | | | | | | P | P | P | | | | S | S | P |
| Business Support | | | | | | | | P | P | P | P | P | | | | P | P | P |
| Contracting Services, no storage or yard | | | | | | | | | | P | P | P | P | | | | | P |
| Funeral, Mortuary, Crematory | S | S | S | S | | | | | | S | P | P | | | | S | S | S |
| General Personal Services | | | | | | | | P | P | P | P | P | | | | P | P | P |
| Gun Sales and Service | | | | | | | | S | P | P | P | P | | | | | | |
| Indoor Shooting Ranges | | | | | | | | | | | S | S | P | P | | | | |
| Maintenance and Repair | | | | | | | | | P | S | P | P | | | | | S | S |
| Tattoo Parlor/Body Art | | | | | | | | P | P | | P | P | | | | | | |
| Radio, Television, and Recording Services | | | | | | | | | | S | P | P | | | | | P | P |
| Studio, Music/Movie/TV | | | | | | | | P | P | P | P | P | | | | | | |
| Retail (Sales) | | | | | | | | | | | | | | | | | | |
| Building Supplies and Equipment | | | | | | | | | | P | P | P | | | | | S | P |
| Consumer Goods | | | | | | | | P | P | P | P | P | | | | P | P | P |
| Sundries, Pharmaceuticals, Convenience Store | | | | | | | | P | P | P | P | P | | | | P | P | P |

| Table A1-1, TABLE OF PERMITTED USES P = Permitted, S = Special Use Permit Required | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Use Category | Residential | | | | | | | | Non-Residential | | | | | | | Overlay | | |
| Subcategory | R1-25 | R1-9 | R1-7.5 | R1-6 | R-MF | R4-16 | MP | RMX | NBD | OBD | CBD | GBD | I-1 | I-2 | FP | NN | DT | NG |
| Specific Use Type | | | | | | | | | | | | | | | | | | |
| Food, Beverage, and Groceries | | | | | | | | P | P | P | P | P | | | | P | P | P |
| **Vehicles and Equipment** | | | | | | | | | | | | | | | | | | |
| Automobile Repair Shop | | | | | | | | | | P | P | P | | | | | | |
| Automobile, Boat, Truck, Motorcycle, RV Sales, Rental, and Service | | | | | | | | | | P | P | S | | | | | | |
| Car Wash/Truck Wash | | | | | | | | | S | | S | P | P | | | | | |
| Gas Station | | | | | | | | | S | | P | P | P | | | | S | P | P |
| Heavy Vehicle/Equipment Sales, Rentals and Service | | | | | | | | | | | | P | P | P | | | | |
| Parking Lot or Garage (Commercial, Non-Accessory) | S | S | S | S | | | | S | S | S | P | P | S | S | | S | S | S |
| **Visitor Accommodation** | | | | | | | | | | | | | | | | | | |
| Bed and Breakfast Inns | S | S | S | S | S | S | S | P | P | P | P | P | | | | S | S | S |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| Residential Home Stay | S | S | S | S | S | S | S | P | P | P | P | P | | | | S | S | |
| Boarding and Rooming Houses | S | S | S | S | S | S | S | P | S | S | P | P | | | | S | S | |
| Camp, Private, Overnight | S | | | | | | | | | | | | | | | | | |
| Health Resort/Spa | | | | | | | | | | P | P | P | | | | | | |
| Hotel | | | | | | | | | | P | P | P | | | | P | P | P |
| Hotel – Limited Service | | | | | | | | | | P | P | P | | | | P | P | P |
| Residence Hotels | | | | | | | | S | S | P | P | P | | | | P | P | P |
| Retreat House | S | S | S | S | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| **INDUSTRIAL USES** | | | | | | | | | | | | | | | | | | |
| **Industrial Service** | | | | | | | | | | | | | | | | | | |

| Table A1-1, TABLE OF PERMITTED USES P = Permitted, S = Special Use Permit Required | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Use Category | | Residential | | | | | | | | Non-Residential | | | | | | | | Overlay | | |
| Subcategory | | | | | | | | | | | | | | | | | | | | |
| | Specific Use Type | R1-25 | R1-9 | R1-7.5 | R1-6 | R-MF | R4-16 | MP | RMX | NBD | OBD | CBD | GBD | I-1 | I-2 | FP | NN | DT | NG |
| | Animal Research Facilities | | | | | | | | | | | | | S | | | | | |
| | Builders Supply Yards and Lumberyards (except when indoors as part of a hardware store) | | | | | | | | | | | | P | P | | | | | |
| | Construction Industry Related Businesses (such as general contractors, electrical contractors, plumbing contractors) /Accessory and Incidental uses | | | | | | | | | | | | P | P | P | | | | |
| | Educational and Scientific Research, Development, and Testing Services | | | | | | | | | P | P | P | P | P | | | | P | P |
| | Heavy Industrial | | | | | | | | | | | | | P | S | | | | |
| | Light Industrial | | | | | | | | | | | | | P | P | S | | | |
| | Petroleum Pipeline and Pressure Control Stations | S | S | S | S | S | S | S | S | S | S | S | S | S | S | | | | |
| Manufacturing and Production | | | | | | | | | | | | | | | | | | | | |
| | Manufacturing, Fabrication, and Assembly: Custom | | | | | | | | | | | | S | P | P | | | | |
| | Manufacturing, Fabrication, and Assembly: Light | | | | | | | | | | | | P | P | P | | | | |
| | Manufacturing, Fabrication, and Assembly: Heavy | | | | | | | | | | | | S | S | P | | | | |
| Wholesale, Storage, Warehouse, and Distribution | | | | | | | | | | | | | | | | | | | | |
| | Automobile Towing Service Storage Yard; Impound Lot | | | | | | | | | | S | S | P | P | | | | | |
| | Mini-Storage | | | | | | | | | | S | P | P | | | | | | |
| | Moving and Storage Facilities | | | | | | | | | | | P | P | | | | | | |
| | Warehousing | | | | | | | | | | S | P | P | P | | | | | |

DEVELOPMENT REGULATIONS
APPENDIX A.  USE TABLE

**Table A1-1,  TABLE OF PERMITTED USES**
P = Permitted, S = Special Use Permit Required

| Use Category | Residential | | | | | | | | Non-Residential | | | | | | | Overlay | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Subcategory | | | | | | | | | | | | | | | | | | |
| Specific Use Type | R1-25 | R1-9 | R1-7.5 | R1-6 | R-MF | R4-16 | MP | RMX | NBD | OBD | CBD | GBD | I-1 | I-2 | FP | NN | DT | NG |
| Wholesale Trade or Storage, General | | | | | | | | | | | | P | P | P | | | | |
| Wholesale Trade or Storage, Light | | | | | | | | | | | P | P | P | | | | | |
| **Waste and Salvage** | | | | | | | | | | | | | | | | | | |
| Automobile Parts Recycling Business | | | | | | | | | | | | S | P | P | | | | |
| Junkyard, Salvage Yard | | | | | | | | | | | | S | P | P | | | | |
| Neighborhood Recycling Center | S | S | S | S | S | S | S | S | S | S | S | S | S | S | | P | P | P |
| Recycling Collection Station | | | | | | | | | | | | | P | P | | | | |
| Solid Waste Facility | | | | | | | | | | | | | S | S | | | | |
| **AGRICULTURE** | | | | | | | | | | | | | | | | | | |
| **Agriculture/Aquaculture** | | | | | | | | | | | | | | | | | | |
| Animal Husbandry (other than dairy) | P | | | | | | | | | | | | | | | | | |
| Apiary | P | P | P | P | P | P | P | P | | | | | | | | | | |
| Farming | P | | | | | | | | | | | | | | | | | |
| Fish Farm/Hatchery | S | | | | | | | | | | | | | | | | | |
| Ranching | S | | | | | | | | | | | | | | | | | |
| Greenhouse/Nursery | S | S | | | | | | | S | S | P | P | S | S | | | | P |
| Urban Agriculture/Community Garden | P | P | P | P | P | P | P | P | | | | | | | | P | S | P |

NOTE 1:  In the CBD, Residential is not permitted within the front half or front 30' of space, whichever is greater, on the 1st floor (Sec 1.17 A,B)

DEVELOPMENT REGULATIONS
APPENDIX A. USE TABLE

# EXHIBIT 2

## ORDINANCE NO. 7911

**AN ORDINANCE AMENDING THE 2011 DEVELOPMENT REGULATIONS, ARTICLE II. ADMINISTRATION. SECTION 2.12 APPEALS JURISDICTION; ARTICLE XV. BOARD OF ZONING APPEALS; AND TABLE XVI-1 TABLE OF PERMITTED USES OF THE CITY OF LEAVENWORTH, KANSAS BY AMENDING AND PROVIDING ADDITIONAL AND SUBSTITUTE PROVISIONS.**

BE IT ORDAINED BY THE GOVERNING BODY OF THE CITY OF LEAVENWORTH, KANSAS:

Section 1. That the following articles/sections of the 2011 Development Regulations of the City of Leavenworth, Kansas be and are hereby amended by reference and incorporated as fully as if set forth at length herein and the provisions therein shall be controlling within the area of jurisdiction of the City of Leavenworth, Kansas:

> **ARTICLE II. ADMINISTRATION. SECTION 2.12 APPEALS JURISDICTION; AND**
> **ARTICLE XV. BOARD OF ZONING APPEALS; AND**
> **TABLE XVI-1 TABLE OF PERMITTED USES**

Section 2. All sections and portions thereof intended to be omitted clearly marked to show any such omission or showing sections, articles, chapters, parts or portions that are incorporated as the case may be, and to which shall be attached a copy of the incorporated ordinance filed with the City Clerk to be open to inspection and available to the public at all reasonable business hours.

Section 3. That all ordinances found to be in conflict with the amendment to the "2011 Development Regulations" be and the same are hereby repealed.

Section 4. That this ordinance shall take effect and be in force from and after its passage, approval, and publication as provided by law.

Passed by the Leavenworth City Commission on this 13th day of November, 2012.

Mayor Larry Dedeke

ATTEST:

Karen J. Logan, MMC, City Clerk

Summary Published in The Leavenworth Times
Date of Publication: November 16, 2012

Amendment to 2011 Development Regulations Ordinance No. 7911, November 13, 2012

# EXHIBIT 3

ELECTRONICALLY FILED
2025 Jun 02 PM 5:24
CLERK OF THE LEAVENWORTH COUNTY DISTRICT COURT
CASE NUMBER: LV-2025-CV-000180
PII COMPLIANT

**IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS**

| | |
|---|---|
| **CITY OF LEAVENWORTH, KANSAS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )     **Case No. LV-2025-CV-000180** |
| **CORECIVIC, INC. AND** | ) |
| **MISTY LYNN MACKEY,** | ) |
| | ) |
| **Defendants**. | ) |

**FIRST AMENDED PETITION**

*The only way I could describe it frankly, what's going on at CoreCivic right now is it's an absolute hell hole. The Court is aware of it. The defense bar is aware of it. The prosecutors are aware of it. The United States Marshals are aware of it. He's doing his best to get people moved as soon as the United States Marshal Service nationally can negotiate contracts with other facilities.*

*So that's no news to me as well, all that's going on there and causing trauma to everybody – guards are being traumatized. Guards have been almost killed. Detainees are being traumatized with assaults and batteries, and not long ago a detainee was killed. So I'm well aware of the situation at CoreCivic and very troubled by it as well.*

United States District Court Judge Julie A. Robinson, *United States v. Mathew Clark,* Case No. 16-cr-20078-JAR, Doc. 87, pp. 46-47 (Transcript of Resentencing, Sept. 8, 2021).

**I.      INTRODUCTION**

1.      The foremost responsibility of the Leavenworth City Commission, the City's governing body, is to protect the health, safety, and economic development of its citizens and businesses and to preserve and protect property values throughout the City. To help achieve these objectives, the City has enacted Development Regulations governing the use of land and buildings. These Development Regulations include provisions first enacted by a 2012 ordinance prohibiting the operation of a jail or prison without having a special use permit ("SUP") issued by the City. Through an SUP, the City can impose conditions on the use of land to prevent or mitigate harm,

1

economic and otherwise, to the City and its citizens arising from the manner in which land is used, including harm caused by some of the conditions described above by Judge Robinson.

2.      This case is not, however, about what conditions the City may place on CoreCivic's use of its property. Rather, it is about whether CoreCivic may use its property for a jail or prison within the City without first obtaining from the City a special use permit, as required by the City's Development Regulations.

3.      CoreCivic is a private for-profit corporation that operates prisons and jails throughout the United States. From 1992 through 2021, it owned and operated a "detention facility" at 100 Highway Terrace ("the Property"), located within the boundaries of the City, known as the Leavenworth Detention Center ("the Facility"). The Facility primarily housed pre-trial detainees under a contract with the United States Marshals Service.

4.      During this time, CoreCivic became embroiled in multiple widely publicized scandals resulting from its gross mismanagement of the Facility and the ensuing rampant abuse, violence, and violations of the constitutional rights of its detainees and staff, such as those described above by Judge Robinson. CoreCivic's mismanagement directly and indirectly impacted the City in countless ways, including for example, by imposing unexpected maintenance costs on its taxpayers, unreasonably increasing the burden on the City's police and law enforcement agencies to address violent crime, and even *impeding* the City's investigation of sexual assaults and other violent crimes against detainees and staff.

5.      Because CoreCivic was already using its Property for a jail or prison when the 2012 ordinance went into effect, the City's Development Regulations "grandfathered" that use—that is, until CoreCivic abandoned that use for over three years. In CoreCivic's own words, the Facility is "inactive." Under the City's Development Regulations, once CoreCivic stopped operating the

City of Leavenworth v. CoreCivic--Complaint(4080301.4) - 4/2/2025 10:54 AM

Facility for 12 months, it lost its grandfathered status and, as a condition of reopening the Facility, had to obtain a special use permit from the City.

6.      In recognition of this fact, on February 21, 2025, CoreCivic applied for a special use permit so that it could use the Property as a detention center under a contract with the Department of Homeland Security's Immigration and Customs Enforcement agency ("ICE"). The City's Planning Commission set a public hearing on the application for April 7, 2025, with subsequent and final hearings to occur before the City Commission on May 13 and 27, 2025.

7.      But then on March 13, 2025, CoreCivic abruptly withdrew its application. It has now taken the position that it need not seek or obtain a special use permit and that it plans to start housing detainees at the Facility at some point in the immediate future, all in violation of the City's lawfully enacted ordinances. On March 25, 2025, CoreCivic stated that its recently awarded contract with ICE "necessitates a swift contract activation of the Midwest Regional Reception Center[1] to accommodate their pressing need for capacity in the region." According to CoreCivic, "ICE's pressing need for capacity dictates the speed at which we must move to hire and ready the facility (and thus does not allow time to go through a protracted permitting process)." In other words, CoreCivic refuses to comply with the City's permitting process because, it contends, it will take too long to do so. This is not a valid or legal rationale for violating City ordinances.

8.      This Court's swift intervention is imperative to prevent the irreparable harm to the City that will result if CoreCivic is allowed to flout the City's Development Regulations and bypass the established processes for obtaining a special use permit to use its Property as a detention facility within the City.

---

[1] CoreCivic is now referring to the Facility as the Midwest Regional Reception Center ("MRRC").

3

## II.     PARTIES

9.      The City is the governing body of the City of Leavenworth, which is constitutionally "empowere[d] to determine [its] local affairs" under Article 12 § 5 of the Kansas Constitution and to seek an injunction and other remedies for violations of its Development Regulations under K.S.A. 12-761; K.S.A. Chapter 60, Article 9; and Ordinance No. 8113. (Ex. A, Ordinance No. 8113.)

10.     CoreCivic is the private for-profit corporation that seeks to violate the Development Regulations.

11.     Defendant Misty Lynn Mackey ("Defendant Mackey") is the Warden of the MRRC who is aiding, abetting, and conspiring with CoreCivic to violate the City's Development Regulations.  Upon information and belief, Ms. Mackey is a citizen of, and is domiciled in, the State of Kansas, in that she is registered to vote in Tonganoxie, Kansas, has resided in the State of Kansas with intent to remain indefinitely, and has not subsequently changed her domicile.[2]

## III.    JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this civil matter under Article 3, § 6 of the Kansas Constitution and, including but not limited to, K.S.A. Chapter 60, Article 17; Chapter 60, Article 9; and §§ 12-761, 20-301, and 4-202.

