UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CORECIVIC, INC.,

   Plaintiff,

v.                              Case No. 25-2457-TC

CITY OF LEAVENWORTH, KANSAS,    Topeka, Kansas
et al.,                         Date:  November 25, 2025

  Defendants.                   (Pages 1-62)
......................

TRANSCRIPT OF MOTIONS HEARING

BEFORE THE HONORABLE TOBY CROUSE
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:

Mr. Bradley D. Simon            Mr. Kyle M. Tanner
Mr. Thomas A. Kissane           Husch Blackwell, LLP
Schlam, Stone & Dolan, LLP      4801 Main Street
26 Broadway, 19th Floor         Suite 1000
New York, New York 10004        Kansas City, Missouri 64112

For the Defendants:

Mr. W. Joseph Hatley            Mr. David E. Waters
Spencer Fane, LLP               City Attorney, Leavenworth
1000 Walnut Street, Suite 1400  Spencer Fane, LLP
Kansas City, Missouri 64106     6201 College Blvd., Suite 500
                                Overland Park, Kansas 66211

For the United States of America:

Mr. Ryan A. Kriegshauser, United States Attorney
Mr. Christopher Allman
Mr. Bryan C. Clark
United States Attorney's Office
500 State Avenue
Suite 360
Kansas City, Kansas 66101

*** Proceedings recorded by machine shorthand, transcript produced by computer-aided transcription.***

(Called to order).

THE COURT:  Good afternoon, everyone.  We are here in Case No. 25-2457.

Counsel, please state your appearances for the record.

MR. SIMON:  Good afternoon, Your Honor.  Bradley Simon and Thomas Kissane for Plaintiffs CoreCivic.

THE COURT:  Good afternoon to you both.

MR. TANNER:  Your Honor, Kyle Tanner with Husch Blackwell.

THE COURT:  I'm sorry?

MR. TANNER:  Kyle Tanner with Husch Blackwell also for plaintiff.

THE COURT:  Good afternoon.

MR. HATLEY:  Good afternoon, Your Honor.  Joe Hatley on behalf of the defendants.

MR. WATERS:  And David Waters, city attorney for Leavenworth, on behalf of the city as well.

THE COURT:  Good afternoon to you both.

All right.  Counsel --

MR. KRIEGSHAUSER:  May it please the court.  Your Honor, Ryan Kriegshauser, United States Attorney, appearing on behalf of the United States with Assistant U.S. Attorney Chris Allman and Assistant U.S. Attorney Bryan Clark.

THE COURT:  I saw you guys entered your appearance, but I don't think you have a dog in this fight, do you?

MR. KRIEGSHAUSER:  We entered a statement of interest, Your Honor.  We have a special statute that allows us to appear on behalf of the United States when an interest of the United States is at issue and so we filed that statement.

THE COURT:  But you didn't -- you don't have an interest that's at issue in this case -- in this motions hearing; is that right?

MR. KRIEGSHAUSER:  We have an interest in the case generally that CoreCivic be open.

THE COURT:  I just looked at the docket sheet and you made no arguments other than Document 27, which is your statement of interest.

MR. KRIEGSHAUSER:  Correct.  Correct, Your Honor.

THE COURT:  Okay.  All right.

Okay.  So we are here today for the purpose of going over a couple of different pleadings.  I think when we got together last there was an issue relative to the request for a preliminary injunction.  I kind of anticipated there would be a motion to dismiss so we kind of set those on a briefing schedule that would be complementary to each other.  You all filed them.

The documents that I have relative to that, I just want to kind of confirm where we are status-wise and then I

want to talk to you about where I want to maybe direct this discussion.  The amended motion for preliminary injunction is Document 36.  The memo in support of that is Document 37. There is a memo in opposition, which is 39, and then a reply, which is Document 48.

And then relative to the motion to dismiss, the motion is Document 41, memo in support is Document 42, and the memo in opposition is 44, and the reply in support is 47.  I think that's the universe of documents.

Mr. Simon, do you agree?

MR. SIMON:  I think that's correct, Your Honor.

THE COURT:  Mr. Hatley?

MR. HATLEY:  Yes, Your Honor.

THE COURT:  Okay.  All right.  So what I would kind of like to do -- and, again, I kind of defer to you all.  You each filed your respective motions, but I have consumed all the information you provided to me and so I guess what I'm thinking is I might ask you some questions that came to me as we go through this.  But again, it's -- you all may have different thoughts.

So, Mr. Simon, how do you want to proceed?

MR. SIMON:  Your Honor, I'm happy to do it that way. If you want to ask us questions, that's a perfectly fine procedure for us.

THE COURT:  Okay.  And you don't anticipate, like,

calling witnesses or things -- my recollection is you just said no, because I was wondering, I had an hour blocked and I was, like, I don't think they want witnesses, but I just want to make sure.

MR. SIMON:  No, we don't intend to call witnesses.

THE COURT:  Perfect.  Thank you.

Mr. Hatley, your thoughts?

MR. HATLEY:  No witnesses, Your Honor.  I'm prepared to make an argument really as to both motions because there's a lot of overlap between them, especially in the likelihood of success, and motion to dismiss might bear on that.

THE COURT:  Okay.  So what I'm going to do is -- and I mentioned -- I know Mr. Kriegshauser is here, Document 27 is the government's statement in interest.  So I will note that.

Maybe before I get going, I guess my probable anticipation is that I would rule from the bench today because I anticipate that one side or the other is going to be pleased and then displeased with what I do.  So maybe to kind of govern our discussions or to constrain our discussions, I will kind of put forth the standard that I think applies to me in this hearing before we get going into those questions.

I noted at the outset that there are two motions at issue.  In one, CoreCivic seeks an entry of preliminary injunction.  Those are Documents 36 and 37.  And then the other, Leavenworth defendants seek dismissal, which is

Documents 42 and -- 41 and 42.

In essence, those motions — I think Mr. Hatley indicated — kind of turn on whether the allegations in the complaint make it likely that the plaintiff is going to succeed on the merits or whether they fail to state a claim.

Two separate standards kind of apply and I want to address them briefly.  First is a preliminary injunction standard, which is -- the Tenth Circuit has indicated is an extraordinary remedy with the limited purposes of preserving the relative positions of the parties until the trial on the merits can be held.

Under Rule 65 of the Rules of Civil Procedure, the party seeking the preliminary injunction must show four things:

One, that they are substantially likely to succeed on the merits of their claim;

Two, that they will suffer irreparable harm if the injunction is denied;

Three, their threatened injury without the injunction outweighs any harm to the party opposing the injunction;

And finally, the injunction, if issued, is not adverse to public interest.

That's a -- comes out of a Tenth Circuit case, *Harmon versus City of Norman*.

The preliminary injunction standard is -- the preliminary injunction relief itself is never awarded as a

matter of right.  Even a standard preliminary injunction, one that simply preserves the position of the parties pending resolution of the litigation, is extraordinary.

Those seeking to mandate specific action rather than prohibit it, in other words, change the status quo or grant all relief that the victorious movant could obtain if the trial were considered, are even more disfavored.

Movant seeking a disfavored injunction must make a strong showing that the likely success on the merits and the balance of harms tilt in their favor.  This heightened standard applies because the primary goal of the preliminary injunction is to preserve the pretrial status quo.  In applying that standard, courts should aim to minimize any injury that would not have occurred but for the court's intervention.

Skipping next to the request for dismissal that I think the City of Leavenworth, et al., has filed.  Rule 12(b) indicates that a federal district court may grant a motion to dismiss for failure to state a claim upon which relief may be granted.  In order to survive the motion to dismiss, the complaint need only contain a short and plain statement showing that the pleader is entitled to relief from each of the named defendants.

The Tenth Circuit has indicated and identified a couple of working principles that underlie that standard and set forth those in *Kansas Penn Gaming versus Collins*.

The first kind of principle is that a court must ignore legal conclusions, labels, and formulaic recitations of elements.  And the second thing is courts are to accept as true all remaining allegations and the logical inferences from those, asking whether the claimant has alleged facts that make his or her complaint plausible.

A claim need not be probable to be considered plausible.  But the facts when viewed in the light most favorable to the claimant must move the claim from conceivable to plausible.

As the court has noted frequently, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient. The complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for those claims.