13.     The Court has personal jurisdiction over CoreCivic because it has the requisite "minimum contacts" with Kansas under K.S.A. § 60-308, in that all causes of action alleged in this Petition arose from the transaction of business in Kansas by CoreCivic, which owns and possesses the Property located within the state of Kansas.

---

[2] The City refers to both defendants collectively as "Defendants."

14.     This Court is the appropriate venue under K.S.A. Chapter 60, Article 6, because the causes of action alleged herein arose, CoreCivic is transacting business, and the Property is situated in Leavenworth County, Kansas.

15.     This Court may enter a declaratory judgment and an injunction against CoreCivic under K.S.A. §§ 60-1701 and 12-761 because an actual controversy exists due to CoreCivic's stated intention to use the Property as a jail or prison without first seeking a special use permit.

## IV.    FACTS

### A.    For years, CoreCivic operates a "hell hole" within the City of Leavenworth.

16.     As noted at the outset of this Petition, this Court succinctly described the Facility while it was operated by CoreCivic in 2021 as "an absolute hell hole."

17.     In April 2017, the United States Department of Justice's Office of Inspector General ("OIG") issued a 129-page audit report ("Audit Report") detailing the shortcomings and abuses that had occurred up to that point. A copy of the Audit Report is attached to this Petition as Exhibit B and incorporated by reference.

18.     Understaffing was chief among the "issues affecting the safety and security" at the Facility. (Audit Report at ii.) This was "primarily driven by correctional officer vacancies, which reached as high as 23 percent" during the relevant time. (*Id.*) "These correctional officer vacancies led to several problems in 2015, including the [Facility's] long-term use of mandatory overtime, which [Facility] personnel said led to lower morale, security concerns, and fewer correctional officers available to escort medical staff and detainees to and from the health services unit."  (*Id.*)

19.     According to the OIG, the shortage of correctional officers led to systemic closures of security posts that were *mandatory* to ensure the safe and secure operation of the Facility. (*Id*.) The correctional officers who hadn't yet quit were then shuffled around to fill the vacant posts, which snowballed into shortfalls in other services, including "assisting detainees with casework"

and the "transitional services" that were critical for successfully reintegrating back into society. (*Id.*)

20.    CoreCivic then "took actions that exacerbated the problem."   (*Id.*) Instead of transferring staff *from* other CoreCivic facilities to help, it transferred staff *to* other facilities. (*Id.* at ii-iii.) Bafflingly, it then added to its already disproportionate burden by agreeing to take on additional detainees from local non-federal prosecutions. (*Id.* at iii.)

21.    Other examples of mismanagement and malfeasance included active concealment of "triple bunking" to avoid demerits during audits, deficiencies in quality control mechanisms, and unlawful withholding of "sick account" funds that should have been paid to correctional officers. (*Id.*) These are just some of the problems documented by the OIG in 2017. Yet despite all of these blatant and egregious failures, many of which involved lapses in *security*, the Facility's primary function, CoreCivic was paid in full. (*Id.*)

22.    Conditions only worsened after the OIG issued its audit report. According to the American Civil Liberties Union (ACLU) and the Federal Public Defenders (FPD) in the region, the total number of violent incidents was trending upward aggressively when the Facility finally closed. To highlight a few examples:

> a.    Beatings and stabbings, including of correctional officers, became so rampant due to insufficient patrolling that detainees and the lawyers who visited the Facility considered them routine.
>
> b.    Suicides were prevalent due to insufficient suicide-watch monitoring. Detainees were required to clean up the feces of the deceased.
>
> c.    Following the homicide of one detainee, the Facility went on lockdown for several weeks. Detainees were not allowed out of their cells except to shower every three-to-four days and were denied basic hygienic supplies and routine medical care.
>
> d.    Weapons were typically found stashed away following major incidents.
>
> e.    Sexual assault reports were discouraged and impeded by management.

f.      Detainees were locked in showers as punishment.

g.      Calls for help often went unanswered, leading detainees to arm themselves for their own protection.

h.      Many cell doors *didn't even lock*, which forced detainees to create makeshift barricades for their own safety.

(ACLU and FPD Letter to the White House at 4-6, 8, attached to this Petition as Exhibit C.)

23.     In the final years of the Property's use as a detention center, the Leavenworth Police Department ran into one roadblock after another when investigating violent crimes within the Facility. (Although mostly serving as a detention center for federal detainees under the charge of the U.S. Marshal for the District of Kansas, crimes occurring within the Facility had to be investigated by the Leavenworth Police Department and prosecuted in the Leavenworth County District Court or City municipal court since the Facility was—and remains—privately owned.) CoreCivic seemed to have no plan concerning which law enforcement agency would handle a major crisis, such as a riot, hostage situation, or escape. Officers found it difficult to access the facility at all, and they were often required to conduct interviews from outside the Facility's gate.

24.     CoreCivic prohibited its employees who were victims of crimes from sitting for interviews with City police while they were on duty.  Instead, these crime victims were forced to provide an often incomplete written statement through the Facility's fence and then follow up on their own time. They often failed to follow up though, and both CoreCivic management and employees failed to assist the police with prosecutions, resulting in wasted time and effort by the City's police force. Officers were granted *no* access to other third-party witnesses to crimes, regardless of how critical their testimony may have been to a potential prosecution.

25.     CoreCivic failed repeatedly to report significant crimes that occurred on the Property until a significant time passed after they occurred, often several days and sometimes *months* later. In one instance in November 2018, CoreCivic failed to report a death of an inmate

7

to City Police for six days. Crimes were often reported only because officers were already on scene dealing with another crime. CoreCivic staff refused to provide names of potential witnesses for several weeks at a time and routinely refused to turn over evidence, such as photographs and weapons that were used in assaults among inmates and against guards. (*Id.*)

26.    This also occurred multiple times with sexual assault allegations—CoreCivic staff would report the allegation, ostensibly to document the event for auditing purposes, and then refuse to cooperate with the City's investigation. Often when City police *were* called to the scene, CoreCivic staff had failed to secure the crime scene.  Detainees were allowed to walk through uninhibited, and on several occasions, detainees and staff were instructed to clean up the crime scene before police even arrived, which of course destroyed all evidentiary value and any hope of successful prosecution. This included an inmate death by hanging. (*Id.*)

27.    The procedure for obtaining video evidence proved to be a moving target and changed depending on which corrections officers were on duty. Instead of cooperating with City police investigations and providing them courtesy copies of videos (as is standard in most jails), CoreCivic forced them to go through the more cumbersome, time-consuming, and unnecessary process of obtaining a formal subpoena to obtain video evidence.

28.    In addition to the unquantifiable harm caused by CoreCivic's mismanagement, its problems also extended tangibly and directly to the pocketbooks of City taxpayers. Multiple times, malfunctions with a grinder pump on the Property caused large pieces of debris (e.g., bedsheets, rags, etc.) to be released into the City's sewer system. This led to major downstream clogs in the City's main sewer lines and wastewater treatment facilities, expensive emergency maintenance calls to City employees at all hours of the day, and multiple mandatory reports to the Kansas Department of Health and the Environment as a result of the ensuing sewage spills.

29.     On August 13, 2019, the United States District Court for the District of Kansas issued a 188-page opinion which in part detailed the unlawfulness of CoreCivic's practice of recording attorney-client communications between detainees and their lawyers. *United States v. Carter*, Case No. 16-cr-20032-02-JAR, Doc. 758, pp. 166-76 (D. Kan. Aug. 13, 2019) (Robinson, J.). The fallout from this scandal led this Court to discharge certain detainees *outright* from custody into the community.

**B.     CoreCivic closes the Facility and stops using the Property for a detention center.**

30.     On January 26, 2021, President Biden ordered that "The Attorney General shall not renew Department of Justice contracts with privately operated criminal detention facilities, as consistent with applicable law." Executive Order 14006.

31.     Instead of choosing to house detainees from local governments as it had previously done or ICE detainees (which it could have done notwithstanding President Biden's executive order since CoreCivic would have been contracting with an agency other than the Department of Justice), CoreCivic opted to close the Facility effective January 1, 2022. No detainee has resided at the Facility since 2021. CoreCivic's website displayed the following message on March 19, 2025:

9



([https://web.archive.org/web/20250319174656/https://www.corecivic.com/facilities/midwest-](https://web.archive.org/web/20250319174656/https://www.corecivic.com/facilities/midwest-)

[regional-reception-center](https://web.archive.org/web/20250319174656/https://www.corecivic.com/facilities/midwest-regional-reception-center))[3]

32.     CoreCivic has now deleted the statement, "[t]his facility is currently inactive" from

its website:

---

[3] *See Marten Transp., Ltd. v. Plattform Advert., Inc.*, No. 14-2464-JWL, 2016 WL 1718862, at *4 (D. Kan. Apr. 29, 2016) (taking judicial notice of Wayback Machine records).



(https://www.corecivic.com/facilities/midwest-regional-reception-center.)

**C.    The City's Development Regulations require CoreCivic to apply for an SUP.**

33.    K.S.A. 12-741 *et seq.*, the Kansas Zoning Enabling Act, authorizes Kansas cities and counties to adopt "planning and zoning laws and regulations by cities and counties for the protection of the public health, safety and welfare."

34.    Pursuant to the Zoning Enabling Act, the City has adopted by ordinance its Development Regulations, a complete copy of which can be found at http://bit.ly/3E9GsGt. The City has attached as Exhibit D a copy of those portions of the Development Regulations cited in this Petition.

35.    Appendix A to the Development Regulations is a Use Table that lists a host of possible land uses and specifies whether those uses are allowed within particular zoning districts in the City. If the letter "P" is in a cell of the Use Table, this means that the use specified in the

left-hand column of the Use Table is allowed by right within the zoning district corresponding with that cell. If the letter "S" is in a cell of the Use Table, this means that the use specified in the left-hand column is allowed only "if reviewed and approved as a special use in accordance with Article II – Administration regarding Special Use Permits." If a cell is blank, this means the use is prohibited in the applicable zoning district. (Development Regulations, Ex. D, pg. A-1.)

36.    Under the Use Table, "Jails and Prisons" are allowed only in I-1 and I-2 zoning districts, and then only pursuant to an SUP issued by the City, because they are designated with an "S" in those two zoning districts. (*Id.* at pg. A-3.)

37.    Article 12 of the Development Regulations defines "Jails and Prisons" in relevant part to mean "Places in which people are physically confined and, usually, deprived of a range of personal freedoms." (*Id.* at pg. 12-21.)

38.    Section 2.04.A. of the Development Regulations provides as follows:

All uses identified in the zoning districts, use table or elsewhere in these regulations as a special use in any particular zoning district ***shall require a special use permit***. Applications for special use permits may be submitted by the owners or agents of any property affected.

(*Id.* at pg. 2-9 (emphasis added).)

39.    The requirement that the owner of property to be used for a jail or prison obtain a special use permit was added to the City's Development Regulations through Ordinance No. 7911, which took effect on November 16, 2012 while CoreCivic was still using the Property as a detention center. (City of Leavenworth Ordinance No. 7911, attached hereto as Exhibit E.)

40.    Despite the adoption of Ordinance No. 7911, CoreCivic was not required to apply for an SUP while it was using the Property as a detention center because the Development Regulations had a "grandfather" provision, specifically Section 1.05.E.2:

*Status of existing legal uses designated as special uses*. Any existing legal use at the effective date of these development regulations which is designated as a special

use by these development regulations shall be deemed as an existing special use and a lawful conforming use.

(Development Regulations, Ex. D at pg. 1-9, § 1.05.E.2.)

41.    As a result of the application of § 1.05.E.2, CoreCivic's use of the Property as a detention center was designated as a special use for which CoreCivic was not required to apply for or obtain a separate SUP while it used the Property for a detention center.

42.    However, once CoreCivic stopped using the Property for a detention center and discontinued using it as such for 12 months, the City Commission was authorized to rescind CoreCivic's designated special use of the Property in accordance with Section 2.04.C of the Development Regulations:

> *Discontinuance or violation of permit conditions.* A special use permit may be granted by and continued annually by the city commission. The continuation of a special use permit exists with the property as long as such special use permit is used in accordance with its original intended and approved purpose and the annual SUP fee is paid. Any discontinuance of more than 12 months, violation of permit conditions, or failure to pay a fee may enable the city commission to administratively rescind a special use permit.

(Development Regulations, Ex. D at pg. 2-11, § 2.04.C.)

43.    Even assuming CoreCivic did not have a special use "permit" because of its grandfathered status, it was nonetheless subject to the discontinuance provisions of § 2.04.C because § 2.04.C reflects the intention of the City, through its Development Regulations, not to allow property owners who have abandoned a use to take advantage indefinitely of special dispensations for the use of property. This is in keeping with the general principle that municipalities may provide for the gradual elimination of nonconforming uses. *See, e.g. Art Neon Co. v. City and Co. of Denver,* 488 F.2d 118, 121-22 (10th Cir. 1973); *Spurgeon v. Board of Comm'rs of Shawnee Co.*, 181 Kan. 1008, Syl. ¶ 2 (1957). Indeed, it would make no sense for § 2.04.C to apply only to special uses allowed pursuant to a City-issued permit, because Section 2.04

of the Development Regulations reflects the careful process the City must follow when deciding whether to issue a special use permit, including a balancing of the right of the property owner with the "economic development, welfare or convenience of the public" and the rights of neighboring property owners. The owner of property which has been grandfathered with a designated special use would have never accounted for these counterbalancing factors; discontinuing the special use of property for an extended period and then opting to resume that use justifies the City's requirement that the property owner account for the larger interests of the City and nearby residents if it wants to resume a use that requires an SUP.

44.     Accordingly, the City Commission adopted on March 25, 2025 a resolution rescinding the designated special use of the Property. A copy of that resolution is attached as Exhibit F and incorporated by reference.

45.     The policy of the City not to allow "nonconformances" in general to continue indefinitely is further reflected in § 1.05.D.8 of the Development Regulations, which addresses the abandonment of a grandfathered nonconforming use of property:

> *Abandonment or Discontinuance*. When a nonconforming use is abandoned for a period of 24 consecutive months any subsequent use or occupancy of such land after this period shall comply with the regulations of the zoning district in which such land is located.[4]

(Development Regulations, Ex. D at pg. 1-9, § 1.05.D.8.)

46.     So even if CoreCivic's use of the Property fell within the Development Regulations' definition of a nonconforming use, CoreCivic would have lost its right to use the Property in that manner because it stopped using it as a detention center for 24 consecutive months.

---

[4] Section 1.05.A.3 defines a "nonconforming use" as "An existing use which does not comply with the use regulations applicable to new uses in the zoning district in which it is located." (Development Regulations, Ex. D at pg. 1-7, § 1.05.A.3.) Section 1.05.D.1 generally grandfathers nonconforming uses of property within the City.

14

47.    The City Commission's resolution rescinding CoreCivic's special use designation for the Property also determined that CoreCivic could not use the Property for a jail or prison to the extent its prior use as such was a nonconforming use. (Resolution No. B-2394, Ex. F.)

**D.    CoreCivic applies for and then withdraws its application for an SUP.**

48.    On February 21, 2025, CoreCivic applied for a special use permit for "reactivation" of the Facility as a "Detention Center." CoreCivic claimed in its SUP application that the Facility will house approximately 1,000 detainees at a time, who "will be held for approximately 51 days as they are processed through the immigration system," and that "[n]o ICE detainees will be released into the Leavenworth community." CoreCivic's application and supporting documentation are attached hereto as Exhibit G.

49.    CoreCivic's SUP application did not explain how it calculated the 51-day estimate that individual detainees would be held on average; no consideration for the countless ways in which detainees may be held for longer periods or ordered free to walk out its gates by a court;[5] no accountability for the potential strain on critical City services (such as sanitary sewer, fire protection, and police services); no measures to ensure cooperation with City police investigations

---

[5] Most habeas petitions seeking the release of detainees held at the Facility will be filed in the District of Kansas. *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004) ("[F]or core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement.") It stands to reason, therefore, that if this Court orders the release of a detainee from the Facility, the detainee could be released immediately into the City of Leavenworth. According to page 39 of the ICE National Detainee Handbook, https://bit.ly/3FPZAtG, if a released detainee cannot arrange for a friend or family member to pick them up, the detainee is to "ask staff at the facility or an ICE officer to arrange for your transportation to a public transportation location, such as a bus station, airport, or train." Greyhound has a bus stop in Leavenworth, https://bit.ly/3E3MFDZ, so it is entirely possible that, assuming an employee of CoreCivic or ICE abides by a detainee's request for transportation, CoreCivic or ICE could simply deposit released detainees at the Greyhound stop, at which point they would be on their own.