Plausibility, of course, is context specific.  The requisite showing depends upon the claims alleged and the inquiry usually starts with determining what the plaintiff must prove at trial.  In other words, the nature and the complexity of the claims define what the plaintiff must plead.

With those concepts in mind, kind of capturing what we've got to do today, I thought I would maybe go through you all's pleadings and maybe just ask questions.  And if I get to talking to one side more than the other and the side that's

left out wants to say something, we can probably get to that at some point.

The first question I have, Mr. Simon, is my understanding is the relevant document that contains and captures your claims is Document No. 1, that's the complaint. And then it has four separate claims: the first being a violation of the Supremacy Clause; Counts 2 and 3 invoke a doctrine known as intergovernmental immunity which seeks -- or maybe the principle recognizes that inferior or other sovereigns can't either regulate or discriminate against the federal government's interest; and then the final one is what you labeled preemption.

I think those are kind of your four claims; is that fair?

MR. SIMON:  Yes, Your Honor.

THE COURT:  And my understanding of the defendants' claim, and I -- in reading and skipping ahead kind of to what your brief says, I think the defendants say that you can't bring a Supremacy Clause claim because the Supremacy Clause doesn't confer rights.  I think they say that you haven't sustained your burden under either the second or third, and then the fourth is more of a kind of a way to deal with conflicting claims that isn't an independent right in and of itself.

And so in response, as I read your response brief, you

have suggested that there may be a contracts cause of action and/or a due process cause of action.  Is that a -- maybe a fair characterization of what I perceive?

MR. SIMON:  Yes, Your Honor.

THE COURT:  All right.  And then let's talk about those last two at the outset.  You would agree with me that the parties -- that a party can't amend his or her complaint by way of a responsive brief.  If there's any amendment that would happen, it has to be done pursuant to Rule 15.  Fair?

MR. SIMON:  Through an amendment of the complaint, Your Honor?

THE COURT:  Right.

MR. SIMON:  Yes.

THE COURT:  Under the process of Rule 15.

MR. SIMON:  Yes.

THE COURT:  Yeah.  So for purposes of this hearing, you would agree that we could ignore those two categorizations of claims?

MR. SIMON:  The two categorizations of --

THE COURT:  The contract claim and the -- or the Contracts Clause claim and the perceived due process claim.

MR. SIMON:  No, I would disagree, Your Honor, because if you look at the four corners of the complaint --

THE COURT:  Well, I did and it's not in there.  If you were a pro se litigant I wouldn't consider it because it's not

in the complaint.  You assert the four claims which I mentioned to you and not -- neither of the Contracts Clause claim nor the due process claim is in there.

MR. SIMON:  Well, they're not in the specific claims, but they're in the text of the complaint.  We speak at length about the fact that our right to contract with the --

THE COURT:  Right.

MR. SIMON:  -- government --

THE COURT:  And I've read your complaint.  It leads to those four causes of action that you identify and it doesn't lead to the other two.  And we may disagree, but for our purposes I'm going to set those to the side because I don't think they've been properly pled.  Okay?

MR. SIMON:  Okay.  Well, if -- Your Honor, if -- in that case we would reserve the right to amend the complaint.

THE COURT:  And we can talk about that at the end of this hearing.

MR. SIMON:  Right.

THE COURT:  But I take your point.

Maybe the next question I have is, my recollection of -- and I didn't write down the prior case that we were here on, but your friends on the other side filed a claim against you all, and your colleague persuasively argued that I lacked subject-matter jurisdiction and that the proper procedure was to go to state court.

My recollection is the -- your friends on the other side followed that advice, filed suit in the Leavenworth County court over this zoning dispute, and now you're back here asking that I get involved.

Can you help me understand kind of what that process or thought process is?

MR. SIMON:  Well, Judge -- yes, Your Honor.  It became quite apparent to us that these are federal claims and should've remained in federal court.

THE COURT:  But that's not what you told me in the first lawsuit that I dismissed.  Right?

MR. SIMON:  Well, I -- I wasn't there, but yes, I understand.

THE COURT:  Your colleague -- your colleague made that argument and persuasively --

MR. SIMON:  Yes.

THE COURT:  Yeah.  Okay.

MR. SIMON:  However, it became apparent to us that these are federal actions that belong in federal court and that's why we filed the appropriate federal --

THE COURT:  Was there an intervening judicial decision or change in the law that caused you, CoreCivic, to take that position?

MR. SIMON:  No, there was not.

THE COURT:  And your chief complaint concerns the

document you attached to your complaint, Docket 1-1, which is Resolution No. B-2394.  Correct?

MR. SIMON:  Correct.

THE COURT:  And in that resolution the concern is whether or not your client is required under the local zoning rules to obtain a special use permit prior to operating a detention facility.  Right?

MR. SIMON:  Correct.

THE COURT:  I have a question -- well, we'll get to that in a bit.

All right.  Let's talk -- let's talk first about the likelihood of success on the merits.  And this kind of envelopes -- and I might want to hear from both sides on this. This kind of envelopes the defendants' position that -- as I understand the defendants' position, they claim that you have no likelihood of success because the Supremacy Clause doesn't give rise to a cause of action — and I think I mentioned this before — neither the discrimination nor regulation prong of the intergovernmental immunity analysis, which I think you guys reflect in the Ninth Circuit and Third Circuit cases apply, and then finally the preemption doctrine doesn't give rise to rights enforceable under Section 1983.

They also -- let's start there.  What's your -- I've read your memo in support of your request for injunction and your response in opposition to the motion to dismiss.  I take

it you concede that the Supremacy Clause gives you no enforceable rights under Section 1983?

MR. SIMON:  No, we don't concede that, Judge.  Even if you set aside the contract argument that we made which we just discussed --

THE COURT:  Okay.  Help me understand how you get around *Exceptional Child versus Armstrong*.

MR. SIMON:  I think, first of all, two reasons.  As contractors I think we -- the caselaw is quite clear that we have a cause of action as agents or contractors to the federal government with respect to the Supremacy Clause, with respect to intergovernmental immunity.

THE COURT:  Right, but that kind of -- the intergovernmental immunity -- kind of if you're looking at the doctrine, the Supremacy Clause exists, it doesn't give you rights.  The intergovernmental immunity doctrine is a concept that you are claiming rights under.  Does that make sense?  The distinction I'm trying to draw here?

MR. SIMON:  Well, no, because as contractors I think we do have a Supremacy Clause claim because --

THE COURT:  All right.  What's the case that you would rely upon for that?

MR. SIMON:  I would rely -- they're both not in this circuit, but at the Third Circuit, case of *CoreCivic v. New Jersey* and *Geo* in California.

THE COURT:  Right.  Those were the regulation and discrimination analyses that came under the intergovernmental immunity doctrine.  Right?

MR. SIMON:  Correct.

THE COURT:  Okay.  Okay.  Let's stay on the Supremacy Clause claim.  Mr. Hatley, any thoughts?

MR. SIMON:  Judge, may I -- may I finish my point?

THE COURT:  Yeah.

MR. SIMON:  There's also -- I'd ask the court to take a look at the *Green Leaf [sic]* v. Wyoming case, which is a Tenth Circuit case.  And the courts spoke about this and said in addition to the Supremacy Clause there is an equitable relief argument that can be made for -- in cases such as this.  That if the --

THE COURT:  Was that in your brief?

MR. SIMON:  I believe we cited *Green Leaf*.

THE COURT:  All right.  Shoot me to where that is, if you don't mind.

MR. SIMON:  One second, Your Honor.

THE COURT:  You're fine.

MR. SIMON:  Page 4 of our reply brief, Footnote 7.

THE COURT:  Which document?  I'm sorry.

MR. SIMON:  In the reply, preliminary injunction.  It's 49 -- 48.

THE COURT:  49.  Hang on here.  49?

MR. SIMON:  48.

THE COURT:  48.  There we go.  This is in footnote what?

MR. SIMON:  Footnote 7 I believe.  Is it 7?  Yes.

THE COURT:  Bear with me.

MR. SIMON:  And, Your Honor, I believe in the -- in the decision in Footnote 4 there was a long discussion of that principle.

THE COURT:  So I don't read that footnote or -- as suggesting that you have a cause of action under the Supremacy Clause.  I have -- I read that footnote to say that you have a cause of action to address -- or to seek equitable relief if there's unconstitutional conduct.

MR. SIMON:  Well, Your Honor, aren't we essentially talking about the same thing there?