15

of violent crimes; and no assurance that the Facility would be appropriately staffed so as to minimize the need for intervention by the City's police.

50.    The City intended to address all these concerns to the greatest extent possible under Kansas law through the process of reviewing and considering CoreCivic's application for an SUP.[6] Moreover, the City's Development Regulations mandate a public hearing on an SUP application before the City Planning Commission, in which "[a]ny interested person or party may appear and be heard at the hearing in person, by agent or by attorney."  (Development Regulations, Ex. D at pg. 2-10, § 2.04.B.4.) By refusing to participate in this lawfully mandated process, CoreCivic has deprived the citizens of Leavenworth of any opportunity to articulate other legitimate concerns over CoreCivic's use of the Property that the City could address through conditions placed on CoreCivic's SUP.

51.    The Development Regulations also provide for additional protections that will be nullified if CoreCivic is allowed to proceed without obtaining a special use permit. Specifically, adjacent landowners would be allowed to submit a petition protesting CoreCivic's application. If the requisite percentage of property owners signed such a petition, it would raise the threshold of votes needed to approve a permit from a simple majority to three-quarters of the City Commission. (*Id.* § 2.04.B.6.)[7]

52.    In determining whether to issue the permit, the City Commission would have been required to find that:

>    a.    The proposed special use complies with all applicable provisions of [the Development Regulations].

---

[6]    https://www.leavenworthks.org/ru/page/press-release-corecivic-special-use-permit-application.

[7] There are five members of the City Commission. So the submission of a valid protest petition would mean that CoreCivic's SUP would require four affirmative votes instead of three.

b.   The proposed special use at the specified location will contribute to and promote the economic development, welfare or convenience of the public.

c.   The special use will not cause substantial injury to the value of other property in the neighborhood in which it is to be located.

d.   The location and size of the special use, the nature and intensity of the operation involved in or conducted in connection with it, and the location of the site with respect to streets giving access to it are such that the special use will not dominate the immediate neighborhood so as to prevent development and use of neighboring property in accordance with the applicable zoning district regulations. In determining whether the special use will so dominate the immediate neighborhood, consideration shall be given to:

   i.    The location, nature and height of buildings, structures, walls, and fences on the site, and

   ii.   The nature and extent of landscaping and screening on the site.

   iii.  Off-street parking and loading areas whether on the premises or auxiliary to the premises will be provided in accordance with the standards set forth in this appendix and such areas adjoining residential uses will be located to protect such residential uses from any injurious effect.

   iv.   Adequate utility, drainage, and other necessary facilities have been or will be provided.

   v.    Adequate access roads or entrance and exit drives will be provided and shall be so designed to prevent traffic hazards and to minimize traffic congestion in public streets and alleys.

(*Id.* at pgs. 2-10 to 2-11, § 2.04.B.7.)

53.   In addition, Kansas law suggests that the City Commission may consider the so-called *Golden* factors in assessing an application for a special use permit. *See McPherson Landfill, Inc. v. Bd. of Co. Comm'rs of Shawnee Co.*, 274 Kan. 303, 306 (2002), citing *Golden v. City of Overland Park*, 224 Kan. 591 (1978). Those non-exclusive factors are: (a) the character of the neighborhood; (b) the zoning and uses of properties nearby; (c) the suitability of the subject property for the uses to which it has been restricted; (d) the extent to which removal of the restrictions will detrimentally affect nearby property; (e) the length of time the property has

remained vacant as zoned; (f) the gain to the public health, safety, and welfare by the possible diminution of value of the developer's property as compared to the hardship imposed on the individual landowners; (h) the recommendations of a permanent or professional planning staff; and (i) the conformance of the requested change to the city's master or comprehensive plan. *Golden*, 224 Kan. at 598.

54.    In addition to the issues already discussed above regarding the problems with "[a]dequate utility, drainage, and other necessary facilities," the Facility is situated not on a rural outskirt, but in an industrially zoned district adjacent to single-family homes, and close to restaurants, grocery stores, and parks:



55.    Assuming the accuracy of CoreCivic's projection that the Facility would house 1,000 detainees, each for an average of 51 days, this would mean that the population of the facility would turn over completely about seven times per year, adding as many as 14,000 trips to the

Property (1,000 x 7 x 2 trips in/out per detainee) annually via a single access road to the Property. This doesn't account for visitors, attorneys, or protestors, the latter of which must be assumed given the controversial nature of current immigration policies compounded by local antipathy toward CoreCivic because of the manner in which it managed the Facility previously.

56.     The City's Planning Commission set its public hearing on CoreCivic's application for April 7, 2025. The City Commission set subsequent and final hearings on CoreCivic's application for May 13 and 27, 2025.

57.     CoreCivic withdrew its SUP application on March 13, 2025, taking the position that it does not need a special use permit because obtaining one would take too long to comply with ICE's demands. It has stated that its recently awarded contract with ICE "necessitates a swift contract activation of the Midwest Regional Reception Center to accommodate their pressing need for capacity in the region," and that "ICE's pressing need for capacity dictates the speed at which we must move to hire and ready the facility (and thus does not allow time to go through a protracted permitting process)."

58.     Unless CoreCivic is required to follow the City's requirements for obtaining a special use permit, neither the City nor its residents will have an opportunity to flesh out in any forum the conditions under which CoreCivic will be allowed to use the Property.

59.     Moreover, without a special use permit, the City Commission will be unable to enforce any conditions it would place on CoreCivic's use of the Property; under the Development Regulations, the City can revoke a special use permit if the City Commission finds, after notice and a public hearing, that the holder of the SUP "has violated any criteria of approval, changed circumstances supporting the approval or a determination that the use has become a nuisance by

reason of design or operation of the use, site or buildings." (Development Regulations, Ex. D at pg. 2-11, § 2.04.D)

E.    Procedural History

60.    On March 31, 2025, the City filed an action in the United States District Court for the District of Kansas seeking a declaratory judgment, temporary restraining order, and preliminary and permanent injunction to prohibit CoreCivic from violating its Development Regulations.

61.    On April 14, 2025, the City and CoreCivic entered into the stipulation attached hereto as Exhibit G, in which the City agreed to withdraw the motion for temporary restraining it previously filed in the federal court in exchange for CoreCivic's agreement to postpone housing for any detainees at the Property up to and including June 1, 2025.  (Ex. G.)

62.    Yesterday, on May 22, 2025, the federal court dismissed the City's action without prejudice for lack of federal subject matter jurisdiction.  (Ex. H, Order of Dismissal.)

63.    The City now seeks a temporary restraining order and preliminary and permanent injunction from this Court to prohibit the irreparable harm that will result from allowing CoreCivic to house ICE detainees in the Facility without a special use permit in violation of the City's Development Regulations.

COUNT I
(Declaratory Judgment: Violation of the Development Regulations)

64.    The City incorporates by reference all preceding paragraphs of this Petition as if fully set forth herein.

65.    Section 2.04.A of the City's Development Regulations provides that "[a]ll uses identified in the . . . use table . . . as a special use in any particular zoning district shall require a special use permit."

20

66.     CoreCivic ceased using the Property for a detention center on or about January 1, 2022 and has not resumed using the Property as such at any point to date.

67.     The City Commission's Resolution No. B-2394 rescinded the special use designation afforded the Property under § 1.05.E.2 of the Development Regulations.

68.     CoreCivic is required to apply for and receive a special use permit from the City before using its Property for an ICE detention center, because CoreCivic intends to use the Property as a "jail" or "prison" as those terms are defined in the Development Regulations.

69.     CoreCivic has withdrawn its application for a special use permit and declared its intention to use the Property as a detention center without first obtaining from the City a special use permit.

70.     An actual controversy exists between the parties, in that the City contends that CoreCivic must have a special use permit before using the property to house detainees in a jail or prison, whereas CoreCivic contends that it does not need a special use permit to use the Property for that purpose.

WHEREFORE, the City prays that this Court enter judgment declaring that CoreCivic must apply for and obtain a special use permit in accordance with the procedures set forth in the City's Development Regulations prior to housing any detainees in the Facility; tax costs against CoreCivic; and grant any such further relief deemed just.

## COUNT II
### (Injunctive Relief)

71.     The City incorporates by reference all preceding paragraphs of this Petition as if fully set forth herein.

21

72.    The City is substantially likely to succeed on the merits of this lawsuit because under the City's Development Regulations, CoreCivic is required to obtain a special use permit from the City before using the Property as a jail or prison.

73.    The City is likely to suffer irreparable, irreversible, direct, and intangible harms to the health, safety, comfort, economic development, and property values of Leavenworth citizens and businesses in the absence of preliminary and permanent injunctive relief for all the reasons discussed above. The City has a compelling interest in enforcing its ordinances and, without injunctive relief, it and its citizens will be deprived of the full, fair, and open public hearing needed to determine whether to place conditions on CoreCivic's use of the Property, and if so, what those conditions would be. Moreover, without a special use permit, CoreCivic will be able to use the Property free from any conditions the City would place on that use pursuant to a special use permit. Finally, without immediate injunctive relief enjoining use of the Property as a detention center pending a final judgment, the Court would be setting the stage for an otherwise unnecessary conflict between the City, the Court, and ICE once detainees are placed at the Facility; should the Court determine only after that point that CoreCivic is required to obtain a special use permit, the Court would have to account for the need to transfer those detainees and even risk the possibility that an order requiring CoreCivic to obtain a special use permit would be rendered ineffectual should ICE refuse to transfer them to another facility.

74.    These threatened harms to the City outweigh the harm any temporary restraining order, preliminary injunction, or permanent injunction may pose to CoreCivic. CoreCivic evidently entered into a contract with ICE either before or at the same time it was applying for a special use permit, reflecting knowledge on the part of CoreCivic that its right to use the Property

22

for a detention center was not absolute. Thus, any harm that may befall CoreCivic through preliminary injunctive relief is self-induced.

75.    If issued, the preliminary and permanent injunctive relief sought will advance, not adversely affect, the public interest. The citizens of Leavenworth have an explicit interest in ensuring that property uses within the City do not cause harm to public safety, health, or the environment; that interest is expressed through the Development Regulations.

76.    Immediate irreparable injury will result without the requested preliminary injunctive relief. Time is of the essence, in that CoreCivic has advised it must move so "swiftly" that it cannot wait for the City to conduct a hearing or otherwise process a special use permit application. Counsel for CoreCivic has advised that CoreCivic may begin moving detainees to the Facility in May, but the City has no assurance, depending on the demands made on CoreCivic by ICE, that CoreCivic will not move sooner.

WHEREFORE, the City prays that this Court enter a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants from housing any detainees in the Facility without applying for and obtaining a special use permit in accordance with the procedures set forth in the City's Development Regulations; tax costs against Defendants; and grant any such further relief deemed just.

**COUNT III**
**(Against Defendant Mackey: Aiding and Abetting CoreCivic)**

77.    The City incorporates by reference all preceding paragraphs of this Petition as if fully set forth herein.

78.    Defendant Mackey's plan to use the Property for a jail or prison by housing detainees in the Facility without applying for and obtaining a special use permit would be a

23

wrongful act under the Development Regulations that would cause injury to the City and its citizens.

79.     Defendant Mackey is generally aware of her role in carrying out these wrongful and unlawful acts.

80.     Defendant Mackey has knowledge of and will substantially assist in these wrongful and unlawful acts and CoreCivic's violation of the Development Regulations.

WHEREFORE, the City prays that this Court enter a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants from housing any detainees in the Facility without applying for and obtaining a special use permit in accordance with the procedures set forth in the City's Development Regulations; tax costs against Defendants; and grant any such further relief deemed just.

## COUNT IV
### (Public Nuisance)

81.     The City incorporates by reference all preceding paragraphs of this Petition as if fully set forth herein.

82.     The City may maintain an action to abate or prevent a public nuisance under K.S.A. 60-908, 12-761(b), and Ordinance 8113.

83.     Using the Property as a jail or prison without a special use permit in violation of the Development Regulations is a public nuisance per se.

84.     Defendants' threatened violation the Development Regulations by operating a jail or prison without a special use permit will interfere with the interests of the community and the comfort and convenience of the general public.

85.     Defendants' threatened violation will annoy a substantial portion of the community.

City of Leavenworth v. CoreCivic--Complaint(4080301.4) - 4/2/2025 10:54 AM

86. Defendants' threatened violation will affect an interest common to the general public, rather than peculiar to one individual or only a few.

87. Defendants' threatened violation will constitute a public nuisance that effects a peculiar injury upon the City and its citizens.

88. Defendant Mackey is an agent and employee of CoreCivic and is acting within the scope of her authority as an agent and employee of CoreCivic.

89. Defendant Mackey had actual, implied, apparent, and specific authority to undertake, on behalf of CoreCivic, the actions she undertook as alleged herein, and the actions she will take to use the Property as a jail or prison without a special use permit.

90. CoreCivic is jointly and severally liable with Defendant Mackey under principles of vicarious liability, including, but not limited to, respondeat superior, for the her wrongful acts.

WHEREFORE, the City prays that this Court enter a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants from housing any detainees in the Facility without applying for and obtaining a special use permit in accordance with the procedures set forth in the City's Development Regulations; tax costs against Defendants; and grant any such further relief deemed just.

Respectfully submitted,

SPENCER FANE LLP

/s/  David E. Waters
David E. Waters          KS #20773
Caleb P. Phillips         KS #26226
6201 College Boulevard, Suite 500
Overland Park, KS 66211
(913) 345-8100 (telephone)
(913) 345-0736 (fascimile)
dwaters@spencerfane.com
cphillips@spencerfane.com

25

W. Joseph Hatley     KS #12929
Angus W. Dwyer     KS #26995
1000 Walnut, Suite 1400
Kansas City, MO 64106
(816) 474-8100 (telephone)
(816) 474-3216 (facsimile)
jhatley@spencerfane.com
adwyer@spencerfane.com

ATTORNEYS FOR PLAINTIFF
THE CITY OF LEAVENWORTH, KANSAS

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2025, I electronically filed the foregoing with the Clerk of the Court using its electronic filing system, which will automatically send a notice of electronic filing to all counsel of record in this action. I further certify that I served the foregoing by email upon the following counsel:

Taylor Concannon Hausmann
Sara A. Fevurly
Husch Blackwell LLP
4801 Main Street, Suite 100
Kansas City, MO 64112
Taylor.Hausmann@HuschBlackwell.com
Sara.Fevurly@HuschBlackwell.com

/s/ David E. Waters

26
City of Leavenworth v. CoreCivic--Complaint(4080301.4) - 4/2/2025 10:54 AM

# EXHIBIT 4

## RESOLUTION NO. B-2394

## A RESOLUTION OF THE CITY COMMISSION OF THE CITY OF LEAVENWORTH, KANSAS, REGARDING CERTAIN JAIL AND PRISON USES ON PROPERTY LOCATED AT 100 HIGHWAY TERRRACE, LEAVENWORTH, KANSAS.

WHEREAS, the Kansas planning and zoning act, K.S.A. 12-741 *et seq.* (the "Act"), is enabling legislation for the enactment by cities and counties of planning and zoning laws and regulations "for the protection of the public health, safety and welfare" (K.S.A. 12-741(a)); and

WHEREAS, pursuant to the Act, the City of Leavenworth, Kansas (the "City") has adopted certain "Development Regulations" as more particularly set forth in Appendix A of and to the Code of Ordinances, Leavenworth, Kansas (the "City Code"); and

WHEREAS, the Development Regulations, at Sec. 1.01.B, provide that the Development Regulations serve certain purposes, including but not limited to "promote the health, safety, comfort and economic development of the city", to "preserve and protect property values throughout the city", and to "regulate the location and use of buildings and land within each district or zone"; and

WHEREAS, reference is hereby made to that certain jail and prison use (the "Facility") which commenced operations in or about 1992 on and upon that certain real property commonly known and numbered as 100 Highway Terrace, Leavenworth, Kansas, Parcel No. 052-094-18-0-20-01-002.00-0 (the "Property"), which Property is zoned "I-2" Heavy Industrial District; and

WHEREAS, pursuant to Sec. 1.04 of the Development Regulations, if any building, structure, use, or other action or condition is found to be in violation of the Development Regulations, then in addition to other remedies, the City may institute any appropriate action or proceeding to, among other things, (1) prevent the continuance of any unlawful action or condition, (2) correct or abate any violation, and withhold public improvements until the violation is abated or corrected, and (3) prevent the issuance of permits, occupancy of the building, structure or land, and otherwise prevent any further illegal act, conduct business, or use of the premises; and

WHEREAS, pursuant to Sec. 1.05.D.8 of the Development Regulations, when a nonconforming use is abandoned for a period of twenty-four (24) consecutive months, any subsequent use or occupancy of such land shall comply with the regulations of the zoning district in which such land is located; and

WHEREAS, pursuant to Sec. 2.04.C of the Development Regulations, any discontinuance of a special use for more than twelve (12) months enables the City Commission to administratively rescind any right to engage in such special use; and

WHEREAS, the Facility and the Property have not been used as a jail or prison for more than thirty-six (36) calendar months, with such uses having been discontinued and/or abandoned on or about January 1, 2022.