THE COURT:  I don't think so.  I think -- my understanding is that you are asserting a cause of action conferred to you by the Supremacy Clause.  I think what that case is talking about is there is unconstitutional conduct on -- occurring and addresses whether or not a federal court has the equitable authority to enjoin that unconstitutional conduct.

MR. SIMON:  Well, that's exactly what we're asking the court to do.

THE COURT:  And so that my recollection -- or my

understanding — and, again, to be fair, I've just looked at this footnote — is it looks like the unconstitutional conduct arises separate from the Supremacy Clause.

MR. SIMON:  Well, Your Honor, you're right that it -- it may not address the Supremacy Clause, but the analysis is exactly -- it's the same -- the relief that we're seeking, we're claiming that this is an unconstitutional action by the City of Leavenworth and the --

THE COURT:  Yeah, I take that.  I guess I'm trying to identify the source of the right that you are asserting has been violated.  I know that's your general claim is that it's unconstitutional, but I've got to look down to figure out what that right is.  And your complaint asserts a violation of the Supremacy Clause and my reading of the *Armstrong* and *Exceptional Child* suggests that's not the case, so -- but we'll see what your friend on the other side has to say.

Mr. Hatley.

MR. HATLEY:  Your Honor, while the court was discussing that, I pulled up the *Green Room versus Wyoming* case.  Just a month ago out of the Tenth Circuit.  And the case says exactly what we've said in the brief; that rejecting a claim under the Supremacy Clause pursuant to Section 1983, the Tenth Circuit flat out says there is no such cause of action. So whatever the case may be -- what they say is nineteen eighty -- you have to have a right, not just the fact that a

law has been violated, you have to be able to assert a right that you have.

So the Tenth Circuit just last month rejected the very theory under which the plaintiff is proceeding.

THE COURT:  Okay.  On that Supremacy Clause, anything else, Mr. Simon?

MR. SIMON:  No, Your Honor.

THE COURT:  All right.  Let's talk next about your request for the discrimination and regulation.  I took a look at the cases that you cited and maybe have -- I'm curious to know why you think those cases are helpful to you here.

MR. SIMON:  I'm sorry.  Which cases in particular?

THE COURT:  I'm sorry.  Bear with me.  The *Geo Group versus Newsom*, that would be the 2022 Ninth Circuit case, and *CoreCivic, Inc., versus Governor of New Jersey*, that would be the 2025 Third Circuit case.

MR. SIMON:  And the question is why --

THE COURT:  Why do those cases help you here?

MR. SIMON:  Because they both involve contractors, CoreCivic and Geo --

THE COURT:  They do.

MR. SIMON:  -- who are asserting claims based on their inability to operate a detention center.  And the -- and the courts in both cases said that as contractors to the federal government, they -- the two contractors have a right with

respect to intergovernmental immunity to operate their facilities and they are -- they have as much right as the actual government themselves because they are contractors of the government and the government is being --

THE COURT:  Well, I think they said that they have less, but similar.  But yeah.

MR. SIMON:  And the government is being deprived of the opportunity -- of their right to manage immigration, which is a federal -- which is mandated by federal law.  And the -- and by taking these actions against the contractors, they are both interfering with the government operations and discriminating against the government.

THE COURT:  Correct.  And so tell me why you think the laws at issue in those cases are remotely similar to what's going on here.

MR. SIMON:  I think that they are remotely similar because in both cases -- in all these situations, an ordinance or a state law barred the contractor from operating a facility, immigration facility, notwithstanding the fact that the federal government had contracted with them and they -- and in each case the state ordinance or law obstructed federal operations.

THE COURT:  Yeah, so I'm looking at the *Newsom* decision, Assembly Bill 32, which states, "A person shall not operate a private detention facility within the state."  Right?

In the *CoreCivic* case, it was Assembly Bill 5207 which

bans the state, its local governments, and private parties from making, renewing, or extending any contract to detain people for civil immigration violations.

In contrast, the zoning regulations you told me earlier in this hearing is B-2394.  I see none of that disabling language.  It's what I think both *Newsom* and *CoreCivic* would indicate is traditional property regulation. How do you kind of bridge that gap?

MR. SIMON:  But the end result is the same.  All three ordinances have basically shut down an immigration detention center notwithstanding the federal government's jurisdiction and -- to operate these facilities.

THE COURT:  And as I read --

MR. SIMON:  And they have every right to engage in contracts with contractors to operate these facilities.  And the end result is the same in all three cases, the facility has been shut down.

THE COURT:  And as I read both the Third Circuit and Ninth Circuit case as well as the Supreme Court cases on which they were built, they draw a distinction between improper regulation and improper discrimination against federal interests and traditional exercise of sovereignty that a state or local municipality may have.  And so areas of traditional state interest of, I don't know, things like zoning and land use are typically not seen as discriminatory or regulating the

conduct, unlike what those rules are here.

So I'm just trying to -- what's your best argument? Except the result.  I mean, I take your point.  I mean, I get it.

MR. SIMON:  Well, Your Honor, since 1992 the -- CoreCivic has operated this facility.

THE COURT:  Right.

MR. SIMON:  The ordinance on which the resolution refers to was adopted in 2012.  And at no time did Leavenworth ever take issue with the fact that CoreCivic was operating without a special use permit, they acknowledged that they didn't need to do so.

THE COURT:  Because they were grandfathered in. Right?

MR. SIMON:  Grandfathered in.

Suddenly CoreCivic contracts with ICE to operate, use this facility as a ICE facility.  Notwithstanding the fact that it's been in operation the whole time, it didn't shut down --

THE COURT:  Well, I --

MR. SIMON:  -- the staff remained in place.  It was continuing -- it was continuing to function and be staffed, upkeep was made.  It didn't shut down.

THE COURT:  I noticed in your brief you mentioned there was a slight change I think is how you refer to it a couple of times, in that the Biden administration discontinued

the contract with CoreCivic.

MR. SIMON:  Right.

THE COURT:  And my understanding is the -- kind of the locus of the fight when you all first were in my court and that which you took to the district court in the state court in Kansas is whether or not there has been a change of use.  And my understanding is that change of use is currently in the state courts right now being litigated.  I think in your brief you indicated it was on appeal before the Kansas Court of Appeals.  Right?

MR. SIMON:  Yes.

THE COURT:  And so I guess my question -- I understand your procedural history.  My question gets to the controlling law that I have to apply.  And if your best argument is *Newsom* and *Governor of New Jersey,* I see a wide chasm between the laws at issue in those cases and the resolution you've got here.

So help me bridge that on a legal basis.

MR. SIMON:  Well, it's our position that the ordinance was enacted for a discriminatory purpose.

THE COURT:  In 1992?

MR. SIMON:  No, in --

THE COURT:  In 2012?

MR. SIMON:  -- 2025.  The resolution -- the resolution barring CoreCivic from contracting with ICE.  It was meant to basically shut down an ICE facility illegally in our position.

THE COURT:  And that's your argument in Leavenworth County.  Right?

MR. SIMON:  That is our argument.  And it's worth noting, as we noted in our papers, that Judge Bryant has basically welcomed a --

THE COURT:  We'll talk about that.

MR. SIMON:  -- resolution from your court.

THE COURT:  I may have a different point of view as to what he -- the words he used were, but we can talk about that later.

MR. SIMON:  Okay.

THE COURT:  Help me understand where you -- what's the best case that shows that a zoning/land use decision that you've just described would constitute either regulation or discrimination against federal interest?

MR. SIMON:  Because we -- they call it a zoning/land use regulation.

THE COURT:  I want to know the best case you've got because I'm controlled by that.  So that's -- help me find the legal authority that would be the strongest case for you.

MR. SIMON:  What we're arguing -- what we're saying to you, Judge, is that's really a subterfuge; that they don't want this facility to operate.  They've used that as a pretext to shut it down.

And we believe that it's discriminatory, it's

unconstitutional because this is a -- the U.S. government and CoreCivic has the right to operate that facility pursuant to federal law and they've shut it down and they've used a land use argument as a pretext when they could easily have made that argument from 2012 onward.  They didn't do so.  They only did it when -- within days of learning that CoreCivic had contracted with ICE.  Suddenly it became a land use issue.

It's the same land, the same use, but suddenly it became a land use issue that they decided to regulate.