NOW, THEREFORE, BE IT RESOLVED BY THE GOVERNING BODY OF THE CITY OF LEAVENWORTH, KANSAS:

Section 1.    The above recitals are hereby incorporated into this resolution. This resolution is adopted pursuant to the City's authority, obligation, and responsibility to, among other things, protect the public health, safety, and welfare.

Section 2.    The Governing Body hereby finds that the use of the Facility and the Property as a jail or prison was discontinued and abandoned on or about January 1, 2022, and has not been reestablished as of the date of this resolution, such that the use was discontinued or abandoned for a period exceeding twelve (12) months for purposes of Sec. 2.04.C of the Development Regulations and for a period exceeding twenty-four (24) consecutive months for purposes of Sec. 1.05.D.8 of the Development Regulations.

Section 3.    To the extent the Facility or the Property could be deemed to be or to have been a lawful nonconforming use, then pursuant to Sec. 1.05.D.8 of the Development Regulations, the Governing Body hereby finds that any use of the Facility and/or the Property as a jail or prison is no longer a lawful nonconforming use and that any use as a jail or prison shall and does require a special use permit as provided for in the City's Development Regulations, and that such uses must otherwise comply with all use regulations applicable to new uses in the I-2 zoning district.

Section 4.    To the extent the Facility or the Property could be deemed to have or to have had a special use permit or special use designation, then pursuant to Sec. 2.04.C of the Development Regulations, the Governing Body hereby administratively rescinds any and all special use permits or special use designations for the Facility and the Property as a jail and/or prison under City Code and the City's Development Regulations.

Section 5.  Nothing herein shall be deemed, by itself, to constitute a waiver by the Governing Body or the City of any provision of the Development Regulations or other applicable law.

Section 6.    The Mayor, City Manager, City Attorney, and Director of Planning & Community Development are hereby authorized and directed to take such other actions as may be appropriate, desirable, or necessary to accomplish the purposes of this resolution, including but not limited to the institution or defense of any appropriate legal proceedings related to Facility, the Property, and/or the matters that are the subject of this resolution.

Section 7.    This resolution shall be effective upon its adoption by the Governing Body of the City of Leavenworth, Kansas.

**PASSED AND ADOPTED** by the City Commission of the City of Leavenworth, Kansas, this 25th day of March, 2025.

Holly Pittman, Mayor

{SEAL}

ATTEST:

Sarah Bodensteiner, CMC, City Clerk

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **CITY OF LEAVENWORTH, KANSAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 5:25-cv-4032** |
| | ) | |
| **CORECIVIC, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

This is not a case about whether there should be an ICE detention facility within the City

of Leavenworth.  This is, instead, a case about a far narrower question: whether CoreCivic can

ignore the City's Development Regulations and operate such a detention center without a special

use permit from the City. As CoreCivic itself initially acknowledged, its use of its Property as a

detention facility (or indeed any other kind of prison or jail) is a special use requiring a permit

from the City Commission, so it submitted an application for such a permit.  Reversing that

position, CoreCivic now contends that it does not need the City's permission to use its Property in

that fashion and has threatened to do so unilaterally in the near future.

The City is likely to succeed on the merits of this case, because any reasonable

construction of its Development Regulations requires CoreCivic to seek a special use permit.

CoreCivic began operating a detention center on the Property in about 1992, but did not need a

special use permit to do so because, although the City adopted an ordinance in 2012 requiring that

jails or prisons have a special use permit, the City "grandfathered" in existing special uses. But the

City's Development Regulations further provide that if a special use is discontinued for more than

12 months, the City Commission can rescind authorization of that special use. CoreCivic stopped

using its Property for a detention center on January 1, 2022, and has not since used the Property as a detention center. The City Commission has accordingly rescinded CoreCivic's authorization for a special use of its Property and is requiring CoreCivic to apply for and obtain a special use permit.

Given CoreCivic's track record of using its Property in a way that imposed substantial costs on the City and the Leavenworth community more broadly, the City will suffer irreparable harm unless CoreCivic is required to first obtain a special use permit. Through a permit, the City can place conditions on CoreCivic's use to protect the public welfare and have an enforcement mechanism in place should CoreCivic materially violate those conditions. Further, the public interest favors the City's ability to enforce its own laws.

## II.    FACTUAL BACKGROUND

CoreCivic is a private, for-profit corporation that operates prisons and jails throughout the United States. From 1992 through 2021, it owned and operated a detention center ("the Facility"), primarily housing pretrial detainees for the United States Marshal Service at 100 Highway Terrace in Leavenworth, Kansas (the "Property"). During its time using the Property in this way, CoreCivic became embroiled in multiple widely publicized scandals due to its gross mismanagement and the rampant violence and abuse at the Facility that flowed from that mismanagement.

At the time CoreCivic began operating the Facility, the use of the Property for a prison was permitted as of right under the City's zoning regime. In 2012, the City amended a portion of its zoning ordinances; among other revisions, the City required property owners to obtain a special use permit from the City if they wanted to use their property to operate a jail or prison from the property. Declaration of City Clerk Sarah Bodensteiner, Exhibit A, attached to which is Exhibit A-1, Ordinance No. 7911.

The City has codified its zoning ordinances in Development Regulations, a complete copy of which can be found at http://bit.ly/3E9GsGt. The portions of the Development Regulations involved in this case are attached to Ms. Bodensteiner's declaration as Exhibit A-2.

Under the Development Regulations, certain uses of land, called special uses, require a special use permit even if they are otherwise allowed within a zoning district. *See* Exhibit A-2 at § 2.04.A.  The Development Regulations lay out the process for seeking a special use permit from the City Commission. *See id.* at § 2.04.B.  Jails and prisons are *per se* special uses under the code. *See id.*, Appendix A at p. A-3.

However, the Development Regulations contain various grandfathering provisions.  One covers preexisting uses that are now classified as special uses. *See id.* at § 1.05.E.2.  Another grandfathered in preexisting nonconforming uses. *See id.* at § 1.05.D.1.  However, the grandfathered use could not be ceased for an extended time without losing the grandfathering privilege. Where a special use is abandoned for 12 months, the special use authorization becomes voidable by the City Commission. *See id.* at § 2.04.C.  In the same way, a nonconforming use that is abandoned for 24 months loses its grandfathering. *See id.* at § 1.05.D.8.

The problems at the Facility were significant and well documented. In 2021, they prompted a judge of this Court to describe the Facility as "an absolute hell hole." *United States v. Clark,* Case No. 16-cr-20078-JAR, Doc. 87, pp. 46-47. The Facility was the subject of a lengthy investigation by the Office of the Inspector General at the United States Department of Justice ("OIG"), which produced a 129-page audit report in 2017 detailing its findings (the "Audit Report").  A copy of the Audit Report is attached as Exhibit B

The Audit Report noted, *inter alia*, that the Facility had significant staffing issues, which resulted in the closure of security posts that were necessary—and mandatory—to ensure that the

3

Facility could be operated safely, as well as short-staffing other essential services.  Ex. B at ii.  The OIG found that rather than bring in additional staff, CoreCivic exacerbated the problem by transferring personnel _to_ other facilities it operated and then agreeing to take additional non-federal pretrial detainees.  *Id.* at iii.  Other sources reported additional problems, including beatings and stabbings of both prisoners and guards, unreported sexual assaults, widespread distribution of weapons, rampant suicides among detainees, denial of basic hygienic supplies and medical care, and doors that failed to consistently lock, forcing detainees to construct makeshift barricades to ensure their own safety. *Id.* CoreCivic was also recording attorney-client communications between detainees and their lawyers, resulting in a scandal that the Court doubtless recalls, as well as a lengthy order from this Court that led to the discharge of several detainees into the community.

The problems inside the Facility caused problems outside its walls, adversely affecting the City. Attempts by the Leavenworth Police Department to investigate crimes that had been reported inside the Facility were routinely stymied by CoreCivic and its policies.  Police were often not permitted to enter the Facility and had to conduct interviews with detainees from outside the gate. Facility staff were not permitted to give interviews to police while on duty and were instructed to provide (often incomplete) written statements to police through the fence.  Police were given no access to third-party witnesses within the Facility.  Additionally, CoreCivic frequently delayed the reporting of serious crimes, such as sexual assaults, and often destroyed evidence by ordering detainees to clean the crime scene before the police could arrive. These problems and more are detailed in the Declaration of the City's Police Chief, Patrick Kitchens, attached as Exhibit C.

Nor were the issues that the Facility caused for the City limited to law enforcement. Multiple times, malfunctions with the Facility's grinder pump caused large pieces of debris (e.g., bedsheets, rags, etc.) to be released into the City's sewer system.  This led to major downstream

4

clogs in the City's main sewer lines and wastewater treatment facilities, emergency maintenance calls to City employees at all hours of the day and night that were costly to taxpayers, and multiple mandatory reports to the Kansas Department of Health and the Environment as a result of the ensuing sewage spills. *See* Declaration of Timothy Guardado, attached as Exhibit D.

The Facility is located in an industrial district, directly opposite a landscaping company:



It is less than a mile from a Ford dealership, a Home Depot, a Starbucks, and a Buffalo Wild Wings. There is a residential neighborhood directly south of the Facility; the Leavenworth National Cemetery lies to its north; Mount Muncie Cemetery lies to its east. These issues, as well as the public safety issues outlined above, thus had (and will have if they resume) significant spillover effects in the community.

On January 26, 2021, President Biden issued Executive Order 14006, which directed the Attorney General to not renew any Department of Justice contracts with private detention facilities.

5

CoreCivic closed the Facility effective January 1, 2022. CoreCivic's own website described the Facility as "currently inactive" as recently as March 19, 2025:




corecivic.com

≡ MENU

**More Info**

This facility is currently inactive. To submit a notification of an allegation of sexual abuse made by individuals previously housed at this facility, please contact Heather Baltz, Sr. Director of PREA Programs and Compliance at Heather.Baltz@corecivic.com

Institutional employers seeking PREA background information on former employees of this facility should contact Margaret Houston in CoreCivic Human Resources at Margaret.Houston@corecivic.com

(https://web.archive.org/web/20250319174656/https://www.corecivic.com/facilities/midwest-regional-reception-center)[1]

In what is presumably an effort to hide unhelpful evidence relevant to this litigation, CoreCivic has since removed that statement from its website.

---

[1] *See Marten Transp., Ltd. v. Plattform Advert., Inc.*, No. 14-2464-JWL, 2016 WL 1718862, at *4 (D. Kan. Apr. 29, 2016) (taking judicial notice of Wayback Machine records).

 

≡ MENU

## More Info

*To submit a notification of an allegation of sexual abuse made by individuals previously housed at this facility, please contact Heather Baltz, Sr. Director of PREA Programs and Compliance at Heather.Baltz@corecivic.com*

*Institutional employers seeking PREA background information on former employees of this facility should contact Margaret Houston in CoreCivic Human Resources at Margaret.Houston@corecivic.com*

(https://www.corecivic.com/facilities/midwest-regional-reception-center.)

In any event, there is no dispute that CoreCivic has not actually used the Facility as a jail or prison since December 2021 and that no detainee has been housed in the Facility for over three years.

On February 21, 2025, CoreCivic filed an application with the City to obtain a special use permit to begin using its Property as an ICE detention center, which CoreCivic proposes to call the Midwest Regional Reception Center ("MRRC"). CoreCivic's application represented that the MRRC would house 1,000 detainees, each of whom would be held for approximately 51 days. The City's Planning Commission set a public hearing for April 7, 2025 to consider CoreCivic's application. The City Commission set hearing dates on May 13, 2025 and May 27, 2025 to consider the Planning Commission's recommendations and make a final determination. On March

7

13, 2025, before any scheduled hearings could take place, CoreCivic reversed course and withdrew its application. CoreCivic has taken the position that it does not need a special use permit and intends to start housing detainees without one.

In light of CoreCivic's announced intent to use the Property as a detention center without obtaining a special use permit, and because CoreCivic has not used the Property as a jail or prison for over three years, the City Commission adopted a resolution on March 25, 2025 rescinding the special use designation applicable to the Property. It further acknowledged that CoreCivic had abandoned its use of the Property as a jail or prison for at least 24 months and that such use of the Property no longer qualified as a valid nonconforming use, should CoreCivic attempt to take advantage of that grandfathering provision. A copy of that resolution is attached to the Declaration of Sarah Bodensteiner as Exhibit A-3.

III.    ARGUMENT

A.    Standard for Preliminary Injunctive Relief

A party seeking a preliminary injunction must show: "(1) a substantial likelihood that they will ultimately succeed on the merits of their suit; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) this threatened harm outweighs the harm a preliminary injunction may pose to the opposing party; and (4) if issued, the injunction will not adversely affect the public interest." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024), quoting *Winter v. Nat. Res. Def. Council, Inc.* 555 U.S. 7, 22 (2008). A party seeking a temporary restraining order must additionally demonstrate "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). The Court otherwise applies the same standard to decide whether to grant a TRO. *See Rangel-Lopez v. Cox*, 344 F. Supp. 3d 1285, 1289 (D. Kan. 2018). "The issuance of a

8

temporary restraining order or other preliminary injunctive relief is within the sound discretion of the district court." *Sac & Fox Nation of Mo. v. LaFaver*, 905 F. Supp. 904, 906 (D. Kan. 1995).

**B.    The City is likely to succeed on the merits.**

The City is substantially likely to succeed on the merits.  The Development Regulations clearly require CoreCivic to obtain a special use permit in order to operate the Facility as a jail or prison.  CoreCivic is refusing to do so and insists it can nevertheless begin operating MRRC at the Facility.  This is not permitted, and the City is likely to succeed in its efforts to obtain a declaratory judgment and a permanent injunction to that effect.

The City's Development Regulations are a class of local zoning regulations, which have been generally recognized as constitutionally permissible for nearly a century.  *See Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 386-88 (1926) (local zoning ordinances are a valid exercise of the police power).  Kansas law specifically authorizes municipalities like the City to pass zoning codes.  *See* K.S.A. 12-741 *et seq.*  The Development Regulations were adopted pursuant to this statute.  *See* Ex. A-2 at 1.

Under the Development Regulations, the operation of a prison or jail is a special use requiring the issuance of a special use permit.  *See* Ex. A-2 at § 2.04.A; *see also id.*, Appendix A at pg. A-3.  The proposed MRRC qualifies as a jail or prison under the definitions applicable to the Development Regulations.  *See id.* at pg. 12-21 (defining the term to refer to "[p]laces in which people are physically confined and, usually, deprived of a range of personal freedoms").  As such, CoreCivic can only operate the MRRC out of the Facility if it follows the procedures set forth in Section 2.04.B and obtains a special use permit from the City Commission.

Section 1.05.E.2 of the Development Regulations provides as follows:

*Status of Existing Legal Uses Designated as Special Uses*.  Any existing legal use at the effective date of these Development Regulations which is designated as a

9

special use by these Development Regulations shall be deemed as an existing special use and a lawful conforming use.

This provision does not allow CoreCivic to terminate the special use and then later start a new special use at the same location without a special use permit. Section 1.05.E.2, on its face, deals with "existing" uses—it applies only to "existing legal use[s]" in place when the Development Regulations were adopted and deems any such "existing legal use" to be an "existing special use and a lawful conforming use." Ex. A-2 at § 1.05.E.2. That the "use" must continue to be "existing" to fall within the scope of Section 1.05.E.2 is thus baked into the language of the regulation itself. If, as occurred here, the "use" is abandoned, discontinued, or waived, it ceases to be an "existing" use, and Section 1.05.E.2 no longer applies.