THE COURT:  All right.  Let's talk next about your preemption claim.  What's your cause of action?  What's your -- what does that look like?  Like, I guess part of the problem is, as I understand the preemption doctrine, is it would, for lack of a better word, be a rule of decision as opposed to a rights-creating doctrine, if that makes sense.

MR. SIMON:  I'm not sure how you -- the way you phrased that, Judge.

THE COURT:  Well, so under 1983 in order to pursue a claim, you've got to have a right --

MR. SIMON:  Right.

THE COURT:  -- conferred either by the Constitution or a statute or some other federal law.  I don't -- I'm unaware of any authority that would indicate that preemption as a doctrine gives you rights that are enforceable under 1983.  Are you?

MR. SIMON:  Well, Your Honor, you know, our argument

was premised that we did have a cause of action under the contracts claim.  You've rejected that for purposes of our complaint.  This all could be easily cured by us amending the complaint which would -- you know, I think we can easily do and then your answers we would be readily -- your questions would be readily answered.

In light of your --

THE COURT:  All right.  But so hold on with that.  You would agree with me that the preemption clause -- or the preemption doctrine doesn't give rights that are enforceable under 1983?

MR. SIMON:  Under 1983?

THE COURT:  Yeah.

MR. SIMON:  Well, under the Supremacy Clause, the preemption, we -- I understand what you're saying, yes, Your Honor.

THE COURT:  All right.  Mr. Hatley, anything you would like to say in response?

MR. HATLEY:  No, Your Honor.

THE COURT:  Mr. Simon, I do have a question and I'm going to direct you to a particular document which is where I'm looking, so that will help you and I get to the same spot.

Document No. 44, which is your memo in opposition to the motion to dismiss at CM/ECF Page 14.  Take your time.

MR. SIMON:  Page 14, Your Honor?

THE COURT:  Yes, sir.  I think it's on your -- on what I would call a Word document Page No. 9, but the CM/ECF banner makes it 14, if that makes sense.

MR. SIMON:  I'm sorry.  If you could repeat what you just said.

THE COURT:  No problem.  So, like, I always look at the document number, the banner at the top, the CM/ECF, and it's Page 14 of Document 44.  But if you're looking at the page numbers that, like, Microsoft Word would put on it at the bottom, it's, like, Page 9.

MR. SIMON:  Okay.  Yes.

THE COURT:  And I want to direct your attention to the quote that I think you attribute to Judge Bryant.  My understanding from your brief was that Judge Bryant invited my consideration of this and wanted to know what I thought about it.  I don't read that language that way.

MR. SIMON:  Well, what he said is right there.

THE COURT:  That's why I'm asking you.  I don't read it that way, so what am I missing?

MR. SIMON:  It says, "If defendant is successful in the newly-filed federal case, it would appear to make any decision in this matter moot."

THE COURT:  Yeah, he's not asking for my help.

MR. SIMON:  I think he's -- what he did is he issued a temporary -- a partial stay to get your -- get your views and

your input on it.

THE COURT:  I read that as he is saying because you filed this in federal court, anything I do may make his matter moot, not that he's seeking that.

MR. SIMON:  Well, Your Honor, he -- you know, he could easily have issued a statement saying I don't really care what Judge Crouse or any federal judge said because I have jurisdiction.  He did not do that.  He basically issued a partial stay to see what your decision is or what your rendering was and then he -- before he took any further action.  He was not obliged to do that.  He decided he wanted to hear from you.  That's how we read this.

THE COURT:  You say, "He has invited this court to resolve the issues under federal law impacting the pending litigation in state court."

MR. SIMON:  Yes.  By issuing a partial stay, he's inviting this court to render a decision.

THE COURT:  I have a question about something I didn't understand.  It is in Document 37, which is plaintiff's memo in support of its motion for preliminary injunction.  It's on page -- CM/ECF Page 15.  It's the kind of block quote and description of the *Blue Circle Cement* case.

MR. SIMON:  What page are you on, Your Honor?

THE COURT:  Yes, sir.  15.  CM/ECF Page 15.

MR. SIMON:  Okay.  We're on Page 15.  Which section?

THE COURT:  It's the -- I guess the only full paragraph there, the *Blue Circle Cement* case, you have kind of an extended block quote relative to that.

MR. SIMON:  Uh-huh.

THE COURT:  And I guess my only question was I'm not -- I didn't pick up what -- I didn't understand necessarily what kind of you were -- what you were wanting me to know from that, if that makes sense.  It's just an absence of comprehension on my part.

MR. SIMON:  Just give me a second if you don't mind, Your Honor, to read.

THE COURT:  Yeah, you're fine.

MR. SIMON:  Judge, in looking at it very quickly, it appears to be a zoning case where -- similar to this where the -- I believe it's the Tenth Circuit indicated that such an ordinance, presumably in the ROM *[phonetic]* zoning, was still going to interfere with federal law.  And that's a quick glance of that -- at that page.  That's what it appears to say.

THE COURT:  Okay.  Mr. Hatley, any -- I don't want to leave you out.  Any response or thoughts relative to that?

MR. HATLEY:  The only point I would make, Your Honor, I think the *Blue Circle* case is something that may be relevant down the road.  If CoreCivic ever actually applies for a permit and the city places conditions that CoreCivic doesn't like, then we may get into some of the issues that were involved in

that case, but I think it's putting the cart before the horse.

And just to elaborate on that, the Tenth Circuit's objection with the ordinance in *Blue Circle* was that it allowed the county basically unfettered discretion without any standards to decide whether to grant or deny a permit.

And our point, again maybe down the road, is that the development regulations have standards under which the City Commission has to assess whether to issue a permit or not. They certainly have the authority to go into state court under K.S.A. 12-760 if they believe that the City Commission did not comply with those standards, but we're not there yet.

THE COURT:  At which point the preemption arguments would be germane, or might be.

MR. HATLEY:  *Blue Circle* would be certainly at that point.  But our point is that there are standards in the ordinance; that *Blue Circle* doesn't apply because of the standardless issue that the Tenth Circuit had.

THE COURT:  Okay.  The next little note I have is -- comes from the government's statement of interest that I think Mr. Hatley referenced, and that is the distinction between property and operations.  It's on the first page of the memo in opposition.

And I guess, Mr. Simon, I kind of have a note here to ask you.  That distinction drawn by your friends in the government seems to be what's going on here and seems to kind

of undermine your claims, and I wonder if you could help me understand why you think that's not the case.

MR. SIMON:  I don't have the statement of interest in front of me.  Could you just repeat that?

THE COURT:  I'm sorry.  Yeah, yeah.  So it's -- Mr. Hatley's memo in opposition to your request for preliminary injunction, which is Document No. 39, at which he quotes the government's statement of interest, which is Document No. 27 at Page 6, in which the government said — and I'm reading from Mr. Hatley's brief — so it says "...the Supreme Court has, from the beginning, distinguished between property of the federal government's contractors which the states may regulate on equal terms as other property and operations of the federal government and its contractors which states cannot regulate at all."

And Mr. Hatley's position is that those -- that distinction wins the day for him and I'm curious to know what your thoughts --

MR. SIMON:  I don't think that's what the government intended at all.  I think what they intended is exactly what they said, that --

THE COURT:  Well, they did say that, that's why I'm --

MR. SIMON:  But, yes, if it were strictly an ordinance regarding property, correct, but that's not what they're saying.  They're saying -- they're using -- they're obstructing

the government's operations at this particular location, at this property.  And that's what's impermissible.  I think that's what the government was saying.  Not that -- not that the City of Leavenworth can't in isolation have zoning -- you know, regulations regarding property, but in this particular case they're disrupting in a very big way federal operations at that property.

THE COURT:  Kind of in an as-applied world, you believe the City of Leavenworth is impermissibly utilizing its neutral zoning regulations to get an improper purpose.

MR. SIMON:  Correct.  And as I said before, if that was their motivation and if it were pure, they would've done it years ago and not within hours after a contract was entered into with ICE.

THE COURT:  Well, part of -- the reason I ask you about the *Blue Circle* is you dropped a footnote coming out of that *Blue Circle* case that indicated that the individual commissioner's subjective motivations weren't important.  And so that's kind of what I -- what I'm wondering here.

MR. SIMON:  Well, all I can say, Judge, is I don't have -- I don't take any issue with the statement in the government's statement of interest.  It's not -- this is not an issue of regulation of property.  What this is is a blatant attempt by the City of Leavenworth to interfere with the management of government operations, because that's what that

facility was being used for.