At that point, property reverts to the default position under the Development Regulations, under which its owner must obtain a special use permit from the City Commission if it wants to undertake a special use. *See id.* at § 2.04.A ("All uses identified in the zoning districts, use table or elsewhere in these regulations as a special use in any particular zoning district *shall require a special use permit*.") (emphasis added). This is consistent with how the law generally treats grandfather clauses, which run with the specific use and cease to apply once the use ends. *See, e.g., Morale v. State*, 557 S.W.3d 569, 572 (Tex. 2018) ("Once a nonconforming use ceases, the grandfathered status is lost."). It is also consistent with how the other grandfathering provision in the Development Regulations operates. *See id.* at § 1.05.D.8 (grandfathering for preexisting nonconforming uses terminates after nonconforming use is abandoned for 24 months).

Moreover, even if one were to assume that Section 1.05.E.2 operated to grant CoreCivic an implicit special use permit, that permit is terminable and has in fact been terminated.[2] Under

---

[2] Given that the Development Regulations unequivocally state that a property owner must have a special use permit to operate a jail or prison (per §§ 2.04.A., 1.03.A.4, Appendix A § A.2,

10

Section 2.04.C, the City Commission can revoke a special use permit if the use is discontinued for more than twelve months. *See* Ex. A-2 at § 2.04.C. The City Commission properly revoked any special use authorization CoreCivic may have had on March 25, 2025. *See* Ex. A-3. At that point, CoreCivic's use of the Facility as a jail or prison had been discontinued for over three years.

Thus, if CoreCivic wants to operate the MRRC at the Facility, it will need to follow the process laid out in Section 2.04.B of the Development Regulations and obtain a special use permit. CoreCivic originally recognized this fact and applied for a special use permit in late February. But it has since reversed course and now takes the position that it does not need a special use permit. For the reasons discussed above, CoreCivic *does* need a special use permit and, as such, the City is likely to prevail on its declaratory and injunctive claims to that effect.

> **C.      The City will suffer irreparable harm if it is not granted temporary and preliminary injunctive relief.**

Likewise, City will suffer irreparable harm if CoreCivic is not enjoined from opening the MRRC without a permit. As discussed at length above, CoreCivic has a lengthy track record at the Facility. CoreCivic's past mismanagement of the Facility when it was using the Property as a detention center imposed significant burdens on the City. It significantly disrupted the City's law enforcement efforts. This constitutes irreparable harm. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (recognizing the "ongoing and concrete harm to [the government's] law enforcement and public safety interests" as a factor that needs to be considered as part of the preliminary injunction analysis).

---

and the Use Table), then the only way § 1.05.E.2 could have deemed CoreCivic's use of the Facility to be a lawful conforming use is if it also deemed CoreCivic to have had a special use permit.

CoreCivic's mismanagement also resulted in significant waste management issues in the surrounding area, which is an industrial district.  This not only substantially disrupted the operations of the City itself as it needed to drop other pressing issues to literally clean up CoreCivic's messes, but it also threatened the public health and safety of the City's residents generally.  Risk to the public at large is sufficient irreparable harm to justify an injunction requiring a Kansas landowner to obtain a special use permit.  *See Board of County Com'rs of Leavenworth County v. Whitson*, 281 Kan. 678, 679-84 (2006).

It is all but certain that these issues will reemerge, immediately, if CoreCivic is allowed to begin operating the MRRC without meaningful safeguards and guarantees in place.  If CoreCivic is allowed to unilaterally open and operate the MRRC without any local oversight, the City will be effectively unable to exercise its own police powers with respect to the Facility, disrupting City operations and putting residents in jeopardy. Putting in place the kinds of safeguards and guarantees necessary to prevent this is one of the major purposes of the special use permitting process.  Enjoining CoreCivic from opening or operating the MRRC without first obtaining a special use permit is necessary to shield the City and its residents from these harms.

Moreover, the City has a valid interest in the enforcement of its ordinances.  *See Maryland*, 567 U.S. at 1303 ("That Maryland may not employ a duly enacted statute to help prevent these injuries constitutes irreparable harm."); *Comprehensive Health of Planned Parenthood of Kansas and Mid-Missouri, Inc. v. Templeton*, 954 F. Supp. 2d 1205, 1218 (D. Kan. 2013) (factoring in Kansas's "interest in the enforcement in any statute" and "the significant harms to the interests of the State of Kansas if the law were to be enjoined" in the balance of harms analysis).  That interest is injured if private parties like CoreCivic are permitted to flout the requirements of the

12

Development Regulations with impunity.  Granting the requested TRO and preliminary injunction will likewise protect against this injury.

### D. The balance of harms favors the City.

The balance of harms weighs in favor of granting the injunction.  As discussed above, the City will suffer irreparable harm if CoreCivic is not enjoined.  CoreCivic, in contrast, will be disadvantaged by an injunction to a much lesser degree.  It will merely be placed in the same position that any other company seeking to use its property in a way that requires a special use permit.  It will be obligated to seek such a permit from the City Commission, following the procedures laid out in Section 2.04 of the Development Regulations.  Having to comply with an otherwise valid and constitutional law does not constitute an irreparable harm for purposes of this analysis.  *See IMS Health Inc. v. Sorrell*, 631 F. Supp. 2d 429, 432 (D. Vt. 2009).

Even with respect to CoreCivic's relationship with ICE, it will not impose significant harm. It will effectively return CoreCivic to the position it has been in for the last several years: able to handle detainees for ICE, just not (for the time being) at the Facility. Requiring CoreCivic to go through the process of obtaining a special use permit will not significantly disrupt the company's ability to provide detention services to ICE.  According to its website, CoreCivic operates 80 other detention facilities across the United States.  *See* https://www.corecivic.com/facilities.  Even assuming, implausibly, that CoreCivic's plan is to immediately fill the MRRC to capacity with ICE detainees, those 1,000 individuals can be housed in other CoreCivic facilities by adding just a dozen to each location.  This burden is not a heavy one, and it is significantly outweighed by the burden to the City posed by allowing CoreCivic to use its Property without any conditions placed on that use.

13

### E.    Temporary injunctive relief serves the public interest

The public interest factors favor granting injunctive relief here.  As discussed above, given its track record, allowing CoreCivic to operate the MRRC without a special use permit protecting the City's interests is highly likely to imperil the health and safety of the local community and adversely affect the City's ability to maintain law and order within the Leavenworth city limits. *See Maryland*, 567 U.S. at 1303; *Whitson*, 281 Kan. at 679-84.  Separate and apart from this, there is a genuine public interest in ensuring the enforcement of valid and constitutional laws.  *See Templeton*, 954 F. Supp. 2d at 1218.  The right of municipalities to regulate local land use has been well established for a century.  *See Euclid*, 272 U.S. at 386-88.

### F.    The City faces immediate and irreparable injury without the issuance of a temporary restraining order.

The City will suffer immediate and irreparable injury if the Court does not issue a temporary restraining order enjoining CoreCivic from opening the MRRC.  As discussed above, the damages to the community that are all but certain to flow from CoreCivic operating the MRRC are irreparable harm.  There is, moreover, an immediate risk of such future harm.  Given CoreCivic's track record, it is virtually guaranteed that those problems will begin to emerge as soon as it opens the facility.  Only an order temporarily restraining this conduct until the preliminary injunction hearing can protect the City and its residents from this injury.

Moreover, it will be less disruptive for all sides to preserve the status quo while the parties litigate the ultimate question of whether CoreCivic has to abide by the City's Development Regulations.  Once detainees are actually housed in the Facility, it will be difficult, as a practical matter, to remove them to another facility if the Court later decides in the City's favor.  And given that CoreCivic could begin moving detainees into the Facility at any moment if it is not enjoined, time is of the essence.

14

### G.    The City need not post an injunction bond.

The City should not be required to post an injunction bond.  The Court has broad discretion to determine whether to require a bond.  *See Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003).  Where the party obtaining the injunction is a governmental entity, and thus "fiscally responsible," no bond is generally necessary.  *See State of Kan. ex rel. Stephan v. Adams*, 705 F.2d 1267, 1268 (10th Cir. 1983).

## IV.    CONCLUSION

For the foregoing reasons, this Court should issue a temporary restraining order and a preliminary injunction enjoining CoreCivic from using the Property for a prison or jail unless and until it obtains a special use permit from the City Commission authorizing such use, as required by  Leavenworth's Development Regulations.

SPENCER FANE LLP

/s/ David E. Waters

| David E. Waters | KS #20773 |
|---|---|
| Caleb P. Phillips | KS #26226 |

6201 College Boulevard, Suite 500
Overland Park, KS 66211
(913) 345-8100 (telephone)
(913) 345-0736 (fascimile)
dwaters@spencerfane.com
cphillips@spencerfane.com

| W. Joseph Hatley | KS #12929 |
|---|---|
| Angus W. Dwyer | KS #26995 |

1000 Walnut, Suite 1400
Kansas City, MO 64106
(816) 474-8100 (telephone)
(816) 474-3216 (facsimile)
jhatley@spencerfane.com
adwyer@spencerfane.com

ATTORNEYS FOR PLAINTIFF CITY OF
LEAVENWORTH, KANSAS

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CITY OF LEAVENWORTH, KANSAS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | |
| CORECIVIC, INC., ) | |
| ) | |
| Defendant. ) | |

## INDEX OF EXHIBITS TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

| Exhibit # | Description |
|---|---|
| A | Declaration of City Clerk Sarah Bodensteiner |
| A-1 | City of Leavenworth Ordinance No. 7911 |
| A-2 | Excerpts from City of Leavenworth Development Regulations |
| A-3 | Resolution Adopted by Leavenworth City Commission, March 25, 2025 |
| B | Department of Justice Office of Inspector General Audit Report, April 2017 |
| C | Declaration of Leavenworth Police Chief Patrick Kitchens |
| D | Declaration of Chief of City Wastewater Treatment Plant Division Superintendent Timothy Guardado |
| D-1 | Wastewater Division Business Records |

WA 6250354.1

SPENCER FANE LLP

/s/ David E. Waters

| | |
|---|---|
| David E. Waters | KS #20773 |
| Caleb P. Phillips | KS #26226 |

2601 College Boulevard, Suite 500
Overland Park, KS 66211
(913) 345-8100 (telephone)
(913) 345-0736 (fascimile)
dwaters@spencerfane.com
cphillips@spencerfane.com

| | |
|---|---|
| W. Joseph Hatley | KS #12929 |
| Angus W. Dwyer | KS #26995 |

1000 Walnut, Suite 1400
Kansas City, MO 64106
(816) 474-8100 (telephone)
(816) 474-3216 (facsimile)
jhatley@spencerfane.com
adwyer@spencerfane.com

ATTORNEYS FOR PLAINTIFF CITY OF
LEAVENWORTH, KANSAS

2

OP 4081997.1

# EXHIBIT 6

ELECTRONICALLY FILED
2025 Jun 03 PM 5:30
CLERK OF THE LEAVENWORTH COUNTY DISTRICT COURT
CASE NUMBER: LV-2025-CV-000180
PII COMPLIANT

## IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS

| | | |
|---|---|---|
| **CITY OF LEAVENWORTH, KANSAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **CORECIVIC, INC., MISTY LYNN MACKEY,** | ) | **Case No. LV-2025-CV-000180** |
| **AND DOE DEFENDANTS 1-10,** | ) | |
| | ) | |
| **Defendants**. | ) | |

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY INJUNCTION

SPENCER FANE LLP

/s/ W. Joseph Hatley
David E. Waters        KS #20773
Caleb P. Phillips      KS #26226
6201 College Boulevard, Suite 500
Overland Park, KS 66211
(913) 345-8100 (telephone)
(913) 345-0736 (fascimile)
dwaters@spencerfane.com
cphillips@spencerfane.com

W. Joseph Hatley       KS #12929
Angus W. Dwyer         KS #26995
1000 Walnut, Suite 1400
Kansas City, MO 64106
(816) 474-8100 (telephone)
(816) 474-3216 (facsimile)
jhatley@spencerfane.com
adwyer@spencerfane.com

ATTORNEYS FOR PLAINTIFF CITY OF LEAVENWORTH, KANSAS

**TABLE OF CONTENTS**

**Page**

I.      The City is likely to succeed on the merits. ................................................... 2

   A.   The City's request for a declaratory judgment is immaterial to the resolution of this motion but is proper under the Kansas Declaratory Judgment Act.............................. 2

   B.   CoreCivic abandoned its grandfathered special use by not using its property as a detention facility since 2021............................................................................. 3

   C.   The City did not violate CoreCivic's due process rights................................. 6

   D.   The City's actions have not violated the Supremacy Clause, which in any event would be an affirmative defense for which CoreCivic bears the burden of proof. ................... 7

        1.   The intergovernmental immunity doctrine does not bar the City's claim that CoreCivic must have a special use permit. ........................................... 7

        2.   Claims that the City's actions are preempted by federal law are premature. ....... 9

III.    A city's inability to enforce a valid ordinance is irreparable harm. ............................ 12

IV.     The City does not have an adequate remedy at law. ..................................... 12

V.      The balance of harms favors the City........................................................... 13

VI.     The public interest favors a preliminary injunction. ..................................... 14

VII.    The Court should not require an injunction bond........................................ 14

i

## REPLY MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR TEMPORARY INJUNCTION

All the City seeks here is an order requiring CoreCivic to comply with a municipal ordinance, the legality of which CoreCivic does not challenge, but whose application it *does* dispute. In light of a recent controversy at a privately owned ICE detention facility in Newark, NJ which was rooted in whether the owner was required to comply with municipal ordinances, injunctive relief is both desirable and necessary here to clarify the parties' rights and avoid disputes of that nature from boiling over in Leavenworth.[1]

**I.        The City is likely to succeed on the merits.**

**A.        The City's request for a declaratory judgment is immaterial to the resolution of this motion but is proper under the Kansas Declaratory Judgment Act.**

CoreCivic's argument that the City may not pursue a declaratory judgment is both immaterial to the outcome of this motion and incorrect. K.S.A. 12-761(c) expressly allows a city to seek injunctive relief when "land is or is proposed to be used in violation of any zoning regulations." Because the City contends that CoreCivic is about to use its property in violation of the City's Development Regulations, K.S.A. 12-761(c) confers jurisdiction on the Court to grant injunctive relief to the City, so whether the City is also seeking a declaratory judgment is not relevant.

---

[1] Because the City seeks only to preserve the status quo through an order of *prohibition*, this motion is not a request for a disfavored mandatory injunction. *See Mid-America Pipeline Co. v. Wietharn,*, 246 Kan. 238, 242 (1990) ("A mandatory injunction is an extraordinary remedy used to effectuate full and complete justice by commanding the performance of a positive act.") The City is not seeking a mandatory injunction, because it is not asking the Court to order CoreCivic to do anything. If the Court enters the requested relief, CoreCivic will not in fact be ordered to do anything; it will still be CoreCivic's choice whether to apply for a permit. The City seeks only an order prohibiting CoreCivic from housing detainees unless it first takes the step of applying for and obtaining a special use permit.

2

Moreover, CoreCivic may not use a federal court's reticence about its Article III power to enter a declaratory judgment to influence this Court's analysis, because the Kansas Declaratory Judgment Act provides specific authority for the Court to act in this case. K.S.A. 60-1704 states that "any person having an interest under a…municipal ordinance…may seek determination of any question of construction or validity arising under that enactment…and may obtain a declaration of rights, status or other legal relations thereunder." The only restriction Kansas law imposes is that a court "may decline to render or enter a declaratory judgment where such judgment, if entered, would not terminate the uncertainty or controversy giving 'rise to the proceeding." K.S.A. 60-1708. As the Court of Appeals stated in *Santa Rosa Associates, Ltd. v. Principal Life Ins. Co.*, 41 Kan. App. 2d 840, 858 (2009), quoting *Franklin Life Ins. Co. v. Johnson*, 157 F.2d 653, 658 (10th Cir. 1946), "the purpose of the declaratory judgment action is to settle actual controversies before they have ripened into violations of law or legal duty or breach of contractual obligations."

CoreCivic has plainly expressed its intention to begin housing detainees at its Leavenworth facility in the immediate future. The City believes that if CoreCivic were to do so without a special use permit, it would put CoreCivic in violation of the City's Development Regulations because CoreCivic's right to operate its facility without a permit ended when it stopped using its property as a jail or prison for more than 12 months. Construing the City's Development Regulations against this set of facts is precisely why the Kansas Declaratory Judgment Act exists.