And they stepped in and they shut down government operations in a big way, causing a major disruption to the functioning of the U.S. government as well as CoreCivic's interest with respect to that property.

They've incurred substantial losses.  As we indicated, it's costing them approximately $2 million a month to operate this facility and it's -- and they've not been able to make it operational because of this ordinance.

THE COURT:  The other thing I wanted to note on that page is Footnote 1 where there has been a lot of briefing submitted and I've kind of talked to you all about page limits and adhering to them and I gave you an opportunity to comply with them.  And in response, you attached a variety of exhibits that, as best I can tell, were designed to get around those page limits.

And so I just want to make sure that our record is clear that I've declined -- expressly declined to rule upon those -- or to rely upon any information contained within those exhibits that were attached, including, for example, Mr. Simon, your affidavit which contains a large portion of legal arguments and additional matters that violate both the letter and the spirit of the local rules.

I do want to talk to you all -- I've got something else that is kind of interesting to me, and that is the concept

of irreparable harm.  CoreCivic I note identified the fact that courts frequently say that an ongoing constitutional violation typically is sufficient for irreparable harm, but I think -- I don't know whose brief this is.

The City of Leavenworth's brief indicates that when that harm is not to an individual but is more of a structural claim, that that rule doesn't apply.  I'm curious about that. Mr. -- I don't care who wants to talk about it, but I am curious as to what you all's thoughts are if you have any.

Mr. Hatley.

MR. SIMON:  Well, it's their argument.

THE COURT:  Sure.

MR. HATLEY:  Your Honor, that argument comes out of the Leachco case.  Leachco was a company that manufactured, as I recall, some product that was for babies and there had been a couple of infant deaths and they were being sued by the Consumer Product Safety Commission -- or actually being -- subject to a recall notice, to actually prohibit that product from being on the market.

So they decided to go on the offensive and they filed a suit in federal court I believe, somewhere in the Tenth Circuit, I think it was in Oklahoma, and claimed that the -- that there was a structural violation because the Consumer Product Safety Commission had -- the commissioners could only be terminated for cause, something that's currently before the

Supreme Court.

And the Tenth Circuit said claiming a structural violation of the Constitution like that is not irreparable harm for purposes of a preliminary injunction.  It's only individual rights, such as First Amendment violations, things of that nature, that can give rise to irreparable harm under the preliminary injunction analysis when we're talking about constitutional violations.

THE COURT:  Okay.  And, Mr. Simon, I didn't dig through your briefs to see if you tracked that argument.  Do you have thoughts relative to that position?

MR. SIMON:  In that case we argued that it actually -- it did effect -- it actually effected an injury.  So we took issue with his position that there was an injury as a result.

THE COURT:  Sorry, say that again one more time.

MR. SIMON:  As I read -- as I read what you're saying here, Judge, we're saying that the constitutional violation -- he's saying there was no actual injury, we're saying that there was.

THE COURT:  Yeah.  I take your point.  I guess what I'm wondering is -- how to say this.

My understanding is that Leachco also said that there were injuries, but the tool of levying those injuries in Leachco was a structural violation, which I take is your point as well.

And so what I'm wondering is (A) do you -- do you disagree with Mr. Hatley's description of Leachco and what it holds?  And (2) why do you not think that that — what I'll call the method of harm — applies to your case?  Does that make sense?  And if I didn't ask it clearly, I'll try to --

MR. SIMON:  I'm having a little trouble following the question.

THE COURT:  No, no, you're fine.  Make sure my microphone is on.

So I guess let's first see, do you agree with the -- that Leachco says that a plaintiff asserting an individual right that is caused by a structural violation does not get to enjoy the presumption of irreparable harm?  Just kind of as an understanding of the doctrine as set forth by Leachco, do you accept that?

MR. SIMON:  You know, I'd have to go back into the -- into the decision, so I can't say that right now.  All I know is we cited it for the proposition that there was an actual injury and not a structural injury.  I'd have to take ten minutes to review the decision in-depth to fully answer that question.  But I don't believe we're talking -- we're talking about a structural injury as opposed to a real injury.

THE COURT:  Well, I guess what I -- and the second point of my question was getting to what caused the injury.  Is it a structural harm, *i.e.*, violation of intergovernmental

immunity doctrine, or is instead it a deprivation of a right to be free of unreasonable seizure or a violation of the free speech?  In other words, those individual rights are typically where you would see the harm being presumed to be irreparable. Does that make sense?

MR. SIMON:  Yes.

THE COURT:  And have you maybe located a case that would say that the harms caused by your structural concerns always are or are presumed to be irreparable?

MR. SIMON:  Judge, it's hard for me to answer that because I'm not sure as I stand here whether -- I don't know that I want to accept the structural argument in sort of a vacuum, I'd need to look at that case a little further with respect to the particular question you're asking.

THE COURT:  Okay.  I have another question for you, Mr. Simon.  In the *Governor of New Jersey* case, I think the Third Circuit indicated that the modern doctrine of what I'll call intergovernmental immunity — and I forget whether it was dealing with discrimination or regulation there — says the following and I'd like your thoughts relative to it.  "In short, the modern doctrine distinguishes between laws that merely impose an incidental economic burden on the federal government and those that subvert federal operations."

And then it cites and it kind of addresses and works through kind of what those cases are.  And, again, there was a

dissent in the case and I take it that it's not a settled comment, but I wonder what your thoughts are as to that distinction and where and why you think your case lands on the subversion side.

MR. SIMON:  But, Your Honor, this is not just an incidental disruption, this is a major --

THE COURT:  Right.

MR. SIMON:  -- major disruption.

THE COURT:  And that's why -- like, talk through me -- I know that's your position, but talk through me why and what --

MR. SIMON:  Your Honor, the Midwest facility in Leavenworth is a major hub.  It's considered mission critical for immigration enforcement.  It houses detainees in Illinois, Indiana, a host of other states.  Without that facility being operational, ICE is being forced to move detainees hundreds of miles away, away from families, away from their support network, away from attorneys.  It's creating absolute chaos for the federal government in operating and enforcing their mandate to enforce the immigration laws.

THE COURT:  Okay.  And as I take the record, and I think your position is that if you had a special use permit you would be able to operate -- your client would be able to operate.  Fair?

MR. SIMON:  Correct.  The problem is this is a -- the

reason we're asking for a preliminary injunction or even a declaratory order is by the time that process played out, it could be years.  Already it's been -- you know, they shut it down in March and we're now almost at the end of the year and that facility has not been operational.  To go through the process which we've contended we're not required to do would wreak havoc on the federal government.

THE COURT:  If Governor Kelly called your client today and asked you to house state detainees, you would run into the same problem, wouldn't you?

MR. SIMON:  At that facility?

THE COURT:  Yeah.

MR. SIMON:  In light of the ordinance, yes.  We cannot operate it.

The resolution, Your Honor.

THE COURT:  Yeah, I took your -- the one that's attached to your --

MR. SIMON:  Yes.

THE COURT:  Yeah, I take that.

Bear with me.  Let me get my papers organized.

The Leavenworth folks raised the Anti-Injunction Act and made the argument that your request for a preliminary injunction seeks to enjoin the state court litigation.  And my understanding of your response to that is, well, we're also seeking declaratory relief.

So I guess (A) is that your position?  And (B) do you agree that at least your injunctive relief seeks to enjoin the state court litigation?

MR. SIMON:  Well, obviously we have the issue of your position regarding our contract claim, but as we read the -- as we read the Tenth Circuit case which indicates — the name escapes me at the moment — where 1983 actions are not subject to anti -- the anti-injunction statute.  So that was another argument that we made.

THE COURT:  Let's talk about that.  I saw that in your brief.  Do you have that off the top of your head where -- your argument made relative to that?

MR. SIMON:  One second, Your Honor.

THE COURT:  I think it's Document 37, around Page 18 and 19.  Actually, I may have misled you, I'm not -- no, maybe it is.  No.  I'm not entirely sure.  But I recall seeing it, but I wanted to -- if you can help me get to that, that would help me.

MR. SIMON:  Document 44 at Page 17.

THE COURT:  Hang on here.  Let me find that.

MR. SIMON:  And it's the first -- well, it would be the second paragraph.