**B.      CoreCivic abandoned its grandfathered special use by not using its property as a detention facility since 2021.**

Although CoreCivic's use of the property as a detention center before 2022 was a conforming use, Kansas law on the abandonment of nonconforming uses is helpful in analyzing whether a *special* use has been abandoned. A "landowner generally has no right 'to change,

expand, or to recommence after abandonment' a nonconforming use." *Lambert v. City of Leawood*, 471 P.3d 36, 2020 WL 5491377, at *3 (Kan. Ct. App. Sept. 11, 2020) (quoting *Goodwin v. City of Kansas City*, 244 Kan. 28, 32, 766 P.2d 177, 181 (1988)). "Courts have consistently ruled that the right to a preexisting nonconforming use is to be strictly construed and that the burden of proof is on the party claiming the nonconforming use." *Seward Cnty. ex rel. Seward Cnty. Bd. of Com'rs v. Navarro*, 35 Kan. App. 2d 744, 752, 133 P.3d 1283, 1288 (2006). Direct testimony of intent to abandon "is not essential." *Chapman v. Cont'l Oil Co.*, 149 Kan. 822, 89 P.2d 833, 834 (1939).

CoreCivic focuses its substantive argument on its claim that it did not intend to abandon its use of the Property as a jail or prison. But under Kansas law, and the law of many other states, a property owner's intent to carry on a grandfathered use is irrelevant if (a) the city's zoning code provides that discontinuance of the use for a specified time terminates the right to the grandfathered use, and (b) the property is not actually and actively being used as grandfathered for that specified time.

In *M.S.W., Inc. v. Bd. of Zoning Appeals of Marion Co.,* 29 Kan. App. 2d 139 (2001), the Court of Appeals affirmed a lower court judgment finding that the property owner had forfeited its right to operate a landfill where the landfill was given a Conditional Use Permit, but where (a) the property was not in fact used as a landfill for more than six months, and (b) the county zoning ordinance provided that the failure to use property for the purpose allowed by the CUP for six months, the CUP was forfeited. *See also City of Belton v. Smoky Hill Ry.,* 170 S.W.3d 429 (Mo. Ct. App. 2005) (intent to abandon irrelevant where rail line was not used for the period of time specified in ordinance); *City of Glendale v. Aldabbagh*, 939 P.2d 418 (Az. 1997) (intent to abandon not relevant where nonuse attributable, at least in part, to owner); *Cizek v. Concerned Citizens*, 49

4

P.3d 228 (Alaska 2002) (fact that airstrip was usable as such irrelevant; one-year discontinuance ordinance enforced).

These cases reflect that when cities adopt ordinances providing that the right to use property as either a nonconforming use or under a special use permit ceases when the property is not in fact used as such for a specified period, the property owner's intent is irrelevant. This eliminates the need to discern something as subjective as intent and makes particular sense when dealing with grandfathered uses, because they are by definition inconsistent with the city or county zoning ordinances. Property owners benefitting from grandfathered uses have not gone through the approval process, so it makes no sense that they would have greater rights than property owners who have sought proper approval. *See M.S.W., Inc.*, *supra¸* 29 Kan. App. 2d at 139 ("The doctrine of nonconforming uses is recognized in Kansas but is not a favored status under the law.")

CoreCivic stopped using its property as a detention facility by choosing not to house a single detainee there since 2021.  It clearly could have done so given that, in 2023 alone, it housed thousands of ICE detainees at eight other facilities across the United States.  *See* CoreCivic PREA Annual Report 2023 at 7, *available at* https://bit.ly/452MSlS. That it continued to "maintain and operate the property" or that it "pays its taxes"[2] does not mean it was *using* the property *as a detention facility*.  (Resp's Br. at 12.)  Anyone can build a jail in Leavenworth without first obtaining an SUP, but an SUP would be required before housing detainees in it. It is the actual use

---

[2] Upon information and belief, CoreCivic reduced its property tax payments to Leavenworth County by about half during the time it was not operating a detention facility. This seems inconsistent with the notion that the use of its property never changed; presumably this happened only at CoreCivic's insistence since it would be unusual for County Assessor to unilaterally drop a property assessment by that much. The City intends to explore this question in discovery.

of property, not whether its lights are being kept on, that dictates property's status under the City's Development Regulations.

*Union Quarries, Inc. v. Bd. of Cnty. Com'rs of Johnson Cnty.*, 206 Kan. 268, 478 P.2d 181 (1970), and *Vickers v. Franklin Cnty. Bd. of Commissioners*, 444 P.3d 380, 2019 WL 3242274 (Kan. Ct. App. 2019), are both readily distinguishable.  In both cases, the owners of rock quarries continued to sell rocks from their property during the alleged period of abandonment. *Vickers*, 2019 WL 3242274 at *8.  Here, CoreCivic stopped housing detainees altogether for over three years, and as the Kansas Court of Appeals noted in *Vickers,* a zoning ordinance's specification of the time after which a special use is deemed to be discontinued supplants any subjective questions about the property owner's intent. *Id.*  In short, CoreCivic's decision not to house detainees for over three years caused it to lose its grandfathered status and requires it to seek an SUP before housing detainees again.

### C.    The City did not violate CoreCivic's due process rights.

CoreCivic claims the City violated § 2.04.D of the Development Regulations and its due process rights because it did not provide CoreCivic with notice and a hearing prior to rescinding its special use designation.  But section 2.04.D does not apply here.  It applies only to *revocations* of special use permits or active grandfathered special uses. Here, the City administratively *rescinded* the special use designation due to abandonment under a different provision of the Code, § 2.04.C, which does not contain the notice-and-hearing requirements of § 2.04.D.  Once a special use is discontinued for 12 months, even the City Administrator may rescind the right to carry on the special use without notice or hearing. Here, the City Commission did so.

Due process also did not require the City to provide notice and a hearing.  Property rights may be deemed abandoned without notice and a hearing. *See Nigh v. Haas*, 139 Kan. 307, 31 P.2d 28, 28 syl. ¶ 1 (1934) (holding that due process did not require personal service of notice of

6

forfeiture of mineral rights following abandonment); *Hawley v. Kansas Dept. of Agric.*, 281 Kan. 603, 626, 132 P.3d 870, 886 (2006) (holding that no taking occurs when property is abandoned because the government is not required "to compensate the owner for the consequences of his own neglect.'"); *In re Dahn's Estate*, 204 Kan. 535, 535, 464 P.2d 238, 239 syl. ¶ 6 (1970) (homestead interest extinguished by abandonment); *Casco LLC v. McDonald's Real Estate Co.*, 666 Fed. Appx. 743, 755 (10th Cir. 2016) (easement extinguished by abandonment). CoreCivic was not entitled to notice and a hearing after ceasing its special use for three years because the Development Regulations placed it on notice already that its special use rights could be administratively rescinded at any time thereafter.

      **D.**      **The City's actions have not violated the Supremacy Clause, which in any event would be an affirmative defense for which CoreCivic bears the burden of proof.**

CoreCivic broadly claims that the City's efforts to regulate CoreCivic's use of its property would violate the Supremacy Clause of the United States Constitution. CoreCivic is simply wrong at a high level, and its asserted defense on this basis would not be ripe under the City either denies a permit altogether or issues one with conditions to which CoreCivic objects.

The primary doctrines at play here are the intergovernmental immunity doctrine and federal preemption. The first does not apply to CoreCivic because federal contractors do not stand on the same footing as the federal government itself. It is premature to apply the second doctrine because there is no way to know whether a particular action of the City is preempted until the City actually takes that action. The City will discuss each doctrine in turn.

      **1.**      **The intergovernmental immunity doctrine does not bar the City's claim that CoreCivic must have a special use permit.**

The intergovernmental immunity doctrine generally immunizes the federal government from state laws that directly regulate or discriminate against it. *United States v. Washington*, 596

U.S. 832, 835 (2022). But the doctrine does not apply with the same vigor to federal contractors, who are typically private businesses. Rather, especially when contractors such as CoreCivic are involved, the doctrine prohibits state laws that either "regulate the United States directly or discriminate against the Federal Government or those with whom it deals. *North Dakota v. United States*, 495 U.S. 423, 435 (1990).

The City's requirement that CoreCivic obtain a special use permit does not discriminate against CoreCivic on the basis that it is a federal contractor. Rather, the portion of the Development Regulations requiring a special use permit for any person wanting to use its property as a jail or prison applies without regard to whom the owner is contracting with. If CoreCivic wanted to use its facility to house pretrial detainees charged with state claims, and thus contract with local counties, it would need a special use permit. If CoreCivic wanted to use its facility to house a part of the state's prison population, it would need a special use permit. And it needs a special use permit to house ICE detainees. So the City's Development Regulations do not discriminate against CoreCivic based on the origins of its detainee population, and thus do not violate the intergovernmental immunity doctrine.

Even the Ninth Circuit case cited by CoreCivic makes clear that "[p]rivate contractors are not federal instrumentalities." *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 755 (9th Cir. 2022). "Private contractors do not stand on the same footing as the federal government, so states can impose many laws on federal contractors that they could not apply to the federal government itself." *Id.* at 750. "Absent federal law to the contrary, the Supremacy Clause therefore leaves considerable room for states to enforce their generally applicable laws against federal contractors." *Id.* at 755. A company's mere status as a federal contractor does not confer upon it total immunity from any state or municipal regulation. And indeed, such regulation is not prohibited even where

8

it has an indirect effect on the federal agency with which it is partnered. A state or municipality may enforce its statutes and regulations against federal contractors even where doing so would "increase the federal government's costs." *Id.* at 755.

Notably, the regulations here are fundamentally different from those in the immigration-related cases cited by CoreCivic. The statute at issue in *Geo Group* categorically prohibited the operation of private prisons in California, which would have made it impossible for ICE to use private contractors to detain illegal aliens in the state. *See* 50 F.4th at 752. Similarly, the statute at issue in *CoreCivic, Inc. v. Murphy*, 690 F. Supp. 3d 467 (D.N.J. 2023) prohibited both state and private prisons in New Jersey from contracting to provide detention services for ICE, which likewise operated as a complete ban on ICE using any contractors to house detainees in the state. *See id.* at 473

In these two cases, the state or municipal ordinance sought to *directly* regulate either immigration or the provision of private detention services to ICE and was enacted with that deliberate purpose. Here, in contrast, the City asks CoreCivic to comply with a zoning ordinance whose application does not depend on whom CoreCivic wishes to detain. It does not discriminate against either the federal government or its chosen contractor, so it does not violate the intergovernmental immunity doctrine.[3]

> ### 2.    Claims that the City's actions are preempted by federal law are premature.

The Court should reject CoreCivic's argument regarding preemption for similar reasons. Obviously, the federal government "has broad, undoubted power over the subject of immigration

---

[3] The case is likewise distinguishable from *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) because the City is not seeking to license who can serve as a government contractor; requiring CoreCivic to comply with the Development Regulations would not give the City *de facto* control over who ICE can hire as a contractor.

and the status of aliens." *Arizona v. U.S.*, 567 U.S. 387, 394 (2012). But that broad authority has never been held to operate as a complete preemption of any state or municipal statute or regulation that touches on immigration issues, and the Supreme Court has repeatedly upheld such laws against a preemption challenge. *See id.* at 414 (state statute requiring arresting officers to determine the immigration of individuals who are arrested not preempted); *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (state statute revoking the licenses of businesses that employ undocumented aliens not impliedly preempted); *id.* at 609-10 (state statute requiring employers to use the E-Verify program was not preempted).

This is particularly the case where the specific subject of the law that has incidental effects on immigration is one that falls within an area traditionally regulated by the states rather than the federal government. *See id.* at 605 ("Regulating in-state businesses through licensing laws has never been considered an area of dominant federal concern."). And as the Tenth Circuit has noted, zoning regulations have traditionally been treated as a state and local government issue by our federal system. *See Mount Olivet Cemetery Ass'n v. Salt Lake City*, 154 F.3d 480, 487 (10th Cir. 1998) ("Land use policy such as zoning customarily has been considered a feature of local government and an area in which the tenets of federalism are particularly strong."). Where states or municipalities are legislating within such traditionally local concerns, there is a strong presumption against preemption. *See Arizona*, 567 U.S. at 400 ("In preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'"), quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

Here, CoreCivic has presented no evidence that Congress had the "clear and manifest purpose" of assuming federal control over municipal land use regulation, either in general or

10

specifically with respect to facilities whose owners wish to use them as ICE detention facilities. It has not identified an applicable federal zoning code, for example, or pointed to any language in any federal statute prohibiting the application of municipal zoning regulations to private prisons whose owners seek to contract with ICE. CoreCivic's argument is not that these zoning questions are governed by federal law; it is that they are governed by *no law* whatsoever—that CoreCivic is a law unto itself, free to unilaterally reopen the facility solely because it wants to.

If credited, CoreCivic's argument would open the door would open the door to a kind of radical anarchy regarding federal contractors. Nothing about the logic of CoreCivic's argument is limited to the specific provisions of the Development Regulations at issue in this suit. By CoreCivic's logic, preemption or intergovernmental immunity shield it from *all* zoning laws. Given the Supreme Court's increasing deference to the notion that states are equal sovereigns in our constitutional order, CoreCivic's position is untenable.

Moreover, the fundamental premise of CoreCivic's argument – that requiring it to comply with the City's zoning process will impermissibly burden ICE's carrying out of its immigration-enforcement duties – is not well supported in CoreCivic's motion. Whether, and to what extent, compliance with the City's zoning process will impact ICE's operations is ultimately a factual question, and CoreCivic supplies no evidence to support its position. (And, of course, if it *did* provide such evidence, it would be outside the four corners of the City's petition and therefore not appropriately considered on a motion to dismiss for failure to state a claim under K.S.A. 60-212(b)(6).

The proposition that complying with the City's zoning process will adversely affect ICE is also almost certainly not true, as is evidenced by DHS's own regulations. The specific regulation that authorizes ICE to house detained aliens with private contractors like CoreCivic in fact *requires*

11

private contractors to comply with local "safety and emergency codes.". *See* 8 C.F.R. § 253.3(e)(2) (including "[c]onformance with safety and emergency codes" as one of the "four mandatory criteria for usage" applicable to private detention facilities). Indeed, the contract with ICE in *Nwauzor v. GEO Group, Inc.*, 127 F.4th 750, 757 (9th Cir. 2025) required GEO (CoreCivic's chief competitor in the private prison industry) "to comply with 'all applicable federal, state, and local laws and standards.'" CoreCivic has opted thus far not to disclose its contract with ICE to the City, but if it contains a similar provision, then CoreCivic's arguments will be wholly for naught.

## III.     A city's inability to enforce a valid ordinance is irreparable harm.

In general, a person's past conduct is the best guide to their future conduct. For this reason, past conduct can appropriately be considered when evaluating whether there is a future risk of harm. *See Tandy v. City of Wichita*, 380 F.3d 1277, 1289 (10th Cir. 2004). CoreCivic does not challenge the City's description of its history on this site or offer any evidence that history will not repeat itself. CoreCivic further does not challenge the City's position that a government's inability to enforce its own laws for the benefit of its own citizens is itself irreparable harm. *Maryland v. King*, 567 U.S. 1301, 1303 (2012). For that reason, the City will suffer irreparable harm if it is unable to enforce its Development Regulations regardless of how CoreCivic plans to operate.

## IV.     The City does not have an adequate remedy at law.

CoreCivil blithely asserts, without evidence, that the City is not entitled to an injunction because it has an adequate remedy at law in the form of monetary damages. CoreCivic's argument flies in the face of K.S.A. 12-761(c), which explicitly gives cities the right to injunctive relief to stop a threatened violation of their zoning ordinances.

CoreCivic offers the Court no means by which the City could measure its damages, casting further doubt on the credibility of its arguments. But the major problem is that if CoreCivic is

12

allowed to operate without a special use permit, the City will lack any method to enforce compliance with conditions that the City may impose to prevent or ameliorate the harm it sustained in the past. Moreover, without a permit, CoreCivic may impose untold costs on the City in the future with no end in sight. If the City were to sue CoreCivic to recover those costs, CoreCivic would likely argue that the City is not entitled to compensation for doing the things the City may otherwise be required to do anyway, such as respond to emergency calls, investigate crimes, and the like.

K.S.A. 12-761(c) is designed to prevent these kinds of disputes by enabling cities to prevent the unregulated use of property where such use, even if allowed in a particular zoning district, requires extraordinary attention by the City or poses a particular threat of harm to neighboring property owners. The statute presumes that cities do not have an adequate legal remedy when trying to stop threatened violations of its zoning ordinances.

## V.    The balance of harms favors the City.

CoreCivic's contentions about the harms it will allegedly suffer are supported only by a conclusory declaration. This is insufficient, as a party opposing a preliminary injunction must support its factual arguments with non-conclusory evidence. *See, e.g., Mercy Health Services-Inc. v. Efstratiadis*, 579 F. Supp. 3d 1096, 1115 (N.D. Iowa 2022).