THE COURT:  I think that's your response in opposition to the motion to dismiss.  Page what?

MR. SIMON:  Page 17 in the ECF.

THE COURT:  And you are citing -- thank you for that by the way.

MR. SIMON:  Uh-huh.

THE COURT:  You are citing the *CCMS Publishing Company versus Dooley-Maloof* case.

MR. SIMON:  And *Mitchum v. Foster.*  That was the case I was trying to -- the name I was trying to remember.

THE COURT:  Okay.  And your position is that 1983 always allows me to enjoin state court litigation?

MR. SIMON:  It's an exception to the Anti-Injunction Act, Your Honor.  That's our position.

THE COURT:  Yeah, talk to me about what the -- what's that exception look like in your world or in your point of view?

MR. SIMON:  In other words -- well, as you know, the Anti-Injunction Act is a -- is a federal statute which enjoins injunctions against state court proceedings.  In the *Mitchum* case, the court said we're not going to apply it in the 1983 arena because these are -- these are exclusively federal claims.  And that's how we read that decision.

THE COURT:  My understanding of the 1983 exception to the Anti-Injunction Act is that when the state court proceedings themselves are imposing the constitutional violation, that is the exception and that's the only limited narrow exception.

MR. SIMON:  Well, that's the *Hickey* case that Leavenworth cited, which is a Seventh Circuit case.  And that's the case where -- that's where we indicated that that would not -- that only applies -- in *Hickey* they drew a distinction between statutory claims under 1983 and constitutional claims and --

THE COURT:  Well, but I guess the -- I don't read this as a Seventh Circuit -- my understanding is this derives from the Supreme Court's decision in *Mitchum,* is that if the state court action itself is the violation, I can enjoin that ongoing constitutional violation; however, everything else precludes me from enjoining that state court litigation.

MR. SIMON:  That's not how we read that.  As I indicated, we believe there was a distinction made between statutory and constitutional and -- and that's what they meant when they said if the proceeding itself is unconstitutional.

THE COURT:  When you say "that's what they meant," what do you mean?  Who's "they"?

MR. SIMON:  The case cited by Leavenworth was the *Hickey* case, that's the only case that's in any of the briefing that makes that point.

THE COURT:  And you think the Tenth Circuit's law is different and that difference is the 1981 Tenth Circuit case, *CCMS*?

MR. SIMON:  I don't think what the Seventh Circuit --

that Seventh Circuit *Hickey* case is the law of the Tenth Circuit.

THE COURT:  Yeah, yeah, I take that.  But my point is you think there is a different rule that rejects the *Hickey* decision in the Tenth Circuit.

MR. SIMON:  I don't think there's any case that even speaks of the *Hickey* decision.  The *Hickey* decision is exclusively a Seventh Circuit decision.

THE COURT:  But the rule of law that it recognized, do you believe that it's applicable in the Tenth Circuit or not?

MR. SIMON:  I do not.

THE COURT:  Okay.  And you believe that a contrary rule exists under *CCMS Publication versus Dooley-Maloof*?

MR. SIMON:  Yes.

THE COURT:  Okay.  All right.  Let's put a pin in that and let's talk to your friend on the other side.

Mr. Hatley, what say you about that?

MR. HATLEY:  Your Honor, *CCMS* is a wholly different fact situation.  In *CCMS*, the plaintiff — I want to make sure I have my parties straight — had filed a suit in federal court and that suit went to judgment.

In an effort to basically hinder enforcement of the judgment, the federal court defendant then filed a state court suit in New York and the federal court in *CCMS* entered an injunction stopping that New York suit because there's a

different prong of the Anti-Injunction Act that says the federal court can enjoin a state court proceeding when it's necessary to protect their own judgments.

They said that the New York state court plaintiffs' claims should have been brought as compulsory counterclaims in the federal litigation and on that basis applied the Anti-Injunction Act.  It's a different prong of the Anti-Injunction Act, not the expressly authorized by Congress one.

THE COURT:  What of Mr. Simon's position that the Seventh Circuit case that you cited is a rule of law in the Seventh Circuit only?

MR. HATLEY:  I'm not aware of any case anywhere that has gone against that.  I don't know that that issue has specifically been addressed by the Tenth Circuit.  Not that it necessarily matters, but Judge Easterbrook, who's a highly respected federal judge, authored the decision in *Hickey* and I believe he has a lot of credibility on matters dealing with federalism, state court -- federal and state relations.  And it's a good rule.

The rule he's -- he's suggesting that 1983 creates an exception.  Your Honor, that creates an exception you could drive a truck through because any claim can be cast as a 1983 claim.  But as we've already pointed out, this isn't a 1983 claim anyway.  It can't be brought under 1983.  So it's kind of

beside the point.

THE COURT:  Why can it not be brought under 1983?

MR. HATLEY:  Well, for the reasons we've stated previously.  We have a Supremacy Clause claim that can't be brought under 1983.

MR. SIMON:  Your Honor, as I've indicated previously --

THE COURT:  Hang on here.

MR. SIMON:  All right.

THE COURT:  If, however, CoreCivic had a claim under the intergovernmental immunity doctrine, either discrimination or regulation, you would concede that those claims would be cognizable.  Now, whether they would survive or not is another matter, but they would at least be cognizable.  Right?

MR. HATLEY:  They might be cognizable, but then we'd start getting into abstention doctrines that we haven't talked about yet.

THE COURT:  Hang on here.  My computer went to sleep.

I'm sorry, Mr. Simon, I cut you off while I was talking to Mr. Hatley.  Go forth.

MR. SIMON:  Judge, Mr. Hatley just brought up the same point again.  And as I want to reiterate, that this issue in -- can be completely resolved with having leave to amend to correct the issue that you've raised with respect to the Contract Clause cause of action.  So I would ask that the court

hold off any ruling today and give us leave to amend we should be freely given under the Federal Rules of Civil Procedure.

MR. HATLEY:  I'd like to respond to that point, but I want to wait for the court to get the computer firmed up.

THE COURT:  Thank you.

Okay.  I'm sorry.  Where were we?  Somebody -- you wanted to say --

MR. HATLEY:  He's made I think an oral request to amend the complaint and I think under the court's local rules since we're outside the time for doing that, by right they have to attach a copy of the proposed amended complaint to the motion.  That may be subject to a futility argument.  So I think we'd need to comply with the local rule before that happens.

THE COURT:  Okay.

MR. SIMON:  We're happy to do that.  That's not an issue.

THE COURT:  I'm sorry?

MR. SIMON:  We're happy to do that, that's not an issue at all.  I would just ask you to hold off making a decision today so we have the opportunity to do that.

THE COURT:  Talk to me a little bit about the abstention concepts.  One of you mentioned abstention and I wanted to see what you all thought of that.  And I'm most interested in the *Colorado River* doctrine.

Mr. Hatley, what are your thoughts relative to abstention and how would that work and what remedy would that require?

MR. HATLEY:  I think, if memory serves me correctly, Your Honor, I think the only abstention doctrine that requires the court to stay rather than dismiss is *Pullman*.  *Colorado River* I think authorized dismissal.  And the point there is that -- of *Colorado River* is that federal courts are to either dismiss or stay a federal case that's covering the same substantive terrain as a pending earlier-filed state court case.

And what the courts are concerned about is the danger of piecemeal litigation, potentially inconsistent results, and that's especially pronounced here because the Supremacy Clause issue has been raised by CoreCivic as a defense to the city's action in state court.  And we attached I believe to our motion to dismiss the briefing that CoreCivic has filed with the Kansas Court of Appeals in which they argued the Supremacy Clause issue.

So I think there's a very real danger that if this court were to start issuing decisions on the Supremacy Clause issues, it puts it in conflict with a potentially pending decision from the Kansas Court of Appeals once that case is argued.  I think that's the heart of the *Colorado River* doctrine.

THE COURT:  And so to sum up your point, you -- or response, it would be:  *Colorado River* gives me discretion to either stay or dismiss at my option.

MR. HATLEY:  Correct.

THE COURT:  And which do you think is the appropriate one and why?

MR. HATLEY:  We believe dismissal would be the appropriate option because of the fact that the Supremacy Clause argument that is at the heart of their claim here is the very defense that's before the Kansas Court of Appeals that they're going to have to weigh in on.