But even taking CoreCivic's assertions at face value, they do not justify the denial of the City's motion. CoreCivic previously recognized that it would need a special use permit and was presumably incurring the same expenses *before* it inexplicably changed course. Moreover, any harms that flow from delay are self-inflicted. If CoreCivic had stuck with its original plan to seek a permit, the process would be over by now given the City Commission's plan to make a final decision by May 27, 2025. It is only CoreCivic's decision to proceed unilaterally that has caused

13

the delay of which it now complains. "When the harm to a defendant is self-inflicted, it is outweighed by the irreparable harm to the party seeking injunctive relief." *H.H. Franchising Systems, Inc. v. CareSmart Solutions, Inc.*, Case No. 1:21-cv-575, 2022 WL 4274278, at *6 (S.D. Ohio Sep. 15, 2022.)

CoreCivic's invocation of its property rights is of no consequence to this motion. Cities have an unquestioned right reasonably to regulate the use of property within their boundaries through zoning ordinances. To be sure, the Takings Clause does not make that right absolute but that would be another question for another case, not this one.

## VI.    The public interest favors a preliminary injunction.

The City asks only that CoreCivic follow the steps required by the City's Development Regulations before it begins housing detainees again. One of those steps is a public hearing at which the citizens of Leavenworth can voice their concerns one way or the other. If, as CoreCivic claims, opening the Facility will be an economic boon to the City, then this is a policy reason for issuing a permit that should be weighed by the Planning Commission and the City Commission; CoreCivic should make that case through the democratic processes specified in the Development Regulations. An order denying the City's motion would take this decision out of the hands of elected officials and place it with an unelected judge. It is hard to see how the public interest would be furthered by denying the democratic process an opportunity to work.

## VII.    The Court should not require an injunction bond.

The purpose of an injunction bond is to provide a source to pay for damages caused by a wrongfully issued preliminary injunction. *Universal Engraving, Inc. v. Duarte,* 519 F. Supp. 2d 1140, 1156 (D. Kan. 2007). CoreCivic has requested that the City be required to post an injunction bond that is tied to its claimed monthly gross revenues from the facility. This is plainly

14

inappropriate because it would create the potential for a windfall. According to its most recent 10-K, which the Court can access at https://bit.ly/3YJ5DHb, CoreCivic reported 2024 net income of $63.5 million on revenue of $1.958 billion—a profit margin of only 3.2%.

The City stands by its position that no injunction bond should be required here because of the City's status as a governmental entity. The Court has discretion to waive an injunction bond if the movant has substantial assets. *Id.* The City has available cash reserves of over $5,000,000, sufficient to cover any reasonable damages CoreCivic could claim for a wrongful injunction.

SPENCER FANE LLP

/s/ W. Joseph Hatley
David E. Waters          KS #20773
Caleb P. Phillips        KS #26226
6201 College Boulevard, Suite 500
Overland Park, KS 66211
(913) 345-8100 (telephone)
(913) 345-0736 (fascimile)
dwaters@spencerfane.com
cphillips@spencerfane.com

W. Joseph Hatley         KS #12929
Angus W. Dwyer           KS #26995
1000 Walnut, Suite 1400
Kansas City, MO 64106
(816) 474-8100 (telephone)
(816) 474-3216 (facsimile)
jhatley@spencerfane.com
adwyer@spencerfane.com

ATTORNEYS FOR PLAINTIFF CITY OF
LEAVENWORTH, KANSAS

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2025, I electronically filed the foregoing with the Clerk of Court utilizing this Court's electronic filing system, which will automatically transmit notice of the foregoing to all CM/ECF users.

/s/ W. Joseph Hatley_____

15

# EXHIBIT 7

ELECTRONICALLY FILED
2025 Jul 11 AM 11:29
CLERK OF THE LEAVENWORTH COUNTY DISTRICT COURT
CASE NUMBER: LV-2025-CV-000180
PII COMPLIANT



| | |
|---|---|
| **Court:** | Leavenworth County District Court |
| **Case Number:** | LV-2025-CV-000180 |
| **Case Title:** | City of Leavenworth, Kansas  vs. Corecivic, Inc, et al |
| **Type:** | ORD: Order Originated by Judge TEMPORARY INJUNCTION |

SO ORDERED,

/s/ Honorable John Bryant, District Court Judge

Electronically signed on 2025-07-11 11:29:18        page 1 of 7

**IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS**

CITY OF LEAVENWORTH, KANSAS,    )
              )
    **Plaintiff,**          )
              )
       **v.**          )
              )
CORECIVIC, INC., and       )
MISTY LYNN MACKEY,       )     **Case No. LV-2025-CV-000180**
              )
    **Defendants**.        )

## <u>TEMPORARY INJUNCTION</u>

Now on this 4th day of June 2025, the motion of the City of Leavenworth, Kansas (City) for a Temporary Injunction comes on for hearing. Plaintiff City of Leavenworth appears by counsel David E. Waters, W. Joseph Hatley and Caleb Phillips. Defendant CoreCivic, Inc. (CoreCivic) appears by counsel Taylor Concannon Hausmann and Sara A. Fevurly. There are no other appearances.

Before proceeding, the Court advised that it had reviewed the parties' briefing on the City's motion for temporary restraining order and temporary injunction, including the reply memorandum in support of its motion the City filed on June 3, 2025, and the exhibits attached to the parties' memoranda. Counsel for CoreCivic acknowledged receipt and review of the City's reply memorandum. Thereupon, the Court proceeded to hear argument from counsel. During the argument, counsel for the City provided the Court with the Declaration of Roberta Beier, attesting that the City has $5,295,616 available to satisfy any subsequent claim by CoreCivic that it has been wrongfully enjoined.  The court hereby incorporates all findings and decisions made on the record by reference herein.

After hearing argument and being otherwise fully advised in the premises, the Court finds, concludes, and orders as follows:

1

1.      In 2012, the City passed Ordinance No. 7911, amending the City's then-effective Development Regulations to, among other things, require a Special Use Permit to operate a "jail" or "prison." The current Development Regulations define "Jails and Prisons" as "[p]laces in which people are physically confined and, usually, deprived of a range of personal freedoms."

2.      It is undisputed that prior to and after the City's 2012 revisions to the Development Regulations, CoreCivic operated a "jail" or "prison," as those terms are defined by the Development Regulations, on its property at 100 Highway Terrace, located within the boundaries of the City and within Leavenworth County, including pursuant to a contract with the United States Department of Justice, United States Marshals Service.

3.      It is undisputed that when the City enacted the 2012 revisions to the Development Regulations, CoreCivic was not required  to obtain a special use permit because the use of its property as a "jail or prison" was "grandfathered" pursuant to Sect. 1.05.E.2 of the Development Regulations, which designated CoreCivic's property as "an existing special use and a lawful conforming use." Sect. 1.05.E.2 provides:

> *Status of existing legal uses designated as special uses*. Any existing legal use at the effective date of these development regulations which is designated as a special use by these development regulations shall be deemed as an existing special use and a lawful conforming use.

4.      Sect. 2.04.C of the City's Development Regulations provides that:

> ***Discontinuance of Violation of Permit Conditions***:  A Special Use Permit may be granted by and continued annually by the City Commission, City of Leavenworth, Kansas. The continuation of a Special Use Permit exists with the property as long as such Special Use Permit is used in accordance with its original intended and approved purpose and the annual SUP fee is paid. Any discontinuance of more than 12 months, violation of permit conditions, or failure to pay a fee may enable the City Commission to administratively rescind a special use permit.

5.      It is undisputed that in or around the end of 2021, following former President Biden's Executive Order prohibiting the Department of Justice from renewing contracts with

2

private prisons, that CoreCivic's contract with the U.S. Marshals Service expired and CoreCivic stopped housing detainees pursuant to that contract. It is also undisputed that CoreCivic has not housed any detainees at its property since 2022.

6.     The evidence before the Court reflects that during this time CoreCivic continued to employ individuals at the facility and engage in contract negotiations for detention services, including as a partner for U.S. Immigration and Customs Enforcement (ICE). According to CoreCivic's Vice President, Real Estate, Marcelo Ariola, CoreCivic has never "shuttered" its facility and it has no intent, and has never had any intent, to discontinue or abandon the use of CoreCivic's property as it had operated previously.  However, in the months leading up to the filing of this Petition, CoreCivic listed its status as "currently inactive" on its website.

7.     In 2024, CoreCivic began engaging in conversations with the City of Leavenworth about CoreCivic's opportunity to serve as a partner for ICE. On February 21, 2025, CoreCivic applied to the City for a special use permit.  Although CoreCivic agreed to apply for a special use permit to help facilitate these efforts, CoreCivic continues to maintain that a special use permit was not required because CoreCivic's use of its property as a detention center was "grandfathered" pursuant to Sect. 1.5.E.2, by which it was previously deemed at the time as "an existing special use and a lawful conforming use."

8.     The City scheduled a hearing before its Planning Commission for April 7, 2025, to consider CoreCivic's application, and then two hearings before its City Commission on May 13 and 27, 2025, respectively, for the City Commission to consider CoreCivic's application. On March 13, 2025, CoreCivic withdrew its application, now citing that its decision to do so was based on the parties' deteriorating relationship.  CoreCivic has maintained, and continues to maintain, that a special use permit was not required in order to continue operations as a detention

3

facility under a new contract with ICE and further that it never "abandoned" the facility as it is defined in the Developmental Regulations.

9.    On March 25, 2025, the City Commission passed and adopted Resolution No. B-2394 finding that CoreCivic had discontinued or abandoned the use of its property as a jail or prison on or about January 1, 2022, and that such use was, therefore, no longer a lawful nonconforming use under Sect. 1.05.D.8. The City Commission also found that to the extent the property could be deemed to have or to have had a special use permit or special use designation, that the City was administratively rescinding any and all special use permits or designations pursuant to Sect. 2.04.C. The City did not hold a public hearing, nor was it required to, on its decision to revoke or rescind CoreCivic's designation as a lawful conforming use or existing special use or consider evidence from CoreCivic.  While the use of the term "revoke" has been used loosely in this context, it is clear to the Court that the City acted administratively under Sect. 2.04.C.

10.    To the extent CoreCivic disagreed with the City's March 25, 2025, Resolution administratively rescinding CoreCivic's status as an existing special use, it can or should exhaust the administrative remedies under Chapter 12. CoreCivic has not yet done that, which the Court believes causes a procedural and jurisdictional problem.

11.    CoreCivic has taken the position that the administrative decision made by the City on March 25, 2025, is invalid and has no authoritative or binding effect on its ability to house inmates or detainees.

12.    The City has satisfied its burden to show its entitlement to a temporary injunction.

13.    Specifically, the City has shown that it is likely to succeed on the merits of Count II of its Amended Petition, which requests the Court enter a temporary injunction and permanent

4

injunction "prohibiting Defendants from housing any detainees in the Facility without applying for and obtaining a special use permit in accordance with the procedures set forth in the City's Development Regulations."

14.  The City administratively rescinded CoreCivic's grandfathered status under Sect. 2.04.C on March 25, 2025.  CoreCivic admitted that it had received notice of this decision on or about March 27, 2025.

15.  Because CoreCivic has no special use permit to operate a detention center, jail, or prison, the extraordinary relief of a temporary injunction is justified.

16.  The Court is satisfied that the City will suffer irreparable harm in the absence of a temporary injunction because CoreCivic currently has no permit to operate and the City must have the ability to regulate itself by enforcing its own laws.

17.  The Court is also satisfied that the City has no adequate legal remedy due to the extreme difficulty of measuring damages that will accrue in the future, based on events that must first come to pass before the scope of damages can be assessed.

18.  The Court also believes that the balance of harms in this case favors the City. While CoreCivic now has the ability to increase revenue that it has lacked since 2021, it also has had other remedies available to it in order to move this process further along toward a resolution.

19.  A temporary injunction also favors the public interest, because allowing CoreCivic to begin to house detainees without a proper determination on its permit status undermines the confidence and trust of the public in the City's ability to enforce its own regulations and ordinances.

5

20.    Finally, the Court is waiving any requirement that the City post an injunction bond for the reasons set forth by the City, namely, that the Court believes the City has the resources to pay should CoreCivic be awarded damages in the future.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED, that the motion of the City of Leavenworth, Kansas, for a temporary injunction is GRANTED. CoreCivic, Inc., is hereby temporarily enjoined, pending a full determination on the merits, from operating a jail or prison, as those terms are defined in the City Development Regulations, at its property located at 100 Highway Terrace, unless and until it obtains a Special Use Permit from the City of Leavenworth or it is otherwise expressly permitted to use the property for jail or prison purposes by this Court or another court of competent jurisdiction. The injunction shall be binding upon CoreCivic, Inc., its officers, agents, employees, and any person acting on behalf of or in concert with any such person or entity who receives actual notice of this order by personal service or otherwise.   This Journal Entry is filed over the objections of CoreCivic noted in Defendant CoreCivic, Inc.'s Opposition to Plaintiff's Motion to Settle Journal Entry filed June 27, 2025.

IT IS SO ORDERED.

6

# EXHIBIT 8

ELECTRONICALLY FILED
2025 Aug 15 PM 1:17
CLERK OF THE LEAVENWORTH COUNTY DISTRICT COURT
CASE NUMBER: LV-2025-CV-000180
PII COMPLIANT



**Court:**         Leavenworth County District Court

**Case Number:**   LV-2025-CV-000180

**Case Title:**    City of Leavenworth, Kansas  vs. Corecivic, Inc, et al

**Type:**          ORD: Order Originated by Judge COURT ORDER REGARDING STAY AND CONSOLIDATION

SO ORDERED,

/s/ Honorable John Bryant, District Court Judge

Electronically signed on 2025-08-15 13:17:18        page 1 of 5

**IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS**

| | |
|---|---|
| CITY OF LEAVENWORTH, KANSAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CORECIVIC, INC., and | ) |
| MISTY LYNN MACKEY, | )    Case No. LV-2025-CV-000180 |
| | ) |
| Defendants. | ) |

<u>**COURT ORDER REGARDING STAY AND CONSOLIDATION**</u>

Now on this 12th day of August 2025, the court on its own motion enters a stay on further decisions on pending motions.  Plaintiff is represented by counsel David E. Waters, W. Joseph Hatley and Caleb Phillips. Defendants are represented by counsel Taylor Concannon Hausmann and Sara A. Fevurly. There are no appearances.

MOTIONS PENDING

1. <u>Defendant CoreCivic, Inc.'s Motion to Dismiss</u>

   Defendant CoreCivic Inc.'s Motion to Dismiss the Amended Petition and Defendant CoreCivic, Inc.'s Memorandum in Support of Motion to Dismiss the Amended Petition filed July 7, 2025.   Memorandum in Opposition to CoreCivic, Inc. Motion to Dismiss filed by Plaintiff on July 16, 2025.  Defendant CoreCivic, Inc.'s Reply in Support of Its Moton to Dismiss filed July 25, 2025.  Arguments heard on August 6, 2025.

2. <u>Defendant Misty Mackey's Motion to Dismiss</u>

   Defendant Misty Mackey's Motion to Dismiss the Amended Petition and Defendant Misty Mackey's Memorandum in Support of the Motion to Dismiss the Amended Petition filed July 17, 2025.  Memorandum in Opposition to Defendant Misty Mackey's Motion to Dismiss filed by Plaintiff on July 24, 2025.  Defendant Mackey's Reply in

1

Support of Her Motion to Dismiss the Amended Petition filed on July 31, 2025.  Not currently set for argument.

3.  <u>Defendant CoreCivic, Inc.'s Motion to Suspend or Stay Enforcement of Temporary Injunction</u>

Defendant CoreCivic, Inc.'s Motion to Suspend or Stay the Enforcement of the Court's Order Temporarily Enjoining CoreCivic and Memorandum in Support filed July 23, 2025.  Memorandum in Opposition to CoreCivic, Inc. Motion to Stay Enforcement of Temporary Injunction filed July 30, 2025.  Defendant CoreCivic, Inc.'s Reply in Support of Its Motion to Suspend or Stay the Enforcement of the Court's Order Temporarily Enjoining CoreCivic filed August 6, 2025.  Not currently set for argument.