And principles of federalism show us that state courts are perfectly capable of making decisions on issues relating to the federal constitution.  If they don't like the way that turns out, they can go to the Kansas Supreme Court.  And if they don't like that, they can apply for a cert for the Supreme Court.  That happens all the time.  State courts do weigh in on federal constitutional issues.

THE COURT:  Mr. Simon, your reaction to Mr. Hatley's --

MR. SIMON:  Well, it was raised as a defense, it wasn't a primary cause of action in the state court proceeding.

THE COURT:  That being the Supremacy Clause that he mentioned?  You say it was raised?

MR. SIMON:  As a defense.

THE COURT:  Right.  Being the Supremacy Clause issue?

MR. SIMON:  Yes.

THE COURT:  Yeah.  And what of his comment relative to (A) the applicability of *Colorado River* and (B) whether, if I find that it applies, a stay or a dismissal is the more appropriate venue and why?

MR. SIMON:  Well, first of all, all of these abstention doctrines with the exception of *Younger* are discretionary.  You're not mandated to adopt them.  And really I think the only prong of the *Colorado River* four prongs would be the danger of piecemeal litigation.  I don't see it here.

You and I may, Your Honor, disagree as to the exact language of Judge Bryant's text, but I think he is happy to await a decision by you, which is why he issued a partial stay. And if you are going to act on -- rely on *Colorado River*, I would ask that there not be a dismissal but a stay.

THE COURT:  And why -- and from a -- I get the end result, but help me on a doctrinal basis why that's the appropriate --

MR. SIMON:  Because I don't -- I don't think *Colorado River* provides a very strong basis for this court to dismiss this litigation.

THE COURT:  Spin that out just a little bit.  Like, what do you mean -- what do you mean it doesn't provide a --

MR. SIMON:  Because really Mr. Hatley argues that the

Supremacy Clause is being litigated in the state court.  It was raised as one of many defenses, it was not -- it's almost a secondary issue before the court in Leavenworth.  Here it is -- it is front and center of this litigation.  It's a federal issue, it belongs in federal court.

THE COURT:  But you could assert it in -- as an affirmative claim in state court.

MR. SIMON:  Well, it's been raised as a defense, not as an affirmative claim.

THE COURT:  But you could.

MR. SIMON:  We could, but being a supremacy -- because it's the Supremacy Clause of the U.S. Constitution, I think it makes sense for that issue to be litigated in a federal forum, which is this court.

MR. HATLEY:  Your Honor, may I -- one point I'd like to add to that.  I think actually the *Younger* doctrine is probably the one that mandates dismissal especially in these circumstances, because even if they amend it doesn't cure the problem.

The relief they're seeking is an injunction against the state court proceeding and *Younger* requires dismissal when there's an ongoing state proceeding and they're asking the federal court to unduly interfere with the state court's ability to enforce its orders.

We have a state court injunction in place.  Both the

district court and the Kansas Court of Appeals have denied motions to stay that injunction pending appeal.  So whether they bring a claim under the Contracts Clause or some other constitutional theory, we believe *Younger* is going to require the dismissal of that and it requires the dismissal now because of what they're seeking to do.

We have a state court injunction in place.  However you want to spin it, they're trying to keep the state court from being able to enforce that injunction, whether it's to prohibit us from going to the Kansas Court of Appeals and arguing the appeal or, more perniciously, end-around effectively directing the Kansas state courts not to enjoin CoreCivic.

MR. SIMON:  Your Honor, Mr. Hatley argues that you should dismiss under *Younger*.  We take a very different position.  It's our view that the Supreme Court -- U.S. Supreme Court has essentially eviscerated the *Younger* doctrine.

If you look at the *Sprint v. Jacob*s case and the language in that decision, they basically said that we -- we're of the view that *Younger* should be -- if it's going to be enforced at all should be used primarily in -- almost exclusively in criminal matters and not in civil cases.

And I believe *Sprint v. Jacob*s was a unanimous decision by the Supreme Court and they said -- and they said the federal court -- you know, federal judges have an

unflagging duty to decide federal issues that are before them. And I would submit that *Sprint v. Jacobs* has essentially been the death knell to the *Younger* abstention doctrine.

THE COURT:  Anything else you have, Mr. Simon or Mr. Hatley — I don't care who goes first — before I issue a decision?

MR. SIMON:  Well, Your Honor, again, I would ask you to hold off issuing a decision.  I think you've made it very clear that you are -- based on the drafting of the complaint in its current form, that you don't think there is a constitutional issue alleged in particular causes of action with respect to the impairment of contract under Article I, Section 10.

We'd ask for leave to amend.  And in my many years of litigating, in just about every case I've been in, there have been multiple amended complaints filed.  So this would be the first.  We'd ask that you -- respectfully ask that you hold off decision, allow us to make that motion to amend.  And I think almost all of the issues of concern that you've raised today will be -- will be put to rest with that filing.

So, again, I would implore the court to hold off any decision until we have that opportunity to make that -- file that amended complaint and to seek leave to make it.

THE COURT:  Mr. Hatley.

MR. HATLEY:  Your Honor, we believe the motion for

preliminary injunction should be denied because it is based upon a complaint that — as I understand CoreCivic's position — even it understands may not pass muster with the court.  If they wish to renew another motion for preliminary injunction after the court grants them leave to amend, assuming the court does that, they're certainly free to do so.

We would also ask that the motion to dismiss the pending complaint be granted for the reasons the court has stated.  There is no cause of action under 1983 for Supremacy Clause violations.  I think we need to do this to make sure we have our record clean.

If the court then wants to grant them leave to amend, the court can give them a certain amount of time within which to file a motion under Rule 15 for leave to amend, but we believe that would be procedurally the correct way to handle this.  Thank you.

MR. SIMON:  Your Honor, if you were contemplating dismissing the complaint, we'd ask that it be dismissed only as moot in contemplation of our filing a new amended complaint.

THE COURT:  Say that again.

MR. SIMON:  I'm sorry?

THE COURT:  Say that again.  I'm not sure I follow it.

MR. SIMON:  If the court is contemplating dismissing the complaint based on your -- your objections to the causes of action, we would ask that if you were to do so — and we -- and

we request that you don't — and the -- but if you do, it be dismissed as moot because -- in contemplation of CoreCivic filing an amended complaint.

MR. HATLEY:  I think they'd have to voluntarily dismiss in order to make it moot.

THE COURT:  Maybe, Mr. Simon, you're thinking that a pending motion to dismiss becomes moot once an amended complaint is filed.  Is that what you're thinking?

MR. SIMON:  Once it's filed, the earlier amendment -- earlier complaint would be moot.

THE COURT:  Well --

MR. SIMON:  I'd ask you to hold off.  But if you were somehow inclined to grant Mr. Hatley's request, I would ask that it -- that it would be declared moot and not dismissed on any other basis.

THE COURT:  All right.  Thank you all for making time for me today and answering kind of the questions that I had in mind.

I note that plaintiff CoreCivic filed this suit against the City of Leavenworth and other defendants alleging the city zoning laws violated their constitutional rights. It's Document No. 1.  CoreCivic filed a motion for preliminary injunction, which is Document No. 36, and the city filed a motion to dismiss, which is Document 41.

I've previously mentioned kind of the standards that

are applicable to my case and I guess I would break my ruling down into three kind of separate functions.  The first one is I find that the complaint fails to state a claim.  CoreCivic's complaint has not shown that it is substantially likely to succeed on the merits because it has not pled a valid claim.

In its complaint it alleges four counts in violation of 42, United States Code, Section 1983.  The first one being -- well, before I get there, the Supreme Court has recognized in *Albright versus Oliver* that Section 1983 is not in and of itself a source of substantive rights but merely provides a method for vindicating those rights elsewhere conferred.  CoreCivic's complaint fails because it fails to identify any of those rights that have been violated or plausibly violated.

First, relative to the Supremacy Clause, I think my discussion with Mr. Simon previously indicated his agreement with the concept that the Supremacy Clause is not a source of any federal rights.  It secures only the rights afforded in priority when there's a conflict between state and federal law.  And under both *Golden State Transit Corp. and the Exceptional Child* decision, I think everyone agrees that the Supremacy Clause doesn't state a claim.

CoreCivic also suggests that Leavenworth is either directly regulating or discriminating against federal interests, citing to the Third and Ninth Circuit cases where

those claims were discussed.  That claim fails because the entirety of this dispute, both the first time it was in my court and dismissed for lack of subject-matter jurisdiction at CoreCivic's request and then sent to state court and now, concerns the zoning issue of whether the property must have a special use permit under the local zoning code.