POSTURE OF THE CASE

The court heard arguments on August 6, 2025, regarding CoreCivic's Motion to Dismiss. During that hearing the court inquired of both parties whether it would be appropriate to consolidate this case with *CoreCivic, Inc. v. City of Leavenworth, Kansas, Leavenworth District Court Case*, LV-2025-CV-229 filed on July 8, 2025.  Further, the court inquired whether these matters should be stayed pending a decision by the Kansas appellate courts on Defendant CoreCivic's appeal of this court's decisions regarding the Temporary Injunction Order entered by the court on July 11, 2025.

Notice of that appeal was filed on July 18, 2025.  During argument on the Motion to Dismiss, Defendant CoreCivic, Inc., indicated that the appeal should be docketed shortly.  The court indicated to both parties that the court believed that the issues ruled on by the court in its decision to grant the Temporary Injunction seem to be very closely tied to the issues raised in the subsequent Motions (listed above) as well as those raised in LV-2025-CV-229.  The court opined

2

that they were so closely related that it would seem that any decision made by the appellate courts could not only directly affect the Temporary Injunction, but also, any subsequent rulings which are based on the decisions made by the court regarding the issuance of said Order.  The court gave the parties seven days to provide written opinions to the court on those issues.  Those written opinions have now been received and reviewed by the court.

Since that time, the court has received notice from Defendant CoreCivic, Inc., that on or about August 8, 2025, Defendant CoreCivic, Inc., filed Case No. 2:25-cv-2457 in the United States District Court for the District of Kansas.  (*CoreCivic, Inc., v. City of Leavenworth, Kansas, Mayor Holly Pittman, Mayor Pro Tem Nancy Bauder, Commissioners Griff Martin, Jermaine Wilson, and Edd Hingula, in their Official Capacities as Members of the Leavenworth City Commission*).  The argument raised in that Complaint is the same as arguments made in the cases pending before this court regarding the Supremacy Clause of Article VI of the United States Constitution.

CONCLUSION

The court believes that due to the pending appellate review and ongoing federal case, the court has no choice but to stay certain decisions pending the outcomes of those matters.  The legal issues in those matters overlap the issues pending before this court to such a degree as to make them unable to be parsed.  In fact, if Defendant is successful in the newly filed federal case, it would appear to make any decisions in this matter moot.  This decision by the court does not stay the enforcement of the Temporary Injunction Order, nor any other aspect of this proceeding until further Order of this court.

Regarding Defendant CoreCivic, Inc.'s Motion to Dismiss, the court believes that it can at least partially rule on this matter and a separate order will be forthcoming.  Regarding

3

Defendant Misty Mackey's Motion to Dismiss, the court believes that this matter could also be decided and directs the parties to either set the motion for argument or indicate whether argument is waived.  Regarding Defendant CoreCivic, Inc.'s Motion to Suspend or Stay Enforcement of Temporary Injunction, the court believes that issue is so directly tied to the issue pending in the Court of Appeals that the court will stay any decision on that motion.  If the parties are ready to set the case for a Case Management Conference, the court would direct them to contact the court for a date and time.  The court makes no determination regarding consolidation at this time.

IT IS SO ORDERED.

4

# EXHIBIT 9

ELECTRONICALLY FILED
2025 Aug 18 PM 12:11
CLERK OF THE LEAVENWORTH COUNTY DISTRICT COURT
CASE NUMBER: LV-2025-CV-000180
PII COMPLIANT



**Court:**          Leavenworth County District Court

**Case Number:**    LV-2025-CV-000180

**Case Title:**     City of Leavenworth, Kansas  vs. Corecivic, Inc, et al

**Type:**           ORD: Order Originated by Judge COURT ORDER REGARDING DEFENDANT CORECIVIC, INC.'S MOTION TO DISMISS AMENDED PETITION

SO ORDERED,

/s/ Honorable John Bryant, District Court Judge

Electronically signed on 2025-08-18 12:11:21          page 1 of 5

**IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS**

CITY OF LEAVENWORTH, KANSAS,    )
    )
    Plaintiff,    )
    )
    v.    )
    )
CORECIVIC, INC., and    )
MISTY LYNN MACKEY,    )    **Case No. LV-2025-CV-000180**
    )
    Defendants.    )

## COURT ORDER REGARDING DEFENDANT CORECIVIC, INC.'S MOTION TO DISMISS AMENDED PETITION

Now on this 6th day of August 2025, this matter comes before the court for argument on Defendant CoreCivic, Inc.'s Motion to Dismiss the Amended Petition filed July 7, 2025. Plaintiff appears by counsel David E. Waters and W. Joseph Hatley. Defendants appear by counsel Taylor Concannon Hausmann and Sara A. Fevurly.

On July 7, 2025, Defendant CoreCivic, Inc. (CoreCivic) filed Defendant CoreCivic Inc.'s Motion to Dismiss the Amended Petition and Defendant CoreCivic, Inc.'s Memorandum in Support of Motion to Dismiss the Amended Petition.   A Memorandum in Opposition to CoreCivic, Inc. Motion to Dismiss was filed by Plaintiff on July 16, 2025.  Defendant CoreCivic filed its Reply on July 25, 2025.  Arguments were heard on August 6, 2025.

The court believes that the issues surrounding Counts I and II of the Amended Petition are so closely related to those pending on appeal, that the court will stay its decision on those two counts pending a decision made by the Kansas appellate courts.  However, the court believes that the argument regarding Count IV – Public Nuisance can be decided as the court did not issue a Temporary Injunction regarding Count IV and therefore did not find that there was any likelihood of success on that count.  Count III against Defendant Mackey only is the subject of a separate motion.

1

STANDARD OF REVIEW

The court must assume as true all well-pleaded factual allegations and determine whether they plausibly give rise to an entitlement of relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible—not merely conceivable—on its face. *Id*. at 679-80; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In determining whether a complaint states a plausible claim for relief, the court draws on its judicial experience and common sense. *Iqbal*, 556 U.S. at 679. The court need not accept as true those allegations which state only legal conclusions. See *Id*.

The Plaintiff bears the burden of framing its claim with enough factual matter to suggest that it is entitled to relief.  A mere recital of a cause of action accompanied by conclusory statements is insufficient. See *Twombly*, 550 U.S. at 556.  A plaintiff makes a facially plausible claim by pleading factual content from which the court can reasonably infer that a defendant is liable for the alleged misconduct. *Iqbal*, 556 U.S. at 678. Plaintiff must show more than a sheer possibility that Defendants have acted unlawfully.  It is not enough to plead facts that are "merely consistent with" a defendant's liability. *Id.* (quoting *Twombly*, 550 U.S. at 557). A pleading which only contains labels and conclusions, a formulaic recitation of the elements of a cause of action, or naked assertions devoid of further factual enhancement will not stand. *Id*.  Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the pleading has alleged but has not shown that a plaintiff is entitled to relief. *Id.* at 679. In deciding a motion to dismiss for failure to state a claim, "the district court is required to assume that the facts alleged by the plaintiff are true. It is then required to draw any reasonable inferences from those facts and determine whether the facts and inferences state a claim, not only on the theory espoused by the plaintiffs, but on any possible theory the court can

2

divine. Under Kansas' notice pleading, a petition is not intended to govern the entire course of the case. Rather, the ultimate legal issues and theories on which the case will be decided are reduced to writing in the pretrial order, typically entered at the close of discovery." *Nungesser v. Bryant*, 283 Kan. 550, 559, 153 P.3d 1277 (2007).

## ANALYSIS

Plaintiff's Amended Petition filed June 2, 2025, goes to great lengths to paint Defendant CoreCivic in a negative light, going so far as to include a preamble containing Judge Robinson's opinion on the matter. However, there can be no question that as Defendant CoreCivic's facility currently sits, it is not a nuisance and Plaintiff pleads no facts that would portray it as such. Plaintiff makes three main arguments in this regard. First, that the prior conduct and failures by Defendant CoreCivic show proof to this court that it will constitute a nuisance if and when it begins housing detainees. Second, that operating in violation of the City's ordinances and regulations constitutes a nuisance. Third, if the court does not believe these two arguments, then the court could still save this count by considering any possible theory that could be drawn from these facts. Plaintiff fails on all three arguments.

Plaintiff argues that the case law supports not only enjoining a current nuisance but also supports enjoining future nuisances. Plaintiff takes a very broad view of the language in those cases. The court does not believe that is what the cases cited by Plaintiff stand for. The cases cited by Plaintiff take a commonsense approach that there is a right to enjoin a current nuisance and to prevent that nuisance from continuing to occur in the future. They do not stand for the proposition that a court may look into a crystal ball and speculate on a nuisance that could possibly occur at some point in the future. Defendant CoreCivic's prior record does not bode well, however, as noted by Defendant CoreCivic, the complained of conduct apparently occurred

3

only for a short period in the long history of that facility.  Further, if this conduct was so egregious as to warrant a nuisance finding based on the mere possibility of a recurrence, it seems remarkable to this court that Plaintiff chose to take no action whatsoever at the time the conduct was actually occurring.

For a similar reason, the court also decides against Plaintiff's argument that operation of the facility against the City's ordinances and regulations creates a nuisance.  The facility is currently not operating against the City's rules and has shown no intention to do so at this time. The court agrees with Defendant CoreCivic that while they are preparing to open the facility to house detainees at some point, it is mere speculation that they will do so contrary to any of the City's ordinances or regulations.

Finally, the court can find nothing in the facts as alleged that show there is any viable theory as to Count IV.  Defendant is correct that the arguments regarding this count are hypothetical and based on Plaintiff's speculation, not on facts that would support the claim.

CONCLUSION

The court stays its decision as to Counts I, II, and III, but HEREBY DISMISSES Count IV of the Amended Petition.


IT IS SO ORDERED.


4

# EXHIBIT 10

Case 129466   CLERK OF THE APPELLATE COURTS   Filed 2025 Sep 04 AM 8:58

25CV180

CASE NO. 129,466

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CITY OF LEAVENWORTH, KANSAS,
*Plaintiff-Appellee,*

v.

CORECIVIC, INC.,
*Defendant-Appellant,*

AND

MISTY LINN MACKEY,
*Defendant.*

ORDER

We deny Appellant's motion to suspend or stay the district court order. We note Appellee's response.

DATED: September 4, 2025.

FOR THE COURT

LORI BOLTON FLEMING, Presiding Judge

# EXHIBIT 11

25CV180

CASE NO. 129,466

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CITY OF LEAVENWORTH, KANSAS,
*Plaintiff-Appellee,*

v.

CORECIVIC, INC.,
*Defendant-Appellant,*

AND

MISTY LINN MACKEY,
*Defendant.*

ORDER

Given the nature of this appeal, the briefing schedule will be expedited. In the absence of a showing of exceptional circumstances, no extensions of time for filing briefs will be granted. The court will not consider heavy workload, alone, an exceptional circumstance.

DATED: September 4, 2025.

FOR THE COURT

LORI BOLTON FLEMING, Presiding Judge

# EXHIBIT 12

ELECTRONICALLY FILED
2025 Sep 08 PM 1:06
CLERK OF THE LEAVENWORTH COUNTY DISTRICT COURT
CASE NUMBER: LV-2025-CV-000180
PII COMPLIANT



**Court:**          Leavenworth County District Court

**Case Number:**    LV-2025-CV-000180

**Case Title:**     City of Leavenworth, Kansas  vs. Corecivic, Inc, et al

**Type:**           ORD: Order Originated by Judge Court Order Regarding Defendant Misty Mackey's Motion to Dismiss Amended Petition


SO ORDERED,


_____

/s/ Honorable John Bryant, District Court Judge


Electronically signed on 2025-09-08 13:06:11          page 1 of 5

**IN THE DISTRICT COURT OF LEAVENWORTH COUNTY, KANSAS**

| | |
|---|---|
| CITY OF LEAVENWORTH, KANSAS, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| CORECIVIC, INC., and | ) |
| MISTY LYNN MACKEY, | )    Case No. LV-2025-CV-000180 |
| | ) |
| **Defendants**. | ) |

## COURT ORDER REGARDING DEFENDANT MISTY MACKEY'S MOTION TO DISMISS AMENDED PETITION

Now on this 8th day of September 2025, this matter comes before the court for a decision on Defendant Misty Mackey's Motion to Dismiss the Amended Petition filed July 17, 2025. The parties have waived oral argument on this matter. There are no appearances. Plaintiff is represented by counsel David E. Waters and W. Joseph Hatley. Defendant Misty Lynn Mackey (Defendant Mackey) is represented by counsel Taylor Concannon Hausmann and Sara A. Fevurly.

On July 17, 2025, Defendant Mackey filed Defendant Misty Mackey's Motion to Dismiss Amended Petition along with a memorandum in support. On July 24, 2025, Plaintiff filed its Memorandum in Opposition to Defendant Misty Mackey's Motion to Dismiss.

STANDARD OF REVIEW

The court must assume as true all well-pleaded factual allegations and determine whether they plausibly give rise to an entitlement of relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible—not merely conceivable—on its face. *Id*. at 679-80; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In determining whether a complaint states a plausible claim

1

for relief, the court draws on its judicial experience and common sense. *Iqbal*, 556 U.S. at 679. The court need not accept as true those allegations which state only legal conclusions. See *Id*.

The Plaintiff bears the burden of framing its claim with enough factual matter to suggest that it is entitled to relief.  A mere recital of a cause of action accompanied by conclusory statements is insufficient. See *Twombly*, 550 U.S. at 556.  A plaintiff makes a facially plausible claim by pleading factual content from which the court can reasonably infer that a defendant is liable for the alleged misconduct. *Iqbal*, 556 U.S. at 678. Plaintiff must show more than a sheer possibility that Defendants have acted unlawfully.  It is not enough to plead facts that are "merely consistent with" a defendant's liability. *Id.* (quoting *Twombly*, 550 U.S. at 557). A pleading which only contains labels and conclusions, a formulaic recitation of the elements of a cause of action, or naked assertions devoid of further factual enhancement will not stand. *Id*.  Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the pleading has alleged but has not shown that a plaintiff is entitled to relief. *Id.* at 679. In deciding a motion to dismiss for failure to state a claim, "the district court is required to assume that the facts alleged by the plaintiff are true. It is then required to draw any reasonable inferences from those facts and determine whether the facts and inferences state a claim, not only on the theory espoused by the plaintiffs, but on any possible theory the court can divine. Under Kansas' notice pleading, a  petition is not intended to govern the entire course of the case. Rather, the ultimate legal issues and theories on which the case will be decided are reduced to writing in the pretrial order, typically entered at the close of discovery." *Nungesser v. Bryant*, 283 Kan. 550, 559, 153 P.3d 1277 (2007).

2

ANALYSIS

Plaintiff's First Amended Petition filed June 2, 2025, alleges one count against Defendant Mackey, Count III – Aiding and Abetting CoreCivic.  The factual allegations which Plaintiff alleges gives rise to Count III surround Defendant Mackey's plan to aid and abet CoreCivic to operate as a jail or prison for detainees without obtaining a special use permit.  Plaintiff acknowledges that Defendant Mackey is acting with "actual, implied, apparent, and specific authority" to take actions on behalf of Defendant CoreCivic.

The court questions whether Defendant Mackey is a necessary party to this action. Defendant CoreCivic, "its officers, agents, employees, and any person acting on behalf of or in concert with any such person or entity," are currently enjoined from taking any action to open the facility to house detainees by way of the Temporary Injunction.  Defendant Mackey has no authority to act outside of whatever authority is granted to her by Defendant CoreCivic. Defendant CoreCivic is not a "correctional institution" under K.S.A. 75-5202(d), therefore Defendant Mackey is a "warden" in name only.  Defendant Mackey does not meet the definition of "warden" under K.S.A. 75-5202(e).   Defendant Mackey has no authority to act without the permission of Defendant CoreCivic.

However, regardless of whether Defendant Mackey is a necessary party, the only specific actions Plaintiff alleges against Defendant Mackey are "Defendant Mackey's plan to use the Property for a jail or prison…without applying for a special use permit" and that "Defendant Mackey has knowledge of and will substantially assist in these … acts." It would seem that under no theory of the case or under any facts alleged, can Defendant Mackey operate the facility outside of the authority granted by Defendant CoreCivic.  It is not Defendant Mackey's plan to operate the Property for a jail or prison, it is Defendant CoreCivic's plan to do so.  There are no

3

facts set forth with specific regard to Defendant Mackey to illustrate how she will aid and abet

Defendant CoreCivic or how Defendant Mackey plans to aid and abet Defendant CoreCivic in

the future.  The facts as alleged in Count III – Aiding and Abetting CoreCivic are conclusory in

nature.

CONCLUSION

For the above reasons, the court HEREBY DISMISSES Count III of the Amended

Petition.


IT IS SO ORDERED.

4