Regulating land use on an even and neutral basis is consistent with local governmental authority and does not purport to regulate or discriminate against any entity.  And I think, as Mr. Simon indicated, regardless of whether it was the federal government or the state government requesting his client's housing of detainees, they would still need the same permit.  That stands in stark contrast to the two circuit cases that CoreCivic champions where each of them had state laws passed banning private parties from making, renewing, or extending contracts or operating a private detention facility.

In its response the city's -- and then the preemption case -- preemption cause of action, I think as Mr. Simon candidly acknowledged, is not a right that would be enforceable under 1983.  But I do note that in its response to the city's motion to dismiss, CoreCivic notes that it seeks to vindicate its rights under the Contracts Clause of the federal constitution.

As I've previously indicated, that theory does not appear in CoreCivic's complaint.  Federal courts must assess

motions to dismiss based upon the legal sufficiency of the allegations contained within the four corners of the complaint and a plaintiff may not amend its complaint in its briefs in opposition to a Rule 12 motion, as recognized by countless Tenth Circuit decisions, including *Hayes versus Whitman* at 264 F.3d 1017, a Tenth Circuit decision.

CoreCivic does note in passing that the city's actions caused it to suffer violations of constitutional rights, including but not limited to contractual or statutory obligations, but there is no meaningful engagement with the Contract Clause or attempt to identify what the elements of such a claim would be.  And even assuming that I would look through that and consider the request for a Contracts Clause, it fails to plead a claim and would therefore be a futility issue.

I note that the Contracts Clause limits the power of states to modify their own contracts as well as to regulate those contracts between private parties as recognized by the U.S. Supreme Court in *United States Trust Corp. of New York versus New Jersey* at 431 U.S. at 18.

I note that that clause is aimed at the legislative power of the state and not at the decisions of its courts or the acts of administrative or executive boards or officers or the doings of corporations or individuals, consistent with *New Orleans Water-Works Company versus Louisiana Sugar Refining*

*Company,* 125 U.S. at 30.

To determine whether a state law has impaired contractual obligations, there's a three-part inquiry: whether there is a contractual relationship, whether the change in laws impairs that contractual relationship, and whether the impairment is substantial.  That's *Boyz Sanitation Service versus City of Rawlins*, 889 F.3d at 1195.

CoreCivic's complaint failed to plead the requisite elements of a Contracts Clause.  Although it does allege there is a contractual relationship, it does not allege that the change in law impaired that contractual relationship or that the impairment would be substantial.

To the contrary, CoreCivic alleges and has repeatedly argued that the city's municipal law, specifically Ordinance 7911, has prohibited private prisons since 2012 and that the operation of the prison was by a grandfathering process; that the resolution identified as B-2934, which was attached as Exhibit 1 to CoreCivic's complaint, was an administrative recision of CoreCivic's pre-existing non-conforming use, not a change in law.

Because those are the facts that CoreCivic has alleged and I don't believe there is reasonable likelihood of changing that, I find that the inquiry should stop there such that even if there had been a request, a proper request for an amended pleading, that it would be denied as futile.

Next relative to the request that they seek, the Anti-Injunction Act comes into play.  To the extent CoreCivic requests the injunction against enforcement of the activities of the District Court of Leavenworth County and assuming that CoreCivic were entitled to an injunction, that request would be barred by the Anti-Injunction Act.

That statute notes that a court of the United States may not grant an injunction to stay proceedings in a state court except as expressly authorized by an act of Congress or where necessary in aid of its jurisdiction or to protect or effectuate its judgments.  That's at 28, United States Code, Section 2283.

CoreCivic's request for that state court injunction should itself -- that it's -- the injunction itself should be enjoined is tantamount to a request that the state proceedings should be enjoined.  No argument has been made that the District of Kansas must enjoin the state court action in aid of its jurisdiction, and there is no judgment that has been issued that needs to be protected or effectuated.

CoreCivic does argue that it's not requesting a stay of those state proceedings but, rather, a stay of the injunction, but this request ignores that the state court action has been focused on the same subject matter as the instant case and the parties have made the same arguments in the state court action as they have here.

And I will note that the Tenth Circuit has rejected a similar argument that CoreCivic has made in *Quint versus Vail Resorts, Inc.*, 89 F.4th at 810, a 2023 decision.

CoreCivic also argues the Anti-Injunction Act is inapplicable here in light of the Section 1983 exception, but that case doesn't support the proposition that CoreCivic cites it for.  The Tenth Circuit did not hold in that case, that *CCMS* case we've previously talked about, that Congress has expressly authorized federal courts to enjoin state court proceedings when the federal cause of action arises under Section 1983.  As indicated, I think that the concept that it has to be related to the harm-causing activity is consistent with my understanding of how the Anti-Injunction Act would happen.

Next moving to abstention.  Even assuming CoreCivic had adequately pled a claim under any theory, the doctrine of *Colorado River* abstention would counsel against federal jurisdiction here.  I note, as Mr. Simon indicated, federal courts have a virtually unflagging obligation to exercise their jurisdiction.  But at times, as the court has further noted, the reasons of wise judicial administration must weigh in favor of permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding.

I note that *Younger* abstention provides federal courts must abstain from hearing cases in certain instances where there's a parallel state proceeding.  *Burford* abstention calls

for federal courts not to interfere with state administrative proceedings.  And another abstention doctrine holds that it is well-established that federal courts have the power to refrain from hearing, among other things, cases that are duplicative of pending state court matters.  And that doctrine is frequently referred to as the *Colorado River* abstention doctrine.

The *Colorado River* doctrine concerns itself with judicial efficiency and economy and its goal is to preserve judicial resources.  The Supreme Court set out four pertinent factors that courts should consider when employing the decision as to whether or not to abstain or not: first, whether the state or federal court first assumed jurisdiction over the same property; second, the inconvenience of the federal forum; third, the desirability of avoiding piecemeal litigation; and, fourth, the order in which jurisdiction was obtained by the concurrent forums.  That is the case known as *D.A. Osguthorpe Family Partnership versus ASC Utah,* 705 F.3d at 1234.

As in many cases involving the *Colorado River* doctrine, two of those factors are neutral — that being the first two — but the focus of most *Colorado River* cases is the third and the fourth factor.

I note that CoreCivic explains in its complaint the city's lawsuit in the District Court of Leavenworth is ongoing and that CoreCivic's appeal of that court's injunction in this matter is ongoing.  If the District of Kansas were to accept

jurisdiction in this case, the cases in the District Court of Leavenworth and the Kansas Court of Appeals would be rendered unnecessarily moot.  Given the desire to avoid piecemeal litigation, it is the paramount factor in the *Colorado River* doctrine that indicates abstention is proper here.

As noted, the Leavenworth County District Court obtained authority and started handling this case prior to CoreCivic coming to federal court.  Accordingly, the proper result is to dismiss consistent with the *D.A. Osguthorpe* decision.

I note that CoreCivic argues that *Colorado River* abstention is improper for a variety of reasons, in particular the fact that -- suggesting that the state court judge, John Bryant, invited federal jurisdiction in order to resolve that federal law.

I've read the same thing that we talked about and I'm quite confident he did not invite that federal jurisdiction. Judge Bryant merely observed that if CoreCivic is successful in the newly-filed matter, that would make any decisions he makes moot.

That comment is by no means an invitation for federal jurisdiction or federal intervention; rather, it's a description of what would happen and in my estimation is an example of comity and courtesy that I think Judge Bryant should be commended for.

CoreCivic has not shown that Judge Bryant has solicited federal jurisdiction such that *Colorado River* abstention is improper.  Indeed, it is curious to me that CoreCivic, having already successfully argued that federal jurisdiction is improper, would come back to federal court now seeking a contrary result.

So that is the end result of my resolution of the parties' pleadings.

Anything else, Mr. Simon?

MR. SIMON:  No.

THE COURT:  Mr. Hatley?

MR. HATLEY:  Nothing, Your Honor.

THE COURT:  All right.  Thank you all very much.

(Proceedings concluded).

* * *

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

December 1, 2025.

/s/ Kelli Stewart
KELLI STEWART, CSR, RPR, CRR, RMR
United States Court Reporter